UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BENJAMIN M. GAMORAN, derivatively on behalf
of the nominal defendant with respect to its
series mutual fund, the Neuberger Berman
International Fund,

Plaintiff,

- against -

NEUBERGER BERMAN MANAGEMENT LLC, *et al.*,

Defendants,

- and -

NEUBERGER BERMAN EQUITY FUNDS d/b/a
NEUBERGER BERMAN INTERNATIONAL FUND,

Nominal
Defendant.

11 Civ. 7957 (TPG) (KNF)

ECF Case

---

## MEMORANDUM OF LAW IN SUPPORT OF THE INVESTMENT ADVISOR DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

James N. Benedict
Alan J. Stone
Douglas W. Henkin
Mia C. Korot
MILBANK, TWEED, HADLEY & McCLOY LLP
One Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

Attorneys for Defendants Neuberger Berman
Management LLC, Neuberger Berman LLC,
Benjamin Segal, Peter E. Sundman, and Jack L.
Rivkin

## <u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

GLOSSARY OF DEFINED TERMS ......................................................................... ii

TABLE OF AUTHORITIES ................................................................................. iv

PRELIMINARY STATEMENT .............................................................................. 1

BACKGROUND AND RELATED ACTIONS ........................................................... 2

STATEMENT OF FACTS ...................................................................................... 4

ARGUMENT ........................................................................................................ 6

I.  STANDARD OF REVIEW AND CHOICE OF LAW ........................................... 6

II.  THE COMPLAINT FAILS TO STATE A CLAIM ............................................. 7

    A.  The Fund's Ownership Of NETeller And 888 Stock Was Not Illegal .................. 7

        1.  The Fund's Investments Did Not Violate § 1955 ...................................... 7

        2.  The Fund's Investments Did Not Violate New York Law ...................... 15

        3.  The Fund's Investments Did Not Violate Delaware Law ........................ 16

        4.  Plaintiff's Claims Regarding Violations Of State Law Are Barred
           By The Dormant Commerce Clause ...................................................... 17

        5.  Even If Defendants' Alleged Activities Could Be Deemed To
           Have Violated Federal Or State Law, They Would Not Constitute
           Negligence *Per Se* ............................................................................ 18

    B.  The Complaint Fails To Allege RICO Claims .................................................. 21

        1.  Plaintiff Does Not Plead Any Predicate Acts ........................................ 21

        2.  Plaintiff Cannot Establish RICO Proximate Cause ............................... 21

        3.  There Are Additional Reasons The RICO Claims Fail ........................... 22

    C.  The Claims Are Time-Barred ......................................................................... 22

    D.  Plaintiff's Claims For Breach Of Fiduciary Duty And Negligence Must Be
        Dismissed ...................................................................................................... 24

        1.  Plaintiff Has Not Alleged That Defendants Acted In "Bad Faith" ........... 25

        2.  The Complaint Does Not Plead Gross Negligence ................................. 27

        3.  Plaintiff Cannot State A Claim for Breach Of Fiduciary Duty
           Against The Investment Advisor Defendants ........................................ 30

    E.  The Complaint Fails To State A Claim For Waste .............................................. 30

CONCLUSION .................................................................................................... 32

<div align="center">i</div>

## GLOSSARY OF DEFINED TERMS

| | |
|---|---|
| 888 | 888 Holdings plc |
| DOJ | United States Department of Justice |
| Fund | Nominal defendant Neuberger Berman Equity Funds d/b/a Neuberger Berman International Fund |
| *Gamoran I* | *Gamoran v. Neuberger Berman Management LLC*, No. 08 Civ. 10807 (DLC) (S.D.N.Y.) |
| *Gamoran I* Stipulation | Stipulation and Order for Voluntary Dismissal, *Gamoran v. Neuberger Berman Management LLC*, No. 08 Civ. 10807 (DLC) (S.D.N.Y.) (Exhibit A to the Henkin Declaration) |
| *Gamoran II* | *Gamoran v. Neuberger Berman Management LLC*, No. 10 Civ. 6234 (LBS) (S.D.N.Y.) |
| *Gamoran III* | *Gamoran v. Neuberger Berman Management LLC*, No. 11 Civ. 7957 (TPG) (S.D.N.Y.) |
| Henkin Declaration or Henkin Decl. | Declaration of Douglas W. Henkin in Support of the Investment Advisor Defendants' Motion to Dismiss the Complaint, dated December 8, 2011 |
| Investment Advisor Defendants | Defendants NB, NBM, Benjamin Segal, Milu E. Komer, Peter E. Sundman, and Jack L. Rivkin |
| LSE | London Stock Exchange |
| Management Agreement | Management Agreement, dated November 3, 2003, between the Fund and NBM (Exhibit B to the Henkin Declaration) |
| NB | Defendant Neuberger Berman, LLC |
| NBM | Defendant Neuberger Berman Management LLC |
| NETeller | NETeller plc |

| | |
|---|---|
| OCCA | Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 941 (1970) |
| RICO | Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq*. |
| SDNY | United States District Court for the Southern District of New York |
| SEC | United States Securities and Exchange Commission |
| Trust Agreement | Amended and Restated Trust Agreement, dated December 14, 2005 (Exhibit C to the Henkin Declaration) |
| Trustees | Defendants Peter E. Sundman, Jack L. Rivkin, John Cannon, Faith Colish, Martha C. Goss, C. Anne Harvey, Robert A. Kavesh, Howard A. Mileaf, Edward I. O'Brien, William E. Rulon, Cornelius T. Ryan, Tom D. Seip, Candace L. Straight, and Peter P. Trapp |

# TABLE OF AUTHORITIES

Page(s)

CASES

*Alexander v. Sandoval,*
    532 U.S. 275 (2001)...............................................................................................20

*Am. Booksellers Found. v. Dean,*
    342 F.3d 96 (2d Cir. 2003)....................................................................................18

*Arnold v. Petland, Inc.,*
    No. 2:07-cv-01307, 2010 WL 2301194 (S.D. Ohio Jun. 4, 2010)..........................23

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009)..............................................................................7, 16, 28, 30

*Attorney Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.,*
    268 F.3d 103 (2d Cir. 2001)...................................................................................11

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)...............................................................................................31

*Brehm v. Eisner,*
    746 A.2d 244 (Del. 2000) ......................................................................................31

*Broder v. Cablevision Sys. Corp.,*
    418 F.3d 187 (2d Cir. 2005)...................................................................................20

*Burns Jackson Miller Summit & Spitzer v. Lindner,*
    59 N.Y.2d 314 (N.Y. 1983) ...................................................................................21

*Cede & Co. v. Technicolor, Inc.,*
    734 A.2d 345 (Del. 1993) ......................................................................................24

*Del. Elec. Coop. v. Duphily,*
    703 A.2d 1202 (Del. 1997) ....................................................................................19

*Dole v. United Steelworkers of Am.,*
    494 U.S. 26 (1990).................................................................................................10

*Elliott Assocs. v. Porsche Automobil Holding SE,*
    Nos. 10 Civ 0532 & 10 Civ. 4155 (HJB),
    (S.D.N.Y. Dec. 30, 2010) ......................................................................................14

*Gamoran v. Neuberger Berman Mgmt., LLC,*
    10 Civ. 6234, 2010 U.S. Dist. LEXIS 119696 (S.D.N.Y. Nov. 8, 2010) ..................3

*Gamoran v. Neuberger Berman Mgmt., LLC*,
  10 Civ. 6234, 2011 U.S. Dist. LEXIS 17939 (S.D.N.Y. Feb. 9, 2011) ....................................3

*Gustafson v. Alloyd Co., Inc.*,
  513 U.S. 561 (1995)....................................................................................................10

*Hartsel v. Vanguard Grp., Inc.*,
  C.A. No. 5394, 2011 Del. Ch. LEXIS 89 (Del. Ch. June 15, 2011)...................................4, 22

*Hausman v. Buckley*,
  299 F.2d 696 (2d Cir. 1962)........................................................................................8

*Hecht v. Commerce Clearing House, Inc.*,
  897 F.2d 21 (2d Cir. 1990).........................................................................................22

*Hirsch v. Arthur Andersen & Co.*,
  72 F.3d 1085 (2d Cir. 1995)........................................................................................7

*In re Am. Express Co. S'holder Litig.*,
  39 F.3d 395 (2d Cir. 1994).........................................................................................7

*In re Bendectin Litig.*,
  857 F.2d 290 (6th Cir. 1988), *cert. denied*, 488 U.S. 1006 (1989).........................................20

*In re Citigroup Inc. S'holder Derivative Litig.*,
  964 A.2d 106 (Del. Ch. 2009)................................................................................ passim

*In re Lear Corp. S'holder Litig.*,
  967 A.2d 640 (Del. Ch. 2008)...................................................................................28, 31

*In re Walt Disney Co. Derivative Litig.*,
  906 A.2d 27 (Del. 2006) .........................................................................................25, 26

*Jaghory v. N.Y. State Dep't of Educ.*,
  131 F.3d 326 (2d Cir. 1997)........................................................................................7

*Johnson v. United States*,
  130 S. Ct. 1265 (2010).............................................................................................10

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*,
  8 F.3d 130 (2d Cir. 1993) ..........................................................................................11

*Kaufman v. C.L. McCabe & Sons, Inc.*,
  603 A.2d 831 (Del. 1992) ..........................................................................................23

*LAMPERS v. Blankfein*,
  No. 08 Civ. 7605 (LBS), 2009 U.S. Dist. LEXIS 42852 (S.D.N.Y. May 19, 2009).............25

*Lasavoy v. Lane*,
   304 F. Supp. 2d 520 (S.D.N.Y. 2004)..................................................................7

*Lerner v. Fleet Bank*, *N.A.*,
   318 F.3d 113 (2d Cir. 2003).............................................................................22

*Mark G. v. Sabol*,
   717 N.E.2d 1067 (N.Y. 1999)...........................................................................19

*McBoyle v. United States*,
   283 U.S. 25 (1931)............................................................................................9

*McBrearty v. Vanguard Grp., Inc.*,
   No. 08 Civ. 7650 (DLC), 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *aff'd*, No. 09-
   1445-cv (2d Cir. Nov. 23, 2009), *cert. denied*, 130 S. Ct. 3411 (2010) ......................... passim

*Meyer v. Holley*,
   537 U.S. 280 (2003)........................................................................................11

*Microsoft Corp. v. AT&T Corp.*,
   550 U.S. 437 (2007)........................................................................................14

*Morrison v. Nat'l Austl. Bank*,
   130 S. Ct. 2869 (2010)..........................................................................14, 15, 19

*Mozes v. Welch*,
   638 F. Supp. 215 (D. Conn. 1986).....................................................................1

*Nat'l Football League v. Governor of the State of Del.*,
   435 F. Supp. 1372 (D. Del. 1977).....................................................................21

*Nemec v. Shrader*,
   991 A.2d 1120 (Del. 2010) ...............................................................................30

*Nicholson v. S. Oaks Hosp.*,
   811 N.Y.S.2d 770 (N.Y. App. Div. 2006) ..........................................................19

*Norex Petroleum Ltd. v. Access Indus. Inc.*,
   631 F.3d 29 (2d Cir. 2010) (*per curiam*) ............................................................15

*People v. Brown*,
   447 N.Y.S.2d 129 (N.Y. Crim. Ct. 1982) ..........................................................17

*People v. Byrne*,
   77 N.Y.2d 460 (N.Y. 1991) ...............................................................................12

*People v. Shing*,
   371 N.Y.S.2d 322 (N.Y. Crim. Ct. 1975) .....................................................16, 17

*People v. World Interactive Gaming Corp.*,
   714 N.Y.S.2d 844 (N.Y. Sup. Ct. 1999) ............................................................17, 27

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*,
   08 Civ. 1958 (JGK), 2010 U.S. Dist. LEXIS 105720 (S.D.N.Y. Oct. 1, 2010) ..........12, 14, 18

*Rewis v. United States*,
   401 U.S. 808 (1971)..............................................................................................12

*Scottrade, Inc. v. BroCo Inv., Inc.*,
   774 F. Supp. 2d 573 (S.D.N.Y. 2011)..................................................................13

*Seidl v. Am. Century Cos.*,
   713 F. Supp. 2d 249 (2010), *aff'd*, No. 10-2313, 2011 WL 2417319 (2d Cir. June 17,
   2011) ...........................................................................................................2, 3, 5, 22

*Smith v. Hurd*,
   53 Mass. 371 (Mass. 1847) ..................................................................................11

*Sofi Classic S.A. de C.V. v. Hurowitz*,
   444 F. Supp. 2d 231 (S.D.N.Y. 2006)..................................................................11

*Stackhouse v. Toyota Motor Co.*,
   No. CV 10-0922 (DSF), 2010 WL 3377409 (C.D. Cal. July 16, 2010) ...........................14, 18

*State v. Colbert*,
   IN 86-10-0897, 1987 Del. LEXIS 1286 (Del. Nov. 23, 1987) ................................12

*State v. Panaro*,
   28 Del. 230 (Del. 1914) ........................................................................................21

*Sutherland v. Sutherland*,
   C.A. No. 2399-VCN, 2009 Del. Ch. LEXIS 46 (Del. Ch. Mar. 23, 2009)..............23

*United States v. Bass*,
   404 U.S. 336 (1971)..............................................................................................12

*United States v. Murray*,
   928 F.2d 1242 (1st Cir. 1991)..............................................................................13

*United States v. Santos*,
   553 U.S. 507 (2008)..............................................................................................13

*Walker v. City of N.Y.*,
   974 F.2d 293 (2d Cir. 1992)....................................................................................7

*Wash. State Dep't of Soc. & Health Svcs. v. Keffeler*,
   537 U.S. 371 (2003)..............................................................................................10

*White v. Panic*,
    783 A.2d 543 (Del. 2001) ........................................................................31

*Wodka v. Causeway Capital Mgmt. LLC*,
    9 Civ. 2625 (C.D. Cal. Oct. 8, 2009), *aff'd*, No. 09-56733, 2011 U.S. App. LEXIS
    9959 (9th Cir. May 16, 2011), *cert. denied*, 131 S. Ct. 1031 (Nov. 28, 2011)....................4, 22

*Wood v. Baum*,
    953 A.2d 136 (Del. 2008) ........................................................................26

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
    No. 08-0118-cv, U.S. App. LEXIS 10585 (2d Cir. May 19, 2009)........................................23

*Wright v. Moffitt*,
    437 A.2d 554 (Del. 1981) ........................................................................19

*Zupnick v. Goizueta*,
    698 A.2d 384 (Del. Ch. 1997).....................................................................31

**RULES**

Fed. R. Civ. P. 8 ........................................................................................16

Fed. R. Civ. P. 12 .......................................................................................1

**STATUTES**

10 Del. C. § 8106 .......................................................................................23

11 Del. C. § 282 ........................................................................................12

11 Del. C. §§ 1401-11 ...................................................................................17

12 Del. C. § 3302 ...........................................................................11, 17, 29, 32

18 U.S.C. § 1084 ........................................................................................14

18 U.S.C. § 1952 ........................................................................................12

18 U.S.C. § 1955 ....................................................................................passim

18 U.S.C. § 1961 ........................................................................................21

31 U.S.C. § 5361 ........................................................................................14

Del. Constitution, Art. 2, § 17.........................................................................21

N.Y. Penal Law § 20.25..................................................................................12

N.Y. Penal Law § 225.00 ........................................................................................16, 17

N.Y. Penal Law § 225.05 .................................................................................15, 16, 21

N.Y. Penal Law § 225.10 ............................................................................................15

N.Y. Penal Law § 225.15 ............................................................................................16

N.Y. Penal Law § 225.20 ............................................................................................16

N.Y. Penal Law § 225.30 ............................................................................................16

N.Y. Penal Law § 980 (1909) .....................................................................................20

**OTHER AUTHORITIES**

115 Cong.Rec. 10735 (1969) .........................................................................................9

116 Cong.Rec. 590 (1970) .............................................................................................9

116 Cong.Rec. 603 (1970) .............................................................................................9

H.R. Rep. No. 91-1549 (1970), reprinted in 1970 U.S.C.C.A.N. 4007 ......................11

Organized Crime Control Act of 1970, Pub. L. No. 91-452, 83 Stat. 922, 923 ...........19

Paul G. Haskell, *The Prudent Person Rule For Trustee Investments and Modern Portfolio Theory*, 69 N.C. L. Rev. 87, 100-04 (1990) ...........................................................28

Pursuant to Fed. R. Civ. P. 12(b)(1) and (6), the Investment Advisor Defendants respectfully submit this memorandum of law in support of their motion to dismiss the Complaint.

## PRELIMINARY STATEMENT

This case is part of a years-old effort led by one law firm to pursue claims about mutual funds' investments in publicly traded non-U.S. companies whose businesses involved or related to internet gaming.  This is the third complaint filed by *this Plaintiff* seeking to challenge the same two investments by the Fund, and it is the *twelfth* complaint filed by the same firm seeking to pursue similar claims.  Every one of those cases has been dismissed or withdrawn at least once, although no court has yet reached the key issue raised by all of the cases — whether investing in non-U.S. publicly traded stocks is illegal.  So Plaintiff's counsel keeps filing cases and continues accusing the Investment Advisor Defendants of committing federal and state crimes, even though the Fund increased in value more than 23% during the period Plaintiff complains about.  The Investment Advisor Defendants are entitled to have their names cleared of Plaintiff's accusations.

The core of the Complaint is Plaintiff's allegation that the Fund violated federal and state anti-gambling laws by investing in 888 and NETeller, two publicly traded non-U.S. companies that were listed and traded only on the LSE and not any U.S. markets.  Plaintiff asserts class, derivative, and individual claims premised on alleged violations of 18 U.S.C. § 1955, RICO, and state law.  Plaintiff's claims fail as a matter of law for many reasons, but the key reason is that it is not illegal to own publicly traded stock, especially not stock listed and traded on regulated non-U.S. markets like the LSE.  Among the additional reasons the Complaint's RICO claims fail are that Plaintiff has not sufficiently alleged the predicate acts on which his claim is based and cannot establish that the Fund's ownership of 888 and NETeller stock was the proximate cause of the alleged injuries.  With respect to the Complaint's common

law claims, Plaintiff also fails to allege facts sufficient to rebut the business judgment rule, has

not alleged that the Defendants acted in bad faith, and cannot state a waste claim.  Because

Plaintiff has had numerous opportunities to plead the claims in the Complaint (in this case and

others), the Complaint should now be dismissed with prejudice.

## BACKGROUND AND RELATED ACTIONS

The claims in the Complaint were originally asserted in *Gamoran I*, which

purported to plead claims substantially identical to those set forth in the Complaint, including the

same class, derivative, and individual claims asserted now.  *Gamoran I* was one of a group of

cases filed in this Court alleging that investments by mutual funds in publicly traded stock of

certain non-U.S. companies were "illegal."[1]  Although these cases were filed by different

plaintiffs, all were brought by the same lead counsel.  The tortured procedural history of these

cases is summarized below, but the chart attached hereto as Appendix A shows, in stark fashion,

how these cases have become a kudzu to federal and state courts.

On April 2, 2009, Judge Cote dismissed the RICO claims asserted in one of the

related cases, holding that the plaintiffs had failed to plead RICO proximate causation.[2]  Judge

Cote's decision was affirmed by the Second Circuit and the Supreme Court denied *certiorari*.

As a result of Judge Cote's decision (which was then on appeal), Plaintiff voluntarily dismissed

*Gamoran I* by stipulation on May 19, 2009.

---

[1]     *See McBrearty v. Vanguard Grp., Inc.*, No. 08 Civ. 7650 (DLC), 2009 WL 875220 (S.D.N.Y.
Apr. 2, 2009), *aff'd*, No. 09-1445-cv (2d Cir. Nov. 23, 2009), *cert. denied*, 130 S. Ct. 3411
(2010).  Judge Cote later dismissed the claims in the other related case on many of the same
grounds.  *See Seidl v. Am. Century Cos.*, 713 F. Supp. 2d 249 (2010), *aff'd*, No. 10-2313-cv 2011
U.S. App. LEXIS 12274 (2d Cir. June 17, 2011).  In another example of gamesmanship by
Plaintiff's counsel, Seidl made a post-dismissal demand, filed a separate lawsuit based on that
demand, and then argued that the demand-refused complaint mooted the dismissal of the original
case for failure to make demand.  *See Seidl*, 2011 U.S. App. LEXIS 12274,  at *5-6.  The Second
Circuit disagreed and affirmed the dismissal.  *See id.*

[2]     *See McBrearty*, 2009 WL 875220, at *3.

On July 16, 2010, after *McBrearty* became final, Plaintiff re-filed the derivative claims he had asserted in *Gamoran I* — but not the RICO claims — in the Supreme Court of the State of New York, County of New York.[3]  Defendants removed that case (*Gamoran II*) to this Court; Judge Sand denied Plaintiff's motions to remand and for reconsideration,[4] setting the stage for the Defendants to move to dismiss the case on the merits.  But Plaintiff had a different idea:  On February 17, 2011, just days before Defendants filed their motions to dismiss, Plaintiff demanded that the Fund's board pursue the claims set forth in the *Gamoran II* complaint.[5] Because that was a concession that demand had not been excused in the first place (despite Plaintiff's allegations to the contrary), Judge Sand dismissed the Complaint without prejudice.[6]

Meanwhile, Plaintiff's counsel refiled the *McBrearty* derivative claims in Delaware Chancery Court.  On June 15, 2011, Vice Chancellor Parsons dismissed that complaint with prejudice.  Although he did not reach the question formally, Vice Chancellor Parsons expressed skepticism of the theory that investments such as those at issue here were "illegal."[7] Not surprisingly, Plaintiff's counsel has appealed that decision to the Delaware Supreme Court.

There is more to the pattern here:  Twelve days after Judge Cote dismissed the

---

[3]     Compl. ¶ 116; Henkin Decl. Exh. D.

[4]     *See Gamoran v. Neuberger Berman Mgmt., LLC*, 10 Civ. 6234, 2010 U.S. Dist. LEXIS 119696, at *15 (S.D.N.Y. Nov. 8, 2010); *Gamoran v. Neuberger Berman Mgmt., LLC*, 10 Civ. 6234, 2011 U.S. Dist. LEXIS 17939, at *8 (S.D.N.Y. Feb. 9, 2011).

[5]     Compl. ¶ 117.  Plaintiff seems to have learned nothing from his prior frolics and detours with demand requirements, because he cannot even get right what he demanded.  Although he says that he demanded that the Board pursue "the claims alleged herein" (*id.*), his demand addressed only the claims asserted in *Gamoran II* (Henkin Decl. Exh. E), which included no RICO claims.

[6]     *Id.*; *see* Henkin Decl. Exh. F at 3.

[7]      *Hartsel v. Vanguard Grp., Inc.*, C.A. No. 5394, 2011 Del. Ch. LEXIS 89, at *109 (Del. Ch. June 15, 2011) ("Plaintiffs' arguments essentially hinge on whether purchasing or owning the Challenged Securities is a crime under § 1955.  Having carefully considered the allegations in the [c]omplaint and the submissions and arguments of the parties, I am not convinced that this conduct is criminal.").

RICO claims in *McBrearty*, Plaintiff's counsel filed a substantially similar complaint, including

RICO claims, against another mutual fund in the United States District Court for the Central

District of California.  Citing *McBrearty*, that court dismissed those RICO claims, the United

States Court of Appeals for the Ninth Circuit affirmed, and the Supreme Court denied

*certiorari*.[8]  Again not surprisingly, Plaintiff's counsel then refiled the derivative claims relating

to that fund in California state court, where they are now pending.[9]

On August 24, 2011, Plaintiff's counsel filed *Gamoran III*.  In an attempt to avoid

the unfavorable rulings in this Court, the Second Circuit, and the Delaware Chancery Court,

Plaintiff dodged those fora and filed this case in the District of Delaware.  On November 4, 2011,

Chief Judge Sleet granted the Investment Advisor Defendants' motion to transfer, calling

Plaintiff's conduct in filing *Gamoran III* "the epitome of forum shopping."[10]

On November 9, 2011, the Investment Advisor Defendants sent Plaintiff's

counsel a letter requesting that Plaintiff dismiss the RICO claims with prejudice given the

decisions in *McBrearty* and *Seidl*.[11]  Plaintiff's counsel declined,[12] and this motion followed.

## STATEMENT OF FACTS

Plaintiff.  Plaintiff alleges that he purchased shares in the Fund in 2000.  (Compl.

¶ 11.)  He purports to sue the Defendants individually, derivatively on behalf of the Fund, and as

a representative of a proposed class of investors in the Fund.

The Fund and the Investment Advisor Defendants.  The Fund is an open-ended

---

[8]    *Wodka v. Causeway Capital Mgmt. LLC*, 9 Civ. 2625 (C.D. Cal. Oct. 8, 2009), *aff'd,* No. 09-56733, 2011 U.S. App. LEXIS 9959 (9th Cir. May 16, 2011), *cert. denied*, 131 S. Ct. 1031 (Nov. 28, 2011).

[9]    *Wodka v. Causeway Capital Mgmt. LLC*, No. BC463623 (Cal. Super. Ct., filed June 15, 2011).

[10]   Henkin Decl. Exh. G at 2 n.2.

[11]   Henkin Decl. Exh. H.

[12]   Henkin Decl. Exh. I.

investment company registered with the SEC, organized under the laws of Delaware, with its

principal place of business in New York, and is a series of Neuberger Berman Equity Funds.  (*Id.*

¶¶ 12-14.)  NBM serves as the Fund's investment advisor and is responsible for managing the

Fund's investment portfolios and providing administrative services to the Fund, and NB serves

as the Fund's sub-advisor.  (*Id.* ¶¶ 16-17.)  Although Plaintiff does not discuss the Fund's overall

performance during the period at issue, that publicly available fact is highly relevant to this case.

During the period in which the Fund held 888 and NETeller stock, the Fund's share price

*increased* 23.2%.[13]

     Mr. Segal was the portfolio manager of the Fund at all relevant times.[14]  (Compl.

¶ 19.)  Messrs. Sundman and Rivkin, in addition to holding various positions within NBM and/or

NB, served as interested directors of the Fund during the relevant period.[15]  (*Id.* ¶¶ 21-22.)

     <u>The Complaint</u>.  Plaintiff alleges that the Defendants caused the Fund "to illegally

invest in one or more entities whose primary businesses violated state and federal anti-gambling

laws."[16]  Plaintiff alleges that the nature of 888 and NETeller's business operations was

disclosed to the public through public filings by 888 and NETeller, news media reports, and

government sources.[17]  Plaintiff alleges that Defendants knew or were reckless in not knowing

that 888 and NETeller were taking bets from gamblers in the U.S. or processing payments

relating to such bets.[18]  Plaintiff alleges that the share prices of 888 and NETeller fell

---

[13]    Henkin Decl. Exh. J.

[14]    Plaintiff voluntarily dismissed all claims against Milu Komer on October 7, 2011.  *See* Docket No. 12.

[15]    Mr. Sundman is no longer a Director.  *See id.* ¶ 23.

[16]    *Id.* ¶ 4; *see also id.* ¶¶ 52-59.

[17]    *Id.* ¶¶ 33-35, 39, 78-91.

[18]    *Id.* ¶ 78.

dramatically after increased law enforcement began against gambling companies generally and, as a result, the Fund was injured.[19]  Plaintiff also alleges that the defendants conspired to conceal the Fund's alleged injuries while simultaneously acknowledging that the Fund disclosed the 888 and NETeller investments in regular, periodic SEC filings throughout the duration of the supposed conspiracy.[20]

Asserting that the Fund's investments in 888 and NETeller were themselves illegal — that simply buying and owning publicly traded stock was illegal — Plaintiff purports to bring civil RICO claims and claims for breach of fiduciary duty, negligence, and waste.[21]

## **ARGUMENT**

## I.    **STANDARD OF REVIEW AND CHOICE OF LAW**

On a motion to dismiss, courts take a complaint's well-pled factual allegations as true,[22] but conclusory allegations or legal conclusions masquerading as factual allegations are ignored and courts are not required to draw unreasonable inferences in a plaintiff's favor.[23] Courts evaluating the sufficiency of a complaint must determine whether non-conclusory

---

[19]    *Id.* ¶¶ 1, 106.  Plaintiff does not allege any law enforcement activity against 888.  Although he does allege that there was law enforcement activity against NETeller, he concedes that that activity took place after the Fund sold its NETeller stock.  *Compare* Compl. ¶ 60 *with id.* ¶¶ 40-41.  Similarly, many of Plaintiff's allegations about legislative and law enforcement activity post-date the Fund's sale of its 888 and NETeller stock.  *See id.* ¶¶ 98-105.

[20]    *Compare* Compl. ¶ 49 (alleging conspiracy) *with id.* ¶¶ 52-54, 56-59 & 62-63 (acknowledging the Fund's disclosures of the 888 and NETeller investments in periodic SEC reports).

[21]    *Id.* ¶¶ 148-204.  There is little point to wading through the procedural muck created by Plaintiff's shifting allegations regarding whether demand was excused or refused, because (i) Plaintiff purports to bring direct and derivative claims based on the same allegations and (ii) Plaintiff has made clear that he does not care what the result of considering his demand might be.  The simplest way to resolve this case is to address and dispose of the key merits issue.

[22]    *See Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997); *Walker v. City of N.Y.*, 974 F.2d 293, 298 (2d Cir. 1992).

[23]    *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995); *see also In re Am. Express Co. S'holder Litig.*, 39 F.3d 395, 400 n.3 (2d Cir. 1994) ("conclusory allegations of the legal status of the defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss").

allegations, accepted as true, "plausibly give rise to an entitlement to relief," and to survive a motion to dismiss a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[24]  A complaint that offers labels and conclusions or "naked assertions" devoid of factual enhancement is insufficient, and where the well-pled facts do not permit the court to infer more than the mere possibility of misconduct, the complaint must be dismissed.[25]

Under New York's choice of law rules, choice of law clauses are given effect if the selected jurisdiction has a substantial relationship to the parties or their performance and the fundamental policies of New York are not thereby violated.[26]  New York also applies the "internal affairs" rule, which applies the law of the state of incorporation to corporate governance issues.[27]  At all times relevant to this litigation, the Fund was governed by the Trust Agreement, which adopts Delaware law.[28]  To the extent Plaintiff's claims concern matters relating to the governance and administration of the Fund, Delaware law thus governs.

## II.   THE COMPLAINT FAILS TO STATE A CLAIM

### A.   The Fund's Ownership Of NETeller And 888 Stock Was Not Illegal

All of Plaintiff's claims are premised on the notion that the Fund's purchase and ownership of NETeller and 888 stock was illegal.  (*E.g.,* Compl. ¶¶ 1, 51.)  Because that is wrong, the claims in the Complaint necessarily fail.

#### 1.   The Fund's Investments Did Not Violate § 1955

No court has ever held that the purchase or ownership of publicly traded stock is a

---

[24]   *Iqbal*, 129 S. Ct. at 1949-50 (internal quotes omitted).

[25]   *Id.*

[26]   *See Lasavoy v. Lane*, 304 F. Supp. 2d 520, 538 (S.D.N.Y. 2004).

[27]   *See Hausman v. Buckley*, 299 F.2d 696, 702 (2d Cir. 1962).

[28]   Henkin Decl. Exh. C, Art. X, § 7.

violation of § 1955.  Nor is there any indication that any prosecutor or regulator has pursued

charges against a purchaser or owner of publicly traded shares for violating § 1955.[29]  Nothing in

the text of § 1955 or its legislative history supports Plaintiff's theory of liability or the notion that

§ 1955 could be read to regulate transactions on non-U.S. securities markets, and basic canons of

statutory construction rule out Plaintiff's theory.

a.      **Section 1955's Use Of "Owns" Does Not Include Purchasing Or Owning Publicly Traded Stock**

Section 1955 makes it a crime to "conduct[], finance[], manage[], supervise[],

direct[], or own[] all or part of an illegal gambling business" (with "illegal gambling business"

being separately defined in the statute).  The first five verbs in the statute clearly contemplate

active participation in the operation of a business, and there is some overlap in these five words'

meanings — indeed, four can be used as synonyms for each other.[30]  Every prosecution Plaintiff

cites in the Complaint is consistent with that construction of the statute, and *none* involved

prosecuting owners of publicly traded stock.  In fact, it is not even clear that the prosecutions

Plaintiff cites involved corporations with publicly traded stock at all.

It is true that the statute includes the word "own," but the construction Plaintiff

suggests — using that word to include owning publicly traded stock purchased in a secondary

market — makes no sense.  As an initial matter, courts consider the common usage of words and

---

[29]    Although the Complaint discusses enforcement actions taken by the DOJ and certain states against gambling businesses and their officers, it cites nothing indicating that any actions have been taken against investors in publicly traded stock or investment advisors.  *See* Compl. ¶¶ 79-105.  Plaintiff's counsel has had years to identify any such action, and if there was even one for him to point to, he would long ago have presented it to one of the courts hearing these cases in neon text accompanied by a marching band.

[30]    *See, e.g.,* www.thesaurus.com/browse/direct (listing "manage" as the definition of "direct" and including "conduct" and "supervise" as synonyms) (last visited December 7, 2011).

phrases when interpreting criminal statutes.[31]  Under the common usage of "own," a stockholder does not "own" the corporation in which he holds stock — a person who owns a share of Coca-Cola Company stock is not said to "own" the Coca-Cola Company.  Rather, the common usage of "own" connotes *responsible* ownership, which requires significant influence over or responsibility for that which is "owned."  That reading of what triggers liability under § 1955 is entirely consistent with the other words Congress chose to define the crime.  It also comports with what a reader using "everyday speech" would take from the text and legislative history of § 1955 to be the intended targets of the statute — owner-operators and organized crime figures, not investors purchasing publicly traded stock on a major exchange.[32]

The context of how "own" is used in § 1955 further confirms this.  The Supreme Court has made clear that "context determines meaning" for statutes.[33]  The terms that precede "own" in § 1955 connote influence over, responsibility for, or participation in the gambling operation itself, and "own" should be read in the same context.  Put differently, § 1955 starts with five definitional words that are not compatible with the notion that just owning publicly traded stock is sufficient to trigger the statute, which naturally raises the question whether Congress intended to sweep such broader conduct in with the catchall word in the definition.  The normal canons of statutory construction require the conclusion that it did not:

- The canon *noscitur a sociis* requires that words grouped in a list be given related meanings.[34]  This prevents statutes from being given unintended

---

[31]     *McBoyle v. United States*, 283 U.S. 25, 27 (1931).

[32]     Section 1955 was aimed at curtailing syndicated gambling, the lifeline of organized crime.  *See* 115 Cong.Rec. 10735 (1969) (Senator Hruska); 116 Cong.Rec. 590 (1970) (Senator McClellan); 116 Cong.Rec. 603 (1970) (Senator Allott).

[33]     *See Johnson v. United States*, 130 S. Ct. 1265, 1271 (2010) ("we 'do not force term-of-art definitions into contexts where they plainly do not fit and produce nonsense'").

[34]     *See Gustafson v. Alloyd Co., Inc*., 513 U.S. 561, 574-75 (1995) (rejecting broad interpretation of statute based on one word taken out of its statutory context); *Dole v. United Steelworkers of Am*., 494 U.S. 26, 36 (1990) (disputed phrase in statute should be interpreted with reference to phrases

breadth by not ascribing to one word a meaning so broad that it is inconsistent with the words accompanying it,[35] precisely what Plaintiff tries to do with the word "own." Thus, Congress did not use "own" to mean something different from "conduct," "finance," "manage," "supervise," and "direct," all of which require more than just buying or owning publicly traded stock.

- The canon *ejusdem generis* requires that where general words follow an enumeration of specific items, the general words apply only to items akin to those that were specifically enumerated.[36] To the extent that "own" could be viewed as more general than "conduct," "finance," "manage," "supervise," and "direct," it covers only what those words cover.

Finding that merely owning publicly traded stock acquired in the secondary market satisfies § 1955's definition of "owns" would produce the sort of "nonsense" the Supreme Court expressly cautioned against when interpreting criminal statutes and would be contrary to basic canons of statutory construction.[37]

### b.   Congress Did Not Intend To Criminalize The Mere Purchase Or Ownership of Stock

Congress stated that § 1955 was intended to reach "only those persons who prey systematically upon our citizens and whose syndicated operations are so continuous and so substantial as to be of national concern" and are "of considerably greater magnitude than simply meet[ing] the minimum definitions."[38] Those goals clearly seek to reach active participation in a business as opposed to buying or owning publicly traded stock. No one can say that buying or selling stock on a non-U.S. market regulated by a separate sovereign nation counts as "preying upon" U.S. citizens, especially given that Delaware law expressly authorizes fiduciaries to invest

---

surrounding it).

[35]   *See Gustafson*, 513 U.S. at 575.

[36]   *See Wash. State Dep't of Soc. & Health Svcs. v. Keffeler*, 537 U.S. 371, 384-85 (2003) (applying both *noscitur a sociis* and *ejusdem generis* to reject interpretation of catchall provision of statute that would have been broader than specific words in statutory enumeration).

[37]   *See supra* note 33.

[38]   H.R. Rep. No. 91-1549, at 21 (1970), reprinted in 1970 U.S.C.C.A.N. 4007, 4029.

in foreign securities (12 Del. C. § 3302).

A narrow interpretation of "own" is also inconsistent with well-established legal principles that purposely create a divide between corporate entities and their shareholders. Congress legislates against a backdrop of common law and traditional concepts and intends for its legislation to incorporate those rules and concepts unless it specifically says otherwise.[39]  One of the primary purposes of a corporation is to insulate shareholders from legal liability,[40] and state law is clear that owning stock in a company is not the same as owning the company or its assets.[41]  Similarly, individuals are generally not liable for the criminal conduct of a corporation unless they performed or caused to be performed the criminal conduct in question.[42]  In light of these principles, the fact that neither the text nor the legislative history of § 1955 specifically say that just buying or owning publicly traded stock could violate the statute "strongly suggests that Congress did not intend [for] the statute [to] have [such] broad reach."[43]

*Rewis v. United States*, 401 U.S. 808 (1971), provides a good example of these principles.  *Rewis* considered whether 18 U.S.C. § 1952, which prohibits interstate travel in furtherance of gambling, also prohibited gambling operations simply because they were patronized by out-of-state bettors.  The Court observed that persons in the United States can

---

[39]     *See generally Meyer v. Holley*, 537 U.S. 280, 285 (2003) ("when Congress creates a tort action, it legislates against a legal background of ordinary tort-related … liability rules and consequently intends its legislation to incorporate those rules"); *Attorney Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 128 (2d Cir. 2001) (to abrogate a common law principle, a statute must "speak directly" to the question addressed by the common law).

[40]     *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993); *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 240 (S.D.N.Y. 2006).

[41]     *See generally Smith v. Hurd*, 53 Mass. 371, 385 (Mass. 1847) (shareholders are not legal owners of corporate property).

[42]     Both New York and Delaware recognize this principle.  *See* N.Y. Penal Law § 20.25; 11 Del. C. § 282; *People v. Byrne*, 77 N.Y.2d 460, 467 (N.Y. 1991); *State v. Colbert*, IN 86-10-0897, 1987 Del. LEXIS 1286, at *5 (Del. Nov. 23, 1987).

[43]     *United States v. Bass*, 404 U.S. 336, 349-50 (1971).

easily travel between states and that there are many multi-state metropolitan areas, creating a situation in which criminal activity is often patronized by out-of-state customers.[44]  The Court thus held that an expansive interpretation of § 1952 could "alter sensitive federal-state relationships … overextend limited federal police resources, and … produce situations in which the geographic origin of customers, a matter of happenstance, would transform relatively minor state offenses into federal felonies;" although it refused to "weigh the merits of these factors," it held that the absence of any discussion of these factors in the legislative history of § 1952 showed that Congress did not intend for it to apply to such gambling operations.[45]

The answer must be the same here.  Investors can easily purchase stock on exchanges around the world without leaving "home."[46]  And they can even become owners of stock without intending to purchase it, such as by receiving it as a gift or bequest (including through charitable donations).  Plaintiff's interpretation of § 1955 would (i) criminalize the mere ownership of stock (which is not traditionally prohibited by state or federal law), (ii) create conflicts with foreign sovereigns and regulators, and (iii) make criminals out of investors who do no more than participate in open-market transactions or obtain ownership of foreign stock.  The text and legislative history of § 1955 address none of these issues, strongly suggesting that Congress did not intend § 1955 to criminalize mere purchase or ownership of publicly traded stock.

c.    **The Rule Of Lenity Forecloses Plaintiff's Claims**

The rule of lenity requires ambiguities in a criminal statute to be resolved in a

---

[44]    *See* 401 U.S. at 812.

[45]    *See id.*

[46]    *See Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*, 08 Civ. 1958 (JGK), 2010 U.S. Dist. LEXIS 105720, at *5-6 (S.D.N.Y. Oct. 1, 2010).

defendant's favor,[47] and it applies to civil cases in which criminal statutes are interpreted.[48]

Plaintiff alleges that the Fund violated § 1955's prohibition on "owning part of" an illegal

gambling operation.  (Compl. ¶ 167.)  The question is whether owning publicly traded shares in

lawfully listed and traded corporations is what Congress intended to prohibit in § 1955.  If

Plaintiff's theory was plausible, the term "own all or part of" would be ambiguous with regard to

open market purchases and ownership of publicly traded stock in lawfully listed corporations.

Thus, the rule of lenity would preclude Plaintiff's interpretation of § 1955 even if it were

plausible.

> d.     **Section 1955 Has No Extraterritorial Application**

Even if Plaintiff's construction of § 1955 had any interpretive merit (it does not),

the statute could not apply here.  "When a statute gives no clear indication of an extraterritorial

application, it has none," and the presumption against extraterritoriality applies in *all* cases.[49]

Put differently, "[f]oreign conduct is generally the domain of foreign law."[50]  Following

*Morrison*, courts have expressly rejected the theory that a purchase by a U.S. investor of stock of

a non-U.S. company on a non-U.S. market "occurs" in the U.S.[51]  Such purchases occur outside

the U.S., and neither (i) the fact that an investor might have decided in the U.S. to purchase stock

---

[47]    *See United States v. Santos*, 553 U.S. 507, 514 (2008) ("Under a long line of our decisions, the tie must go to the defendant.  The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them."); *see also United States v. Murray*, 928 F.2d 1242, 1246 (1st Cir. 1991) ("The doctrine of lenity 'rests on the fear that expansive judicial interpretations will create penalties not originally intended by the legislature.'") (internal quotation omitted) (citations omitted).

[48]    *See Scottrade, Inc. v. BroCo Inv., Inc.*, 774 F. Supp. 2d 573, 584 (S.D.N.Y. 2011) (applying rule of lenity to interpretation of Computer Fraud and Abuse Act in civil action).

[49]    *See Morrison v. Nat'l Austl. Bank*, 130 S. Ct. 2869, 2873, 2878 (2010).

[50]    *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455 (2007).

[51]    *See Plumbers' Union Local No. 12 Pension Fund*, 2010 WL 3860397, at *18; *Stackhouse v. Toyota Motor Co.*, No. CV 10-0922 (DSF), 2010 WL 3377409, at *1 (C.D. Cal. July 16, 2010).

outside the U.S. nor (ii) the location of the alleged harm can overcome the presumption that

federal statutes do not apply extraterritorially.[52]  888 and NETeller were listed and traded on the

LSE, and Plaintiff does not dispute that the Fund's purchases of those stocks were made on the

LSE.

   Although Congress knows how to write a statute to have extraterritorial effect, §

1955 contains no indication that Congress intended it to apply extraterritorially.[53]  Instead, §

1955 applies solely to conduct occurring in the U.S., which is not what this case involves.[54]

Indeed, Plaintiff concedes that U.S. anti-gambling laws have no extraterritorial reach by

affirmatively pleading that 888 and NETeller chose not to list their stock in the U.S. "to evade

the reach of the U.S. criminal justice system … ."  (Compl. ¶ 42.)  That concession is consistent

with the fact that § 1955 was enacted with RICO, and RICO itself has no extraterritorial

application.[55]  Thus, § 1955 could not apply to the Fund's purchase or ownership of 888 and

---

[52]  *See Swiss Reins.*, 2010 WL 3860397, at *9; *see also Elliott Assocs. v. Porsche Automobil Holding SE*, Nos. 10 Civ. 0532 & 10 Civ. 4155 (HJB), 2010 U.S. Dist. LEXIS 138399, at *18-19 (S.D.N.Y. Dec. 30, 2010) ("Several courts in this district have already rejected the notion that 'domestic transactions in other securities' include an investor's placement of a buy order in the United States for a security traded abroad.").

[53]  For example, the Wire Act expressly applies to "the transmission in interstate *or foreign commerce* of bets or wagers or information assisting in the placing of bets or wagers," 18 U.S.C. § 1084(a) (emphasis added), and the Unlawful Internet Gambling Enforcement Act was enacted to proscribe gambling that "crosses State or national borders," 31 U.S.C. § 5361(a)(4).  In contrast, § 1955 applies only to a busines that is a violation "of the law of a State or political subdivision in which it is conducted," and "State" means "any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States."  18 U.S.C. § 1955(b).

[54]  That some gaming companies were charged under § 1955 in connection with *their* participation in gaming transactions with U.S. residents has nothing to do with whether § 1955 applies to international securities transactions such as those at issue here.  The charged conduct with respect to such companies was their interaction with U.S. residents in connection with gaming transactions, not secondary market stock transactions involving entirely different parties.

[55]  *See Norex Petroleum Ltd. v. Access Indus. Inc.*, 631 F.3d 29, 32-33 (2d Cir. 2010) (*per curiam*).

NETeller stock.[56]

## 2.   **The Fund's Investments Did Not Violate New York Law**

The only provision of the New York Penal Law that is even arguably applicable here is § 225.05, which criminalizes "knowingly advanc[ing] or profit[ing] from unlawful gambling activity."[57]  Those terms are both defined in the statute:  "[A]dvanc[ing] gambling activity" means "conduct that materially aids any form of gambling activity" and "profit[ing] from gambling activity" means "when, other than as a player, [defendant] accepts or receives money or other property pursuant to an agreement or understanding with any person whereby [defendant] participates or is to participate in the proceeds of gambling activity."[58]  But Plaintiff does not allege that the Fund did either.  Instead, Plaintiff alleges that the Fund bought and owned publicly traded stock and engaged in normal shareholder behavior (such as attending annual meetings by proxy and voting).  (Compl. ¶¶ 62, 63.)  Such ordinary incidents to owning

---

[56]   *Accord Porsche*, 2010 U.S. Dist. LEXIS 138399, at \*24 (noting that the '34 Act was not intended to regulate foreign securities exchanges and *Morrison*'s "strong pronouncement that U.S. courts ought not interfere with foreign securities regulation without a clear Congressional mandate").  The same reasoning applies here — U.S. courts should not interfere with foreign corporate or securities regulation without a clear legislative mandate, and there is no such mandate here.

Plaintiff's counsel has previously argued that § 1955 must be read broadly to ensure that foreign countries do not become safe havens for companies to violate U.S. laws.  But that argument directly contradicts the presumption that U.S. statutes do not have extraterritorial application unless Congress says so specifically.  Indeed, in *Morrison* the Solicitor General argued that extraterritorial application of the securities laws was necessary to prevent the U.S. from becoming a Barbary Coast for wrongdoers perpetrating frauds in other markets, and the Supreme Court rejected that argument because it had no textual basis.  *See Morrison*, 130 S. Ct. at 2886.  This case is no different.

[57]   The other provisions of Article 225 cannot be at issue because Plaintiff does not allege that Defendants directly participated in operating any gambling enterprise.  *See* N.Y. Penal Law § 225.10 (prohibiting "bookmaking," lotteries, and "numbers games"); N.Y. Penal Law § 225.15 (possession of gambling records); N.Y. Penal Law § 225.20 (possession of gambling records); N.Y. Penal Law § 225.30 (possession of a gambling device).  Plaintiff does not allege that someone does any of the things prohibited by these statutes by buying or owning publicly traded stock (which would be inconsistent with the general principle that shareholders do not own a corporation's assets).

[58]   N.Y. Penal Law § 225.00.  "Materially" means "to a great extent; substantially; considerably." *See People v. Shing*, 371 N.Y.S.2d 322, 326 (N.Y. Crim. Ct. 1975).

publicly traded stock cannot qualify as "considerably" or to a "great extent" aiding gambling activity.  They thus do not qualify as "materially aiding" a gambling company.[59]  Likewise, Plaintiff does not allege conduct that fits the statutory definition of "profit[ing] from gambling activity."[60]  In any event, just as with § 1955, the rule of lenity would preclude Plaintiff's interpretation even if that interpretation were plausible.

That Article 225 cannot apply here can also be seen by looking at the specific behaviors prohibited under § 225.05, including possessing gambling equipment, soliciting persons to gamble, conducting gambling games, and allowing a building to be used for gambling.[61]  Although that list is non-exclusive, it clearly shows that the intended scope of the statute is the *operation* of a gambling business.  And that is how New York courts have applied the statute — to defendants who operated gambling businesses.[62]  But no court has applied it to someone who bought or owned publicly traded stock.  Indeed, in the only instance Plaintiff cites in which Article 225 has even been applied to an online casino company, the New York Attorney General's Office did not prosecute non-insider owners of stock in the gaming company.[63]

### 3.   The Fund's Investments Did Not Violate Delaware Law

As an initial matter, Delaware law specifically allows fiduciaries to purchase foreign stocks (12 Del. C. § 3302).  Thus, the only way the Complaint could assert claims for violations of Delaware law would be if any of the Defendants actually violated some other part

---

[59]   *See Shing*, 371 N.Y.S.2d at 326.  Because all Plaintiff has done is plead ordinary investor activity as opposed to actions that could plausibly be viewed as improper, the Complaint does not satisfy the requirements of Fed. R. Civ. P. 8.  *See Iqbal*, 129 S. Ct. at 1950.

[60]   Nor does Plaintiff even allege "profit" in a non-statutory sense — he alleges that the Fund *lost* money on the 888 and NETeller investments.  *See* Compl. at 38 ("Prayer for Relief").

[61]   N.Y. Penal Law § 225.00.

[62]   *See Shing*, 371 N.Y.S.2d at 326-27; *People v. Brown*, 447 N.Y.S.2d 129, 473 (N.Y. Crim. Ct. 1982).

[63]   *See People v. World Interactive Gaming Corp.*, 714 N.Y.S.2d 844, 848 (N.Y. Sup. Ct. 1999).

of Delaware law by buying and owning foreign securities § 3302 allowed them to buy.  There is

no such law.  Certain Delaware statutes deal with lotteries or numbers games (11 Del. C. §§

1401-02), betting on sporting events (11 Del. C. § 1403), providing premises for gambling or

possessing gambling devices (11 Del. C. §§ 1404-06), engaging in a crap game (11 Del. C. §

1407), and disseminating gambling information (11 Decl. C. § 1411).  In each case, the statute

makes clear that it only applies to those who actually participate in the gambling activity rather

than to outside shareholders.  And once again any ambiguity would, under the rule of lenity,

mean that Plaintiff's claims fail.

4.    **Plaintiff's Claims Regarding Violations Of State
Law Are Barred By The Dormant Commerce Clause**

Even if Plaintiff's arguments about state criminal laws made textual sense and

could survive under the rule of lenity, the application of such laws to transactions occurring

outside the U.S. would violate the dormant Commerce Clause.[64]  A state statute violates the

dormant Commerce Clause if it has the practical effect of exerting control over commerce

occurring entirely outside the boundaries of the state in question.[65]  The conduct complained of

in the Complaint is the Fund's investments in 888 and NETeller, which were not domestic

transactions and did not occur within the boundaries of any U.S. state.

That Plaintiff's theory of liability conflicts with the dormant Commerce Clause

can best be understood by noting the absurd results that would follow were Plaintiff right:

▪ First, assume that New York law made it a crime to buy or own stock of a
company such as 888 or NETeller.

---

[64]    This analysis would apply to any state's law Plaintiff might assert in opposing this motion,
whether or not Plaintiff has previously asserted reliance on that state's law.

[65]    *See Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102 (2d Cir. 2003) (Vermont law regulating
internet communications containing sexually explicit materials violated dormant Commerce
Clause).

- Next, assume that at precisely the same moment in time, an investor in New York and an investor in Paris each directed their brokers to purchase one share of NETeller or 888 stock on the LSE.  Because both transactions took place on the LSE,[66] both investors have done the same thing, at the same time, in the same place.  So which investor violated state law — both investors, only the Parisian investor, or only the New York investor?

- Because both transactions took place on the LSE and outside New York, there is no analytically consistent basis to avoid finding that the Paris investor violated Article 225 if the New York investor did so.  Indeed, assume there was such a basis, but that the Parisian investor moved to New York while he or she still owned the single NETeller or 888 share purchased on the LSE.  Would the Parisian investor then be guilty of violating New York law because he or she owned the stock while in New York?  Answering yes is absurd,[67] but answering no means there was no basis to distinguish between the New York and Parisian investors in the first instance.[68]

Because every analytically consistent interpretation of state law that would cover the Fund's investments in 888 and NETeller necessarily implies state regulation of purely foreign conduct, the dormant Commerce Clause precludes those interpretations and thus precludes the application of state law to the Fund's investments in 888 and NETeller.

> 5.    **Even If Defendants' Alleged Activities Could Be Deemed To Have Violated Federal Or State Law, They Would Not Constitute Negligence *Per Se***

Negligence *per se* requires that a plaintiff asserting the negligence claim be a part

---

[66]    *See Swiss Reins. Co.*, 2010 WL 3860397, at *9; *Stackhouse*, 2010 WL 3377409, at *1.

[67]    Allowing such an application of state law would frustrate world markets and international travel and raise significant foreign policy power issues:  Anyone owning stock, even stock purchased on a non-U.S. exchange, would have to study the laws of all fifty states before setting foot on U.S. soil to avoid interpretations like the one Plaintiff advances.  Similarly, any U.S. citizen who owned stock would need to investigate whether stock they owned would violate the laws of any state they traveled to, even if such a purchase was legal in their home state and the jurisdiction that was home to the exchange the purchase was made on.  And anyone receiving shares of stock as a gift or charitable donation would have to consider whether simply receiving such stock was a criminal act.  This is what limitations on state power like the dormant Commerce Clause are designed to avoid.

[68]    This is precisely the sort of unpredictability and inconsistency the *Morrison* Court sought to avoid by rejecting the conduct and effects tests.  *See* 130 S. Ct. at 2883.

of the class of persons that the statute he or she claims was violated was intended to protect.[69]

And because negligence *per se* effectively creates a private right of action for violation of a

statute, the creation of such a right must be consistent with the legislative scheme in which the

statute was enacted.[70]  Because neither is true here, Plaintiff cannot assert negligence *per se*.

  Section 1955.  Congress enacted § 1955 as part of the OCCA, which also enacted

RICO.  Congress intended the OCCA to halt the influence of organized crime, which threatened

to "infiltrate and corrupt legitimate business and labor unions."[71]  But Plaintiff does not allege

any conduct remotely like what Congress targeted through the OCCA — he alleges the purchase

and ownership of stock that the LSE deemed appropriate for listing and trading on that market,

something Congress has no say in.  Nor would allowing Plaintiff to proceed on a negligence *per*

*se* theory based on § 1955 be consistent with the legislative scheme Congress enacted:

> - Congress enacted § 1955 against the backdrop of general corporate law, in which shareholders are not held liable for acts of a corporation except in unusual situations not present (or even alleged) here.  If Congress had meant to change the ordinary rule that shareholders are not liable for the activities of the companies in which they invest, it would have said so specifically.
>
> - Only Congress can create a private right of action to enforce federal law,[72] but it did not do so for § 1955 other than by means of a RICO claim.  Allowing Plaintiff to try to create a private right of action through the back door of state law would be inconsistent with Congress's intent in enacting § 1955.[73]

---

[69] *Del. Elec. Coop. v. Duphily*, 703 A.2d 1202, 1209 (Del. 1997); *Nicholson v. S. Oaks Hosp.*, 811 N.Y.S.2d 770, 771 (N.Y. App. Div. 2006).

[70] *See Wright v. Moffitt*, 437 A.2d 554, 559 (Del. 1981); *Mark G. v. Sabol*, 717 N.E.2d 1067, 1070 (N.Y. 1999).

[71] *See* Organized Crime Control Act of 1970, Pub. L. No. 91-452, 83 Stat. 922, 923; *see also supra* note 32.

[72] *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).

[73] *See Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005) ("Were we to hold, despite *Conboy,* that GBL § 349 may be used to assert a private right of action for violation of a federal law otherwise lacking one, we would essentially be attributing to the New York legislature an intent to thwart Congress's intentions on a significant scale."); *accord In re Bendectin Litig.*, 857 F.2d 290, 313-14 (6th Cir. 1988) ("A state's ability to use a federal statute

New York Law.  Prior to 1967 (when the New York Legislature reformed New York's anti-gambling statutes), several New York statutes provided for civil remedies relating to gambling enterprises.  Under the previous statutory regime, for example, persuading a person to visit a gambling establishment gave rise to a civil claim for that person's gambling losses.[74]  The 1967 enactment eliminated those remedies.  The New York Legislature clearly understood how to create civil claims for violations of criminal anti-gambling statutes, but chose to eliminate such claims when it created the Article 225 regime.  Where, as here, the New York legislature has repealed an explicit private right of action, no private right of action remains.[75]  Allowing Plaintiff to rely on negligence *per se* here would thus be inconsistent with New York law.

Delaware Law.  Delaware's anti-gambling statutes and constitutional provision were enacted to protect Delaware citizens from the influence of gambling.[76]  The Delaware legislature did not intend for these provisions to protect businesses or investors, especially not investors several times removed.[77]  Because neither the Fund nor its investors are part of the class of persons intended to be protected by the Delaware anti-gambling statutes and constitutional provision, Plaintiff cannot rely on negligence *per se* here.

---

violation as a basis for state tort liability and negligence per se depends on the intent of Congress, and not merely on the intent of the state."), *cert. denied*, 488 U.S. 1006 (1989).  What Plaintiff seeks here is actually more extreme than the situation *Broder* presented, because Plaintiff seeks to use common law, non-statutory causes of action to pursue claims under federal and state statutes that on their face provide no private rights of action, precisely what the Sixth Circuit warned against in *Bendectin*.

[74]   N.Y. Penal Law § 980 (1909) (Henkin Decl. Exh. K).

[75]   *See Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 329-30 (N.Y. 1983).

[76]   *See State v. Panaro*, 28 Del. 230, 233 (Del. 1914); *Nat'l Football League v. Governor of the State of Del.*, 435 F. Supp. 1372, 1383 (D. Del. 1977).

[77]   In *National Football League*, the court rejected arguments that federal anti-gambling statutes were enacted to benefit "sports entrepreneurs," holding that such statutes were meant to protect citizens "from the demoralizing or corrupting influence of solicitations to gamble."  435 F. Supp. at 1388.  A Delaware court would likely reject arguments that Delaware's anti-gambling statutes and constitutional provision were enacted to protect mutual fund investors for similar reasons.

B.     **The Complaint Fails To Allege RICO Claims**

1.     **Plaintiff Does Not Plead Any Predicate Acts**

A RICO plaintiff must allege at least two predicate acts (18 U.S.C. § 1961(5)),

which are defined in the statute (*id.* § 1961(1)).  The only predicate acts alleged by Plaintiff are

owning shares of 888 and NETeller purportedly in violation of § 1955 and state law.[78]  As

discussed above, Plaintiff has not established that owning shares of NETeller and 888 was

illegal.  Because Plaintiff has not (and cannot) allege predicate acts, the RICO claims fail.

2.     **Plaintiff Cannot Establish RICO Proximate Cause**

The RICO claims in this case are substantively identical to those at issue in

*McBrearty*, *Seidl*, and *Wodka*.  Indeed, both *McBrearty* and *Wodka* involved investments in

NETeller.[79]  All of the RICO claims in those cases were dismissed with prejudice for lack of

RICO proximate cause, and all of those dismissals were affirmed on appeal.[80]  Moreover,

Plaintiff cannot show that he or any other Fund investors were the target or victim of the alleged

RICO violation.  The Second Circuit has "repeatedly emphasized that the reasonably foreseeable

victims of RICO violation are the targets, competitors and intended victims of the racketeering

enterprise."[81]  As Judge Cote explained, "Plaintiffs have raised no plausible claim that they are a

member of any of these groups. [...] Indeed, cases from this Circuit and elsewhere, when

discussing victims of gambling enterprises, refer to those who gambled and lost, and not to

---

[78]     *See* Compl. ¶ 5.  And Plaintiff has not even properly alleged state law predicate acts.  Only acts chargeable under state law "and punishable by imprisonment for more than one year" count as predicate acts (18 U.S.C. § 1961(1)), but Plaintiff has not alleged that any state law satisfies that requirement, nor is it clear he could.  For example, even if it could apply here, a violation of New York Penal Law § 225.05 is a class A misdemeanor.

[79]     *See Hartsel*, 2011 WL 2421003, at *4; *Wodka*, 2011 U.S. App. LEXIS 9959, at *3.

[80]     *See supra* pp. 2, 4.

[81]     *Lerner v. Fleet Bank*, N.A., 318 F.3d 113, 124 (2d Cir. 2003).

investors in the enterprise."[82]  There is no allegation in the Complaint that would permit a

different result here, and so the RICO claims must all be dismissed.[83]

<div align="center">3.  <b>There Are Additional Reasons The RICO Claims Fail</b></div>

Although failure to plead predicate acts and lack of proximate cause are sufficient

to require dismissal of all RICO claims here, there are even more reasons those claims fail.  But

because these cases have already consumed so much of the courts' time and the Court need not

reach these issues to conclude that the Complaint should be dismissed, the Investment Advisor

Defendants present these arguments in summary form and request that the Court allow them to

address these arguments in more detail if any of the RICO claims survive this motion:

- RICO does not apply extraterritorially.  *See supra* note 55.

- The Complaint fails to plead continuity.  Plaintiff does not even try to plead closed-ended continuity, and the Complaint's allegations of open-ended continuity are insufficient.[84]

- The Complaint fails to plead a proper RICO enterprise, because the Fund cannot be both the enterprise and the victim of the alleged racketeering activity.[85]

C.  **The Claims Are Time-Barred**

The relevant limitations periods here are three years (state law claims) and four

---

[82]  *McBrearty*, 2009 WL 875220, at *3.

[83]  Although the Complaint alleges that "[a]ny other cause that may have contributed to the loss, including law enforcement efforts or the market reaction to those efforts, was not a superseding cause of the losses because it was reasonably foreseeable and part of the risk that Defendants' wrongful acts created" (Compl. ¶ 112), that conclusory allegation is insufficient.  *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990).

[84]  Plaintiff's continuity allegation is a single conclusory paragraph that appears to confuse open-ended continuity for RICO purposes with a fund being an "open-ended investment company" (Compl. ¶ 65), which are entirely different concepts.

[85]  *See, e.g., Arnold v. Petland, Inc.*, No. 2:07-cv-01307, 2010 WL 2301194, at *4 (S.D. Ohio Jun. 4, 2010) ("the franchisees cannot serve as both the enterprise and the victims of the alleged RICO activity").

years (RICO).[86]  Those limitations periods began to run no later than November 6, 2006.[87]

Unless they were tolled, the limitations periods expired no later than November 6, 2009 for the

state law claims and no later than November 6, 2010 for the RICO claims.

   Given Plaintiff's inequitable conduct, the Court should hold that Plaintiff has lost

the benefit of whatever tolling the *Gamoran I* stipulation provided.[88]  But even if the stipulation

did toll some claims, Plaintiff's individual and class claims for breach of fiduciary duty and

negligence are time-barred because Plaintiff failed to refile them in *Gamoran II*.  In the *Gamoran*

*I* stipulation, the parties agreed to toll the claims asserted in *Gamoran I* from the date *Gamoran I*

was filed (December 12, 2008) to the <u>earlier</u> of six months after the Second Circuit issued its

decision in *McBrearty* or April 27, 2011.[89]  The *McBrearty* decision was issued on January 20,

2010.  Therefore, the statute of limitations for Plaintiff's individual and class claims for breach

of fiduciary duty and negligence (Claims 6 and 7) expired on May 15, 2011.

---

[86] *See* 10 Del. C. § 8106; *Sutherland v. Sutherland*, C.A. No. 2399-VCN, 2009 Del. Ch. LEXIS 46, at *17 (Del. Ch. Mar. 23, 2009); *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, No. 08-0118-cv, U.S. App. LEXIS 10585, at *698 (2d Cir. May 19, 2009).

[87] Breach of fiduciary duty and waste claims accrue at the time of breach.  *See Sutherland,* 2009 Del. Ch. LEXIS 46, at *17. Negligence claims accrue at the time of injury.  *See Kaufman v. C.L. McCabe & Sons, Inc.*, 603 A.2d 831, 834 (Del. 1992).  RICO claims accrue when the plaintiff discovers, or should have reasonably discovered, the alleged injury.  *See World Wrestling Entm't.*, U.S. App. LEXIS 10585, at *697.  Each of Plaintiff's claims therefore began to accrue no later than November 6, 2006, when the Fund disclosed its last purchase of 888 and NETeller stock and after Plaintiff claims to have been injured by a drop in share prices of that stock on July 16, 2006.  *See* Compl. ¶¶ 93-94.

[88] The stipulation permitted Plaintiff to file *one* new action following the Second Circuit's decision in *McBrearty (Gamoran I* Stipulation ¶ 5), and *Gamoran II* was it.  If Plaintiff squandered that opportunity — which he did by admitting he never had standing to file *Gamoran II* — then the stipulation's tolling provision did not give him leave to just keep trying while keeping claims tolled.  The stipulation tolled claims only to the extent they were brought as part of an "action … commenced sooner than … six months from … the issuance of the mandate of the U.S. Court of Appeals in *McBrearty* … ."  (*Id.*)  But this case (i) is separate from *Gamoran II* and (ii) was filed more than six months after the *McBrearty* mandate issued.

[89] *Gamoran I* Stipulation ¶ 5.

D.      **Plaintiff's Claims For Breach Of Fiduciary Duty And Negligence Must Be Dismissed**

Assuming *arguendo* that Plaintiff's claims for breach of fiduciary duty and negligence are not time-barred, Plaintiff lacks standing to assert direct claims for negligence or breach of fiduciary duty — such claims belong to the Fund.  Plaintiff even acknowledges this in the Complaint itself (Compl. ¶ 3).  Claims 6-9 must be dismissed for this reason alone.

All of the fiduciary duty and negligence claims fail for non-standing reasons as well.  Under Delaware law, the business judgment rule applies to decisions by corporate officers and directors.[90]  Decisions will not be disturbed by courts unless the directors or officers were interested or lacked independence relative to the decision, did not act in good faith, acted in a manner that cannot be attributed to a rational business purpose, or reached their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available; a plaintiff who fails to rebut the presumptions of the business judgment rule is not entitled to any remedy unless the transaction constituted waste.[91]  Plaintiff attempts to evade the business judgment rule by arguing that:  (1) 888 and NETeller operated illegal gambling operations and there was a known risk that federal authorities could crack down on these operations; (2) Defendants knew these risks but recklessly proceeded to invest in these corporations; and (3) if Defendants were ignorant of these risks, it was because they breached their duties to conduct due diligence and monitor the investment process.

Courts have rejected exactly this type of argument.[92]  In *Citigroup*, the plaintiffs alleged that the directors of Citigroup failed to monitor and manage the risks that Citigroup faced

---

[90]      *See Cede & Co. v. Technicolor, Inc.*, 734 A.2d 345, 361 (Del. 1993).

[91]      *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 52 n.62 & 73-74 (Del. 2006).

[92]      *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 128 (Del. Ch. 2009); *see also LAMPERS v. Blankfein*, No. 08 Civ. 7605 (LBS), 2009 U.S. Dist. LEXIS 42852 (S.D.N.Y. May 19, 2009) (rejecting similar argument).

from problems in the subprime lending market.[93]  Instead of specifically alleging how the directors had failed to monitor Citigroup's risks, the plaintiffs argued that certain "red flags" should have given the defendants notice of the impending problems in the subprime mortgage market and that the defendants either (1) consciously ignored these risks in the reckless pursuit of profits or (2) were ignorant of these risks because they failed to properly implement a system to identify risk.[94]  The Chancery Court rejected that argument, holding that the plaintiffs' conclusory allegations failed to adequately explain what the directors did or did not do to violate their duties to Citigroup.[95]  The court further recognized that the plaintiffs' theory was an attempt to evade the business judgment rule, reiterating that "the mere fact that a company takes on business risk and suffers losses — even catastrophic losses — does not evidence misconduct and, without more, is not a basis for personal director liability."[96]

Plaintiff does not allege that any Defendants had interests in the Fund's 888 or NETeller investments or that any Defendants lacked independence relative to those investments. Instead, Plaintiff appears to argue that Defendants did not act in good faith or could not reasonably have chosen to invest in 888 or NETeller.  Both arguments fail.

1.    **Plaintiff Has Not Alleged That Defendants Acted In "Bad Faith"**

A fiduciary acts in bad faith when (1) he or she intentionally acts with a purpose other than that of advancing the best interests of the corporation, (2) he or she acts with the intent to violate applicable positive law, or (3) he or she intentionally fails to act in the face of a known

---

[93]    *See Citigroup*, 964 A.2d at 111.

[94]    *See id.* at 126-27.

[95]    *See id.* at 129.

[96]    *Id.* at 130.

duty to act, demonstrating a conscious disregard for his or her duties.[97]  Plaintiff has not asserted

the first type of bad faith, because he does not allege that the defendants purchased stock in 888

or NETeller for any reason other than as part of the Fund's general investment strategy.

Plaintiff also fails to adequately plead that defendants knew that investing in 888

or NETeller violated any law.  In order to plead bad faith in this way, a plaintiff must plead

"facts that demonstrate that [Defendants] … had 'actual or constructive knowledge' that *their*

*conduct* was legally improper."[98]  Although Plaintiff cites public filings, court decisions, and

newspaper articles about whether certain conduct engaged in by 888, NETeller, and other

companies violated federal and state law, he cites nothing suggesting any defendants knew or

should have known that investments in publicly traded securities could violate federal or state

anti-gambling laws.  As demonstrated above, such investments do not violate federal or state

law, and Plaintiff has not identified any court or prosecutorial decision to the contrary, meaning

that Plaintiff cannot point to any "red flags."  Indeed, in *World Interactive Gaming* (cited

extensively in the Complaint), the New York Attorney General did not pursue claims against

outside investors.[99]

The Complaint also fails to allege intentional failure to act in the face of a known

duty to act.  Plaintiff alleges that defendants knew of the risk that 888 and NETeller's businesses

might be harmed by a federal crackdown on illegal gambling operations, but nonetheless

invested.[100]  But allegations that there was a known potential risk when an investment decision

was made are insufficient to plead that defendants disregarded a duty to protect the Fund from

---

[97]   *See In re Walt Disney*, 906 A.2d at 64, 66-67.  Plaintiff does not allege "subjective bad faith," which would require a showing that Defendants intended to harm the Fund.  *See id.* at 64.

[98]   *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (emphasis added).

[99]   *See* 714 N.Y.S.2d at 848.

[100]   *See* Compl. ¶¶ 77-78, 111.

investment losses.[101]  Indeed, the fact that the Fund had significantly positive returns during the period it was invested in 888 and NETeller means Plaintiff could not allege that the defendants disregarded a duty to protect the Fund from investment losses, because there is no duty to protect a mutual fund from all possible losses on every investment.[102]

Plaintiff also makes conclusory allegations that if the defendants were unaware of the risks posed to 888 and NETeller by a crackdown by federal authorities, then defendants failed in their duties to conduct due diligence or oversee the investment process.[103]  But Plaintiff pleads no *facts* demonstrating how the defendants' "oversight mechanisms" or due diligence processes were "inadequate," or how the defendants "knew of these inadequacies and consciously ignored them," the requirements for pleading this sort of claim.  Indeed, Plaintiff actually pleads that the defendants developed and implemented an investment strategy for the Fund,[104] which is inconsistent with a claim like this.  Under *Iqbal*, this means that Plaintiff's allegations cannot be deemed plausible, and so they fail.

2.     **The Complaint Does Not Plead Gross Negligence**

Gross negligence is "a reckless indifference to or a deliberate disregard of the whole body of stockholders[] or actions which are without the bounds of reason," an "extremely stringent" standard.[105]  The Complaint does not meet that standard.

Plaintiff alleges that defendants invested in 888 and NETeller despite knowing that these companies were involved in illegal gambling operations and could be hurt by what

---

[101]     *See Citigroup*, 964 A.2d at 130.

[102]     Put differently, all investment funds are expected to suffer some losses on some of their investments some of the time — that is an inevitable consequence of portfolio diversification.

[103]     Compl. ¶¶ 77-78.

[104]     Compl. ¶ 51.

[105]     *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 & n.45 (Del. Ch. 2008).

Plaintiff calls — in hindsight — an impending crackdown by federal authorities.[106]  But such

allegations regarding two investments in the Fund's portfolio are, without further allegations

regarding the entire portfolio, insufficient to support a gross negligence claim.  A portfolio

containing some higher-risk investments may be overall less risky than individual investments in

the same instruments.[107]  In such a portfolio, some investments will be expected to lose money,

sometimes as a result of known risks, but the portfolio may still be very profitable (as was the

case here).[108]  A trustee or investment manager overseeing a portfolio of investments thus cannot

be found grossly negligent based on the performance of one or two investments in the portfolio;

their investment behavior can only be evaluated according to the composition and performance

of the entire portfolio.[109]  Delaware has in fact codified this principle, requiring that courts

considering "the propriety of an investment decision" examine "the inherent nature and expected

performance of the investment portfolio … ."  12 Del. C. § 3302(c).

Not surprisingly, Plaintiff fails to make a single allegation regarding the Fund's

portfolio as a whole, probably because the Fund's share price increased 23.25% over the time

period it owned stock in 888 and NETeller, compared to the Dow Jones Industrial Average and

the S&P 500, which increased 16.85% and 14.66%, respectively, over the same period.[110]  Thus,

all Plaintiff alleges is that two particular Fund investments lost money.  Because Plaintiff has

---

[106]    Compl. ¶¶ 78-79, 112.

[107]    *See* Paul G. Haskell, *The Prudent Person Rule For Trustee Investments and Modern Portfolio Theory*, 69 N.C. L. Rev. 87, 100-04 (1990) (Henkin Decl. Exh. L).

[108]    *See id.*; *see also Citigroup*, 964 A.2d at 126 ("Businesses — and particularly financial institutions — make returns by taking on risk; a company or investor that is willing to take on more risk can earn a higher return.").

[109]    *See Citigroup*, 964 A.2d at 126.

[110]    *Compare* Complaint ¶¶ 52-60 (alleging that Fund owned stock in 888 and NETeller between September 1, 2005 and November 30, 2006) *with* Henkin Decl. Exh. J (Fund, DJIA, and S&P 500 prices during same period).

failed to allege any facts regarding the composition or performance of the Fund's entire portfolio, such allegations are insufficient to support a theory that defendants' investment decisions were grossly negligent.

Plaintiff also makes conclusory allegations that if defendants were unaware of 888 and/or NETeller's alleged involvement in illegal gambling or the supposedly impending crackdown by federal authorities, then defendants did not adequately conduct due diligence or oversee the investment process.  But such claims are pure hindsight and are not supported by any *factual* allegations regarding defendants' due diligence or oversight efforts, such as allegations about the due diligence that the Investment Advisor Defendants conducted, what a reasonable person could have concluded about the overall risks of the Fund's portfolio or particular investments, or how the Trustee Defendants supposedly failed to properly oversee the Fund's investment process.  As in *Citigroup*, Plaintiff simply relies on the flawed logic that, because the 888 and NETeller investments later lost value, the defendants must have breached duties.[111]  But the only particularized allegations in the Complaint are actually inconsistent with wrongdoing — Plaintiff affirmatively pleads that the Fund's trustees hired a professional advisor for the Fund, that the Fund's advisor developed and implemented investment strategies for the Fund, that the Fund voted at annual meetings of the companies in which the Fund invested, and that the Fund's trustees received regular reports regarding the Fund.[112]  Those allegations are more consistent with the defendants upholding the Fund's interests than with gross negligence.  The claims must therefore be dismissed under *Iqbal*.

---

[111]    *See* Compl. ¶¶ 77-78; *Citigroup*, 964 A.2d at 128.

[112]    Compl. ¶¶ 12, 48, 51, 62-63.

### 3.   Plaintiff Cannot State A Claim for Breach Of Fiduciary Duty Against The Investment Advisor Defendants

When a dispute relates to obligations that arise under a contract, that dispute should be treated as a breach of contract claim, and any breach of fiduciary duty claims relating to the same contract should be dismissed.[113]  Here, the relationship between the Fund and the Investment Advisor Defendants is governed by the Management Agreement, which provides that "[t]he Manager shall ... determine ... securities to be purchased ... by the [Fund] and implement those decisions" and that "[t]he Manager shall carry out its duties ... in accordance with applicable law ... ."[114]  Plaintiff's claim that the Investment Advisor Defendants breached their fiduciary duties is governed by these parts of the Management Agreement.  The claim should therefore be dismissed because it is contractual rather than tort-based.

### E.   The Complaint Fails To State A Claim For Waste

Waste is "an exchange that is so one-sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."[115]  To plead waste, a plaintiff must plead that the defendants "irrationally squander[ed] corporate assets — for example, where the challenged transaction served no corporate purpose or where the corporation received no consideration at all."[116]  Courts have consistently held that corporate waste claims trigger "an extreme test, very rarely satisfied by a shareholder plaintiff."[117]  Put

---

[113]    *See Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010).

[114]    Henkin Decl. Exh. B, § 1.1.

[115]    *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (citations omitted); *see also White v. Panic*, 783 A.2d 543, 554 (Del. 2001) ("an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade").

[116]    *White*, 783 A.2d at 554 (Del. 2001) (quotation and citation omitted); *see also Brehm*, 746 A.2d at 263.

[117]    *Zupnick v. Goizueta*, 698 A.2d 384, 387 (Del. Ch. 1997).

differently, "[i]f given the facts pled in the complaint, 'any reasonable person might conclude that the deal made sense, then the judicial inquiry ends.'"[118]  Although the test for waste is sometimes phrased in different ways, its core is that a waste claim requires a plaintiff to plead that no rational person would have engaged in the transaction being attacked.

Plaintiff's waste claim does not even come close to meeting this test:

- The Complaint does not allege that the Fund "received no consideration" for its 888 and NETeller investments, or even that the Fund paid too much for those investments.[119]  Plaintiff concedes that the Fund purchased and sold shares in LSE-listed companies in open-market, arm's-length transactions, received and owned those shares, and took normal actions for shareholders (such as voting those shares).  And in each transaction, including when the Fund sold the shares, there was someone (who the Court must presume was rational) willing to take the other side of the transaction in an impersonal market (the LSE), meaning that Plaintiff cannot show that no reasonable person would have engaged in the transactions.

- The sole basis Plaintiff pleads for the waste claim is that the 888 and NETeller investments were "illegal."[120]  As demonstrated above, that argument has no merit.  Other than that, the Complaint alleges only that the Fund lost money on the 888 and NETeller investments.  But Delaware does not permit fiduciaries to be held liable in waste based on alleged underperformance of a subset of publicly traded investments out of a portfolio that otherwise met a fund's overall investment objectives.[121]

If the Complaint sufficed to assert a waste claim then every allegedly losing investment could be challenged as "waste," which would be inconsistent with the fact that waste claims in Delaware are the exception rather than the rule.  The waste claim must therefore be dismissed.

---

[118]     *In re Lear Corp.*, 967 A.2d at 656.

[119]     Nor could Plaintiff allege anything like this, because according to Plaintiff the public (and thus the markets) knew about the potential that 888 and NETeller might be impacted by a federal crackdown on internet gambling at all relevant times.  *See* Compl. ¶¶ 28-30, 34, 70.  But the efficient market hypothesis thus dictates that the market prices for 888 and NETeller — the prices the Fund paid and received — accurately reflected the value of the securities, including all the information discussed in the Complaint, at all relevant times.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 245-47 (1988).

[120]     Compl. ¶¶ 161-62; *see also id.* ¶ 31 (alleging that Fund's investments were "unlawful").

[121]     *See* 12 Del. C. § 3302(c).

## CONCLUSION

For all the foregoing reasons, the Complaint should be dismissed in its entirety with prejudice.[122]

Dated:  December 8, 2011

MILBANK, TWEED, HADLEY & McCLOY
LLP

By:    s / Douglas W. Henkin
  James N. Benedict
  jbenedict@milbank.com
  Alan J. Stone
  astone@milbank.com
  Douglas W. Henkin
  dhenkin@milbank.com
  Mia C. Korot
  mkorot@milbank.com
1 Chase Manhattan Plaza
New York, NY  10005-1413
(212) 530-5000

*Attorneys for Defendants Neuberger Berman
Management LLC, Neuberger Berman,
LLC, Benjamin Segal, Peter E. Sundman,
and Jack L. Rivkin*

---

[122] With respect to the Independent Trustees' Memorandum of Law in Support of Motion to Dismiss Plaintiff's Verified Derivative and Class Action Complaint, dated December 8, 2011, the Investment Advisor Defendants disagree with the Independent Trustees' suggestion that the Court again dismiss the derivative claims without prejudice or delay deciding whether the Complaint states any viable claims.  Plaintiff's demand was extremely narrow, asking only that the board pursue the claims in the *Gamoran II* complaint.  But if the Investment Advisor Defendants are right that the claims in the Complaint have no legal merit, then *no one* can pursue them. Moreover, Plaintiff and his counsel have already stated that they intend to challenge the board's response to the demand.  *See* Henkin Decl. Exh. F at 10:19-24 ("[I]t's possible the directors would offer such a persuasive reasoning for their refusal of the demand that the plaintiff might drop the case.  I'm not predicting that that will happen because I find it hard to believe that they could persuade me that this case should be dropped … ."); Henkin Decl. Exh. E at 2.  In light of that and the fact that the Complaint purports to assert both direct and derivative claims, the Investment Advisor Defendants respectfully submit that this case is ripe for a merits determination.  *See Mozes v. Welch*, 638 F. Supp. 215, 222-24 (D. Conn. 1986) (resolving whether plaintiff could assert personal jurisdiction over certain defendants despite plaintiff's failure to comply with demand requirements and dismissing claims against certain defendants with prejudice).  The judicial economy principles that led Judge Eginton to address merits issues in *Mozes* warrant addressing whether the Complaint states legally viable claims here.

# Appendix A

2008
2009
2010
2011
Vanguard®
MCBREARTY V VANGUARD
SDNY Filed: Aug 29, 2008
SDNY Dismissed: Apr 2, 2009
2nd Circuit Affirmed: Nov 23, 2009
US Supreme Court Cert Denied: Jun 14, 2010
HARTSEL V VANGUARD
Del Chancery Filed: Apr 7, 2010
Del Chancery Dismissed: Jun 15, 2011
Del Supreme Court Appeal Filed: Jun 20, 2011
American Century Investments®
SEIDL V AMERICAN CENTURY
ND Cal Filed: Aug 28, 2008
ND Cal Withdrawn: Nov 15, 2008
SEIDL V AMERICAN CENTURY
SDNY Filed: Oct 15, 2008
SDNY Dismissed: May 7, 2010
2nd Circuit Affirmed: Jun 17, 2011
US Supreme Court Cert Filed: Sep 14, 2011
SEIDL V AMERICAN CENTURY
WD Missouri Filed: Jul 15, 2010
GOMES V AMERICAN CENTURY
ED Cal Filed: Aug 4, 2009
ED Cal Withdrawn: Jan 22, 2010
WD Missouri Filed: Jan 27, 2010
Causeway
WODKA V. CAUSEWAY
CD Cal Filed: Apr 15, 2009
CD Cal Dismissed: Oct 8, 2009
9th Circuit Affirmed: May 16, 2011
US Supreme Court Cert Denied: Nov 28, 2011
WODKA V. CAUSEWAY
Cal Superior Court Filed: Jun 15, 20111
NEUBERGER BERMAN
GAMORAN V NEUBERGER BERMAN
SDNY Filed: Dec 12, 2008
SDNY Dismissed by Stipulation: May 19, 2009
GAMORAN V NEUBERGER BERMAN
NY State Supreme Court Filed: Jul 15, 2010
Removed to SDNY: Aug 19, 2010
SDNY Dismissed: May 11, 2011
GAMORAN V NEUBERGER BERMAN
(the present case)
D. Delaware Filed: Aug 24, 2011
Transferred to SDNY: Nov 4, 2011

