UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BENJAMIN M. GAMORAN, derivatively on behalf of the nominal defendant with respect to its series mutual fund, the Neuberger Berman International Fund,

                    Plaintiff,

          - against -

NEUBERGER BERMAN, LLC, NEUBERGER BERMAN MANAGEMENT LLC, BENJAMIN SEGAL, PETER E. SUNDMAN, JACK L. RIVKIN, JOHN CANNON, FAITH COLISH, MARTHA C. GOSS, C. ANNE HARVEY, ROBERT A. KAVESH, HOWARD A. MILEAF, EDWARD I. O'BRIEN, WILLIAM E. RULON, CORNELIUS T. RYAN, TOM D. SEIP, CANDACE L. STRAIGHT, AND PETER P. TRAPP,

                 Defendants,

         - and -

NEUBERGER BERMAN EQUITY FUNDS d/b/a NEUBERGER BERMAN INTERNATIONAL FUND,

               Nominal Defendant.

---

11 Civ. 7957 (TPG) (KNF)

ECF Case

# PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP**
Thomas I. Sheridan, III
112 Madison Avenue
New York, NY 10016-7416
(212) 784-6404
tsheridan@hanlyconroy.com
*Attorneys for Plaintiff*

Dated: January 27, 2012

# TABLE OF CONTENTS

*Page*

Table of Contents ................................................................................................... i

Table of Authorities ............................................................................................. iii

Preliminary Statement ............................................................................................1

Statement of Facts ...................................................................................................1

    Overview ...........................................................................................................1

    The Parties .......................................................................................................2

    Procedural History ..........................................................................................2

    The Illegal Gambling Businesses ...................................................................3

    Defendants Knew of the Illegality ..................................................................3

    Defendants' Unlawful Investments in Illegal Gambling Businesses ..............5

    The Law Enforcement Crackdown ..................................................................5

    The Losses Suffered ........................................................................................5

    Defendants' Actions Violated the Gambling Act ............................................5

    Defendants' Actions Violated RICO ...............................................................6

    Plaintiff's Common Law Claims .....................................................................6

Argument .................................................................................................................8

I.     Defendants Violated the Gambling Act .........................................................8

    A.    "Own" Means "Own" ............................................................................8

    B.    "Part" Means "Part" ...............................................................................9

    C.    The Statute Contains No Exception for Criminal Enterprises Traded on Foreign Stock Exchanges ......................................................................10

    D.    The Statute Contains No Implied Exception for "Passive" Ownership ................11

    E.    There Is No Implied Exception for Publicly-Owned Illegal Gambling Businesses ............................................................................................13

F.      There Is No Implied Exception for Foreign Illegal Gambling Businesses ............13

G.      The Complaint Does Not Seek to Pierce Any Corporate Veil ..............................15

H.      This Case Does Not Involve Any Extraterritorial Application of U.S. Law .........15

I.      Plaintiff Need Not Prove That Defendants Violated State Criminal Laws ..........15

J.      There Is No Implied Exception for Owners Who Claim Ignorance of the
        Criminal Law ......................................................................................................18

II.     The Court Should Reject The Other Grounds for Dismissal if It Determines that
        Defendants Violated the Gambling Act ...........................................................................19

        A.      Trustees Have Waived Their Right to Terminate Litigation Upon a Finding
                by the Court that Defendants Violated Criminal Statutes .....................................19

        B.      Plaintiff Has Properly Alleged RICO Claims Under the Second Circuit's
                Most Recent Decision Concerning Investment Injury ..........................................21

        C.      The Board Lacks Authority to Terminate Suit by Mutual Fund Shareholders
                Seeking Redress under a Federal Remedial Statute Such as RICO ......................23

Conclusion ...................................................................................................................................26

## TABLE OF AUTHORITIES

Page

**Cases**

*Bell v. Hood*, 327 U.S. 678 (1946) ........................................................................... 26

*Boyle v. United States*, 556 U.S. 938, 129 S. Ct. 2237 (2009) ...................................... 9

*Cheek v. United States*, 498 U.S. 192 (1990) ............................................................. 18

*Clackamas Gastroenterology Associates, P. C. v. Wells*, 538 U.S. 440 (2003) ............................ 9

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984) ................................................... 23

*DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001) ........................................................ 22

*DeSimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007) ................................................... 7

*Exxon Corp. v. Hunt*, 475 U.S. 355 (1986) ............................................................... 12

*Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003) ...................................................... 7

*Ideal Steel Supply Corp. v. Anza*, 652 F. 3d 310 (2d Cir. 2011) ..................................... 22

*Ikuno v. Yip*, 912 F.2d 306 (9th Cir. 1990) .............................................................. 22

*In re Am. Intern. Group, Inc.*, 965 A2d 763 (Del. Ch . 2009), *aff'd,* 11 A.3d 228 (2011) ........... 20

*In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27 (Del. 2006) .................................... 7

*Jackson v. Smith*, 254 U.S. 586 (1921) .................................................................... 6

*Kamen v. Kemper Fin. Services, Inc.*, 500 U.S. 90, 930 (1991) ...................................... 23, 24

*Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A2d 726 (Del. 1988) ................................. 20

*Laventhol, Krekstein, Horwath & Horwath v. Tuckman*, 372 A.2d 168 (Del. 1976) .................... 6

*Marbury v. Madison*, 5 U.S. 137 (1803) .................................................................. 26

*McBrearty v. The Vanguard Group, Inc.*, No. 08-CV-7650, 2009 WL 875220 (S.D.N.Y.
    Apr. 2, 2009), *aff'd* 353 Fed. Appx. 640 (2d Cir. 2009) (summary order), *cert. denied*, 130
    S. Ct. 3411 (2010) ...................................................................................... 22

*Meinhard v. Salmon*, 164 N.E. 545 (N.Y. 1928) ........................................................ 8

*Metro Communication Corp. BVI v. Advanced Mobilecomm Techn., Inc.*, 854 A.2d 121
    (Del. Ch. 2004) .......................................................................................... 8

*Morrison v. Nat'l Aus. Bank Ltd.*, 130 S. Ct. 2869 (2010) ............................................ 15

*People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc. 2d 852 (N.Y. Co. Sup.
    Ct. 1999) ................................................................................................. 3

*Perrin v. United States*, 444 U.S. 37 (1979) ............................................................. 8

*Pinkerton v. United States*, 328 U.S. 640 (1946) .................................................. 6

*Rousso v. State*, 170 Wash. 2d 70, 239 P.3d 1084 (2010) (*en banc*) ........................... 17

*Salinas v. United States*, 522 U.S. 52 (1997) ........................................................ 9

*Sammons v. Ridgeway*, 293 A.2d 547 (Del. 1972) ................................................. 7

*Sanabria v. United States*, 437 U.S. 54 (1978) .................................................. 9, 11

*Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91 (2d Cir.1997) ..................... 22

*Schmeusser v. Schmeusser*, 559 A.2d 1294 (Del. 1989) ......................................... 8

*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985) .................................... 21, 25

*Seidl v. Am. Century Cos., Inc.*, 713 F. Supp. 2d 249 (S.D.N.Y. 2010), *aff'd* 427 Fed. Appx.
    35 (2d Cir. 2011) (summary order), *cert. denied*, 2011 WL 4344573 (Dec. 12, 2011) .......... 22

*Smith v. Hurd*, 53 Mass. 371 (1847) ................................................................. 19

*State ex rel. Nixon v. Interactive Gaming & Communications Corp.*, 1997 WL 33545763
    (Mo. Cir. Ct. 1997) ............................................................................... 3

*United States v. Ables*, 167 F.3d 1021 (6th Cir. 1999) ......................................... 18

*United States v. BetOnSports Plc*, 2006 WL 3257797 (E.D. Mo. Nov. 9, 2006) ................ 5

*United States v. Busacca*, 936 F.2d 232 (6th Cir.1991) ........................................ 22

*United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001) ............................................. 3

*United States v. Dauray*, 215 F.3d 257 (2d Cir. 2000) .......................................... 12

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) ............................................ 3

*United States v. Hawes*, 529 F.2d 472 (5th Cir. 1976) ....................................... 11, 18

*United States v. International Minerals & Chemical Corp.*, 402 U.S. 558 (1971) .............. 18

*United States v. Merrell,* 701 F.2d 53 (6th Cir 1983) ........................................... 11

*United States v. Tedder*, 403 F.3d 836 (7th Cir. 2005) ......................................... 18

*Weems v. United States*, 217 U.S. 349 (1910) .................................................... 14

**Statutes and Rules**

18 U.S.C § 1955 ............................................................................ *passim*

18 U.S.C. § 1955(b)(1) ........................................................................ 16

18 U.S.C. § 1961(1)(B) ...................................................................... 6, 21

18 U.S.C. § 1961(5) ........................................................................... 22

18 U.S.C. § 1962(c) .......................................................................... 6, 21

18 U.S.C. § 2 .................................................................................. 6

Illegal Gambling Business Act of 1970 ......................................................................... 1

N.Y. Penal Law § 100.00 .................................................................................... 16, 17

N.Y. Penal Law § 110.00 ......................................................................................... 16

N.Y. Penal Law § 225.00(5) ..................................................................................... 16

N.Y. Penal Law § 460.25(2)(a) ................................................................................. 17

N.Y. Penal Law §§ 460.20 ....................................................................................... 17

Organized Crime Control Act of 1970, Pub. L. 91-452, 84 Stat. 922 ................................. 7, 9, 25

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ........................... 6

Unlawful Internet Gambling Enforcement Act of 2006, 31 U.S.C. § 5361 *et seq.* ..................... 5

## PRELIMINARY STATEMENT

The primary issue presented to this Court is narrow and straightforward: does the plain and unambiguous language of the Illegal Gambling Business Act of 1970, which makes it a felony to "own … all or part of an illegal gambling business," apply to U.S. mutual fund fiduciaries who knowingly purchased stock of illegal gambling businesses? Plaintiff respectfully submits that the Court should uphold the plain language of the statute and not create a special exemption for Defendants just because the shares they purchased were listed on a foreign stock exchange. Such an exception would effectively authorize foreign stock exchanges to override U.S. law simply by allowing criminal organizations to trade on their exchanges. Resolution of the remaining issues raised by defendants' motions largely turn on the Court's determination of this key question.

## STATEMENT OF FACTS

### Overview

This case involves mutual fund fiduciaries who squandered fund assets investing in illegal offshore Internet gambling businesses. Defendants made the investments despite explicit warnings by the United States Department of Justice ("DOJ") – and even the gambling companies themselves – that the primary purpose of the offshore entities was to violate federal and state gambling laws and that the DOJ considered them to be criminal enterprises. By making the investments, Defendants violated 18 U.S.C § 1955 (the "Gambling Act" or "§ 1955"), which makes it a felony to "own … all or part of an illegal gambling business." The mutual fund and its investors suffered millions of dollars of losses following a law enforcement crackdown that lead to, among other things, the arrests and successful prosecutions of the executives of one of the gambling companies in which Defendants invested, the criminal forfeiture of $236 million in illegal gambling proceeds, and the withdrawal of the gambling companies from the U.S. market.

**The Parties**

Plaintiff is a shareholder in Neuberger Berman Equity Funds (the "Fund"). The institutional defendants – Neuberger Berman, LLC and Neuberger Berman Management LLC – are fiduciaries who manage the Fund. The individual defendants are managers, officers, or trustees of the institutional defendants involved in the wrongdoing. (Compl. ¶ 11-23)

**Procedural History**

No court has yet decided the key issue presented in this case: whether Defendants violated the Gambling Act and are therefore liable to the Fund's investors. All prior decisions in this case have turned on procedural issues. Indeed, the primary issues resolved in other cases involving different mutual funds turned on whether the plaintiff must first make a demand prior to filing common law claims, or whether the plaintiff must pursue derivative, as opposed to direct, claims.[1]

Details regarding the procedural history this case can be found in Paragraphs 2 through 11 of the accompanying Declaration of Thomas I. Sheridan, III ("Sheridan Decl."). Defendants go to great lengths to create the misimpression that the procedural history of this case somehow reflects adversely on its merits. Defendants concede, however, that no court has ever decided the key issue that *Defendants* (as well as Plaintiff) now ask this Court to decide. The fact that

---

[1] In *Hartsel v. The Vanguard Group, Inc.*, 2011 WL 2421993 (Del. Ch. June 15, 2011), *aff'd* 2012 WL 171881 (Jan 19, 2012) (unpublished), the Delaware Court of Chancery dismissed the plaintiffs' claims on the ground that the plaintiffs needed to first make a demand on the board prior to filing suit. That holding is irrelevant to this case. The *Hartsel* court confirmed that its decision does not "not address Defendants' ... argument that the complaint fails to state a claim." *Id.* at *1 & *28. In *dicta*, the court conjectured that, until a federal court determines whether the Gambling Act applies to the defendants' conduct, the business judgment rule would protect *the funds' trustees* for the purpose of determining demand futility under Delaware law. The only issue determined by *Hartsel* applicable to this case is that Plaintiff's claims are derivative, not direct. Plaintiff therefore concedes that his Sixth through Ninth Claims for Relief, which assert direct claims, should be dismissed based on *Hartsel*.

Plaintiffs have had to navigate a series of procedural roadblocks to reach this point should not distract the Court. Mutual fund investors suffered losses because their fiduciaries knowingly invested in criminal organizations; they are entitled to just compensation.

**The Illegal Gambling Businesses**

NETeller Plc ("NETeller") and 888 Holdings PLC ("888"), are Internet gambling businesses that earned most of their revenues from gamblers in the U. S. in violation of U.S. anti-gambling laws. (Compl. ¶¶ 27-42; *see also* Sheridan Decl. Ex. A) 888 is located in Gibraltar, and NETeller is located in the Isle of Man. (Compl. ¶¶ 28, 38) Seeking investment capital for the expansion of their illegal businesses, both listed their shares on the London Stock Exchange in 2005 and 2004, respectively. (Compl. ¶¶ 29-38) They sought  to evade the reach of the U.S. criminal justice system by not listing their shares to be traded on any U.S. exchange through American Depository Receipts or otherwise. (Compl. ¶ 42)

**Defendants Knew of the Illegality**

Before Defendants made the investments at issue, it was well-established that gambling businesses located outside the U.S. violated numerous federal and state criminal laws when they took wagers from U.S. gamblers. *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) (affirming a 2003 conviction); *United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001); *State ex rel. Nixon v. Interactive Gaming & Communications Corp.*, 1997 WL 33545763 (Mo. Cir. Ct. 1997); *People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc. 2d 852 (N.Y. Co. Sup. Ct. 1999). *See also* Compl. ¶¶ 80-96 & 103-05)

The Complaint describes many prosecutions and other enforcement actions that put Defendants on notice that it was illegal to have dealings with offshore Internet gambling companies. (Compl. ¶¶ 79-91) For example, in 2003, the DOJ brought suit against PayPal for processing transactions for an illegal Internet gambling business. PayPal had to pay $10 million

in penalties. (Compl. ¶ 89) Similarly, in April 2004, the DOJ seized over $6 million from Discovery Communications for broadcasting commercials from illegal Internet gambling companies. (Compl. ¶ 90)

> In 2003, the DOJ issued a public warning letter that:

> [n]otwithstanding their frequent claims of legitimacy, Internet gambling and offshore sportsbook operations that accept bets from customers in the United States violate Sections 1084, 1952, ***and 1955*** of [Title] 18 of the United States Code, each of which is a Class E felony. Additionally, pursuant to [18 U.S.C. § 2], any person or entity who aids or abets in the commission of any of the above-listed offenses is punishable as a principal violator of those statutes.

(Compl. ¶ 88) (emphasis added).

NETeller disclosed in its 2004 prospectus that the DOJ considered its principal operations to violate various criminal statutes in the U.S. (Compl. ¶¶ 36-41; *see also* Sheridan Decl. Ex. A) Similarly, 888 warned investors in 2005 that it was "exposed to legal and regulatory risks due to the level of revenue generated" from gamblers in the U.S. (Compl. ¶¶ 34-35)

Illegal gambling businesses made no secret of the legal risks they took. In 2005, *The New York Times* reported that, for one of the largest Internet gambling companies, the "potential illegalities aren't just a secret hidden in its business plan – they are the centerpiece of its business plan."[2] *The New York Times* also reported that "Internet casinos are outlaw operations in the eyes of the federal government."[3]

---

[2] K. Eichenwald, *At PartyGaming, Everything's Wild*, N.Y. Times, June 26, 2005. Available at www.nytimes.com/2005/06/26/business/yourmoney/26poker.html.

[3] M. Ritchel, *Wall St. Bets on Gambling on the Web*, N.Y. Times, Dec. 25, 2005. Available at www.nytimes.com/2005/12/25/business/25gamble.html?pagewanted=all.

**Defendants' Unlawful Investments in Illegal Gambling Businesses**

In an effort to share in the profits of the gambling businesses' illegal activity, Defendants caused the Fund to purchase approximately $19 million worth of NETeller shares and over $13 million worth of 888 shares. (Compl. ¶¶ 52-54, 56-59)

**The Law Enforcement Crackdown**

A law enforcement crackdown launched by the DOJ in 2006 led to arrests and prosecution of NETeller's founders. They pleaded guilty to gambling offenses, including the Gambling Act, and agreed to forfeit $100 million in criminal proceeds. In addition, NETeller agreed to forfeit $136 million in criminal proceeds and admitted that its principal business violated federal law, including the Gambling Act. (Compl. ¶ 41; *see* Sheridan Decl. Ex. A) Other illegal gambling businesses were also successfully prosecuted. (Compl. ¶ 92-105) As part of the crackdown, Congress enacted the Unlawful Internet Gambling Enforcement Act of 2006, 31 U.S.C. § 5361 *et seq.*, which made it more difficult for illegal gambling businesses to operate by making it unlawful to transfer funds to or from such entities. (Compl. ¶ 99)

**The Losses Suffered**

The value of the illegal gambling businesses plummeted after law enforcement choked off their primary source of revenue. (Compl. ¶¶ 1, 92-94) The stock that Defendants purchased on behalf of the Fund lost all of the value attributable to the illegal revenue. (Compl. ¶¶ 106-12)

**Defendants' Actions Violated the Gambling Act**

The complaint alleges that by knowingly causing the Fund to "own" a "part" of an "illegal gambling business,"[4] Defendants caused the Fund to violate the Gambling Act.

---

[4] "Illegality" under the Gambling Act is based on state law. The gambling companies in which Defendants invested violated the laws of virtually all fifty states. *See United States v. BetOnSports Plc*, 2006 WL 3257797, at *2 (E.D. Mo. Nov. 9, 2006); C. Doyle, *Internet*

Furthermore, because they aided and abetted the Fund's violation of § 1955, Defendants are individually liable as principal violators pursuant to 18 U.S.C. § 2. Defendants are also liable as co-conspirators.[5] Importantly, Defendants committed separate and independent violations of the Gambling Act by causing the Fund to "own ... all or part" of illegal gambling businesses. Defendants' violations are distinct from the separate crimes committed by the gambling companies and their managers, who *also* violated the Gambling Act by "conducting" or "managing" them.

**Defendants' Actions Violated RICO**

By causing the Fund to violate the Gambling Act repeatedly, Defendants conducted the affairs of the Fund through a "pattern of racketeering activity" in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"). *See* 18 U.S.C. § 1961(1)(B); 18 U.S.C. § 1962(c). The violations of RICO are pled in support of Plaintiff's common law claims as well as civil RICO claims. The complaint alleges that "[t]he Fund has been injured in its business or property by reason of Defendants' violations of § 1962." (Compl. ¶ 67)

**Plaintiff's Common Law Claims**

The Complaint states common law claims for breach of fiduciary duty, negligence, and waste. It is wrongful for one party knowingly to seek to profit from the wrongdoing of another, particularly from criminal activity.[6] Violations of criminal statutes will support liability on the

---

*Gambling: Overview of Federal Criminal Law*, Congressional Research Service (Updated February 27, 2006) at Ex. A.

[5] *See Pinkerton v. United States*, 328 U.S. 640 (1946).

[6] *See Jackson v. Smith*, 254 U.S. 586, 589 (1921) (those who knowingly participate in a breach of fiduciary duty by a third party are jointly and severally liable for all profits obtained); *Laventhol, Krekstein, Horwath & Horwath v. Tuckman*, 372 A.2d 168, 170 (Del. 1976) (same).

basis of negligence *per se*.[7] Moreover, investing in criminal enterprises can reasonably be said to be imprudent, particularly since such investments can only return a profit so long as the criminal organization successfully evades law enforcement. The courts have a duty to avoid the promotion of such illegality.[8]

Defendants clearly breached their fiduciary duties. It is "utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully."[9] Moreover, "[a] failure to act in good faith may be shown ... where [a] fiduciary acts with intent to violate applicable positive law."[10] Thus, a "fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the

---

[7] *See Sammons v. Ridgeway*, 293 A.2d 547 (Del. 1972). Plaintiffs and Nominal Defendants are within the class of individuals intended to be protected by the statutes that Defendants violated, which is a requirement for the application of negligence *per se*. Section 1955 and RICO were enacted as part of the Organized Crime Control Act of 1970, Pub. L. 91-452, 84 Stat. 922 (the "OCCA"). The statement of findings that prefaces the OCCA states:

> The Congress finds that … organized crime derives a major portion of its power through money obtained from such illegal endeavors as *syndicated gambling* …; [that] this money and power are increasingly used to infiltrate and *corrupt legitimate business* and … corrupt our democratic processes; [and that] organized crime activities in the United States weaken the stability of the Nation's economic system, *harm innocent investors* and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation ….

84 Stat. 922-923 (emphasis added). The statute's statement of findings expressly refers to "harm to innocent investors" and the corruption of "legitimate businesses" in connection with "syndicated gambling." Plaintiffs (innocent investors) and Nominal Defendants (otherwise legitimate businesses in which Plaintiffs invested and that were corrupted by Defendants) were harmed by Defendants' investments in syndicated gambling and are therefore well within the class of individuals intended to be protected by the OCCA.

[8] *In re Delaware Sports Serv.*, 196 A.2d at 219.

[9] *DeSimone v. Barrows*, 924 A.2d 908, 934-35 and n.89 (Del. Ch. 2007). *Accord Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003)).

[10] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006)).

entity."[11] Defendants failed to act in good faith when they violated the Gambling Act and RICO and when they attempted to profit from the illegal activities of NETeller and 888. "A trustee is held to something stricter than the morals of the market place,"[12] and "courts have an obligation to enforce that principle."[13]

ARGUMENT

I.     DEFENDANTS VIOLATED THE GAMBLING ACT

The Gambling Act, is clear and unambiguous. Whoever "owns all or part of an illegal gambling business" commits a felony. § 1955(a).

The gambling businesses are corporations. Therefore, the only way to "own" "all or part" of them was to own their stock. By causing the Fund to own stock in illegal gambling businesses – knowing as they did that the gambling businesses got most of their business from gamblers in the U.S. – Defendants caused the Funds to commit a felony. In so doing, they deliberately sought to share in the illicit profits of known criminal activity. By causing the Funds to commit felonies, Defendants were guilty as principals, both as aiders and abettors and as conspirators.

Despite the plain language of the statute, Defendants argue that it should not apply to *them*. None of their arguments withstands scrutiny.

A.     "Own" Means "Own"

Unless otherwise defined, words in a statute must be interpreted according to "their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979).The gambling businesses at issue are corporations. According to the ordinary meaning of the term, a

---

[11] *Metro Communication Corp. BVI v. Advanced Mobilecomm Techn., Inc*., 854 A.2d 121, 131 (Del. Ch. 2004).

[12] *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928).

[13] *Schmeusser v. Schmeusser*, 559 A.2d 1294, 1298 n.1 (Del. 1989).

corporation is "owned" by its shareholders. *See, e.g., Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 442 (2003) (shareholders described as "own[ing]" a corporation).

The complaint alleges that Defendants violated the Gambling Act not by causing the Funds to own the *assets* of illegal gambling businesses, but rather by causing them to own "all or part" of the *businesses themselves*. Therefore, Defendants argument that § 1955 does not apply to them because shareholders do not own the corporation's *assets* is a *non sequitur*.

Defendants argue that a stockholder does not "own" the corporation in which he holds stock, and they contend that "a person who owns a share of Coca-Cola Company stock is not said to 'own' the Coca-Cola Company." (Def. Br. at 9) That is incorrect. A shareholder who owns a single share usually does not own the entire company, but he certainly "owns" a "part" of the company. According to Defendants, nobody can ever "own" part of a corporation. That is absurd. Such an interpretation would eviscerate the statute.

Defendants seek refuge in the "rule of lenity." In applying criminal laws, however, courts "must follow the plain and unambiguous meaning of the statutory language." *Salinas v. United States*, 522 U.S. 52, 57 (1997).Where, as here, the statutory language is clear, courts may not resort to a narrowing construction. *Boyle v. United States*, 556 U.S. 938, 129 S. Ct. 2237, 2246-47 (2009). In fact, § 1955 has been construed broadly. *Sanabria v. United States*, 437 U.S. 54, 70 n.26 (1978).

### B.    "Part" Means "Part"

The statute creates no implied exception for small shareholdings. Congress knew how to set minimum thresholds when it so desired. Section 1955 was enacted with RICO as part of the Organized Crime Control Act of 1970, Pub. L. 91-452, 84 Stat. 922. Section 1962(a), which is part of RICO, sets ownership and control thresholds of one percent stock ownership or the power

to elect directors. The lack of similar thresholds in § 1955 demonstrates that Congress intended an absolute prohibition.

### C.     The Statute Contains No Exception for Criminal Enterprises Traded on Foreign Stock Exchanges

Defendants contend that criminal enterprises should be allowed to access U.S. capital markets as long as they can persuade a foreign stock exchange to allow them to trade. The Gambling Act, however, contains no exception for ownership of illegal businesses whose shares are traded on a foreign stock exchange. Defendants' proposed judicially created loophole for illegal businesses listed on foreign exchanges would effectively legitimize off-shore havens for illegal conduct, and it would effectively permit foreign stock exchanges to veto U.S. law and give criminal enterprises the ability to access U.S. investment capital to fund their violations of U.S. criminal law.

This is not a case in which the foreign company incidentally happened to violate U.S. law; this is a case in which the primary purpose of the foreign company was to violate U.S. law – and Defendants knew it. While the U.S. cannot control which companies foreign stock exchanges allow to trade, it can certainly prohibit U.S. citizens from knowingly investing in criminal enterprises – regardless of where the stock of the criminal enterprise happens to trade.

A recent example in the news illustrates how important it is for this Court to reject Defendants' proposed judicial exception. The United States government identified the Tidewater Company, headquartered in the port city of Bandar Abbas, Iran, as an illegal organization that facilitates illicit arms sales and funnels money to terrorist organizations.[14] It is illegal for an American to transact business with the company or invest in it. If a foreign stock exchange listed Tidewater's stock to trade on its exchange, U.S. investors should not be free to provide capital

---

[14] *See* www.treasury.gov/resource-center/sanctions/ofac-enforcement/pages/20110623.aspx.

investment to Tidewater. It does not matter if a stock trades on the London, Shanghai, or Tehran exchanges – no foreign authority, much less a foreign stock exchange, can provide a safe haven for U.S. investors to fund violations of U.S. law.

### D.     The Statute Contains No Implied Exception for "Passive" Ownership

There is no implied exception in the statute for "passive" owners.[15] The essence of "ownership" is the right to participate in the profits of the enterprise. Ownership is by its nature passive, but it is hardly innocent. Indeed, passive owners of a criminal enterprise are among the most culpable, because they are entitled to reap the profits from the illegal activity – which is the ultimate goal of the activity. It is perfectly rational that Congress would prohibit any attempt to profit from illegal gambling, either as an active manager or passive owner or financier.

The Supreme Court has said that the Gambling Act "proscribes any degree of participation in an illegal gambling business, except participation as a mere bettor." *Sanabria v. United States*, 437 U.S. 54, 70 n.26 (1978). Even waiters and janitors have been found to be sufficiently involved with illegal gambling operations be subject to criminal liability under the Gambling Act. *United States v. Merrell,* 701 F.2d 53 (6th Cir 1983). Those who seek to profit from illegal activity through ownership of a criminal enterprise are far more culpable that waiters and janitors. There is no rational basis for the Court to create an exception to the plain language of the statute. Indeed, such an exception would eviscerate the statute.

In *United States v. Hawes*, 529 F.2d 472, 478 (5th Cir. 1976), the Fifth Circuit rejected virtually the same argument made by Defendants here, saying, "[w]e are unable to agree with this strained interpretation of an 'illegal gambling business.' Even upon a strict construction of

---

[15] The complaint alleges that Defendants were *not* passive owners. (Compl. ¶¶ 61-64)

the statutory language … we find no requirement that defendants must themselves engage in the act of illegal gambling."

Defendants argue that because *other* conduct proscribed by § 1955 (*e.g.*, "manages", "directs") involves active participation in gambling, "owns" should be judicially limited to ownership that involves active participation. Defendants' premise is flawed. Section 1955 also prohibits financing illegal gambling businesses, which does not involve active participation. Thus, two of the six forms of proscribed conduct are passive.

Furthermore, this Court should avoid a construction that would render the words "owns" and "finances" redundant. *Exxon Corp. v. Hunt*, 475 U.S. 355, 369-70 (1986). The other forms of conduct prohibited by § 1955 cover all forms of active involvement in gambling. If "finances" and "owns" also required active participation, then those words would be surplusage.

The prohibition against financing illegal gambling businesses shows that Congress wanted to target those who provide financial support to such criminal enterprises. The prohibition against owning "all or part" of such entities demonstrates that Congress wanted to target those who seek to profit from them.

Contrary to Defendants' argument, the canon of construction *ejusdem generis* is inapplicable. In *United States v. Dauray*, 215 F.3d 257 (2d Cir. 2000), the Court explained that where "general words follow a specific enumeration of persons or things, the general words should be limited to persons or things similar to those specifically enumerated." 215 F.3d at 262. "Owns" is not a "general" word that "follows" a specific enumeration. To the contrary, "owns" is a "specific" word that is *part of* the enumeration.

12

### E.    There Is No Implied Exception for Publicly-Owned Illegal Gambling Businesses

Nothing in § 1955 suggests a distinction between "illegal gambling businesses" that are closely held and those whose shares are publicly traded. The successful prosecutions of PartyGaming, NETeller, and other publicly-traded gambling companies confirm that there is no implied exception for public companies.

The legislative history indicates that § 1955 was aimed at "large scale gambling businesses." *See* H.R. Rep. No. 91-1549, 91st Congr. 2d Sess., 2 U.S. Code Cong. & Admin. News at 4029 (1970). Public companies (which tend to be larger than private companies) are *more* likely, rather than less likely, to be within the scope of the legislative purpose of stamping out large scale illegal gambling operations.

### F.    There Is No Implied Exception for Foreign Illegal Gambling Businesses

There is no basis in the language of the statute for an implied exception for illegal gambling businesses incorporated in other countries. The successful prosecutions of many foreign gambling companies and their principals confirm that they are subject to the law. It would be a grave error for this Court to depart from the plain language of statute to create a judicial exception for ownership of companies that are formed in foreign jurisdictions for the purpose of violating U.S. law. Doing so would legitimize off-shore havens for illegal conduct.

Defendants say that no court has held that the purchase or ownership of publicly traded stock violates § 1955. They must concede, of course, that no court has ever held the contrary. Internet gambling is a relatively recent phenomenon, and the first illegal Internet gambling company to issue shares to the public did not do so until 2001. Such companies did not attract

significant U.S. investor interest until some years later.[16] Given this timing, it is unsurprising that no court has yet had occasion to rule – one way or the other – on the legality of such investments. Because the issue is one of first impression, it is particularly important for this Court to set a precedent that makes clear that investors in the U.S. are not at liberty to provide financial support for foreign criminal enterprises whose primary purpose is to violate federal and state criminal law.

As the Supreme Court of the United States has explained:

> Legislation, both statutory and constitutional, is enacted, it is true, from an experience of evils but its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle, to be vital, must be capable of wider application than the mischief which gave it birth.

*Weems v. United States*, 217 U.S. 349, 373 (1910).

When the Gambling Act was enacted in 1970, the Internet did not exist. That did not stop the courts from applying the Gambling Act to Internet gambling once that evil developed in the 1990s. Similarly, prior to 2000, it was not possible for public investors to buy stock in illegal off-shore Internet gambling businesses. But that should not stop the courts from applying the Gambling Act to ownership of stock in illegal Internet gambling businesses now that that evil has developed.

A contrary holding would set a dangerous precedent. It would effectively clear the way for persons in the U.S. to provide financial support for foreign criminal enterprises intent on violating U.S. criminal law.

---

[16] To the best of Plaintiffs' counsel's knowledge, the first illegal Internet gambling company to offer its shares for sale to the public anywhere in the world was Sportingbet in 2001. *See* Sportingbet.com launches share offering, BBC News, http://news.bbc.co.uk/2/hi/business/1132366.stm (last visited January 27, 2012). Plaintiffs' counsel are unaware of any investments in such companies by U.S. mutual funds prior to 2004.

### G.      The Complaint Does Not Seek to Pierce Any Corporate Veil

Defendants argue that holding them liable would violate corporate law principles that shield shareholders of corporations from the crimes of the corporation. But Plaintiff does not seek to pierce any corporate veil or to impose vicarious liability on anyone. The illegal gambling businesses violated the Gambling Act by *operating* illegal gambling businesses. Defendants, on the other hand, caused the Fund to commit the separate an independent crime of *owning* "all or part" of such businesses. Plaintiff seeks to hold Defendants liable for *their own crimes*, not the crimes of anyone else.

### H.      This Case Does Not Involve Any Extraterritorial Application of U.S. Law

Defendants argue that applying the Gambling Act and RICO to their conduct may be an impermissible extraterritorial application of U.S. law. This argument lacks merit. This case involves participation in illegal gambling through *ownership* of illegal gambling businesses – an activity that does not focus on the place where the illegal gambling stock is *purchased* but rather on the place where the *ownership* takes place. The Fund is a Delaware entity located in New York. Its *ownership* of the illegal gambling businesses occurred in the U.S., which is also where the underlying illegal gambling occurred. Thus, Plaintiff does not rely on any extraterritorial application of U.S. law.[17]

### I.      Plaintiff Need Not Prove That Defendants Violated State Criminal Laws

Defendants devote pages of their brief arguing that their conduct did not violate various state criminal laws. These arguments simply misconstrue the requirements of the Gambling Act.

---

[17] Defendants rely on *Morrison v. Nat'l Aus. Bank Ltd.*, 130 S. Ct. 2869 (2010). *Morrison* held that the U.S. securities laws do not apply to *purchases and sales* of securities outside the U.S. In contrast, this case involves participation in illegal gambling businesses through *ownership* of them.

To establish that Defendants violated the Gambling Act and RICO, Plaintiff need not prove that *Defendants* violated state criminal law. Violations of state criminal law are only relevant with respect to the operations of the illegal gambling businesses. To be an "illegal gambling business" under the Gambling Act, an entity must have violated at least one state anti-gambling law. 18 U.S.C. § 1955(b)(1). Here, the complaint alleges that the illegal gambling businesses violated state gambling laws by accepting bets from gamblers located within the United States. That uncontroverted allegation is confirmed by the various guilty pleas, criminal convictions, and judicial admissions of the entities and their executives. (Compl. ¶¶ 4, 32, 39-41, 64, 81-85)

Because the gambling companies in which Defendants invested were "illegal gambling businesses" within the meaning of § 1955(b)(1), it is unnecessary for Plaintiff to allege that the Defendants *also* violated state gambling laws by *investing* in them. All that is required is a showing that Defendants caused the Fund to "own ... all or part" of such illegal gambling business.

In any event, Defendants *did* violate state law. For example, under N.Y. Penal Law § 225.00(5), "[a] person 'profits from gambling activity' when, other than as a player, he accepts or receives money or other property pursuant to an agreement or understanding with any person whereby he participates or is to participate in the proceeds of gambling activity." The only reason the Fund did not violate § 225.05, as Defendants point out, is that it *lost* money instead of profiting. The *attempt* to profit, however, was clearly a violation of N.Y. Penal Law § 110.00 (attempt). By attempting to cause the Fund to violate § 225.05, Defendants violated N.Y. Penal Law § 100.00 (criminal solicitation). And by conspiring to seek to profit from illegal gambling

16

Defendants were guilty of violating N.Y. Penal Law § 100.00 (conspiracy).[18] Thus, Defendants did violate state law.

The only reason Defendants were not also guilty of violating New York's equivalent of RICO is that they did not cause the Fund to own 5% or more of the gambling businesses stock. *See* N.Y. Penal Law § 460.20 ("enterprise corruption" includes acquiring "any interest" in a criminal enterprise); N.Y. Penal Law § 460.25(2)(a) (exception for open market purchases of securities of less than 5%). The exception in § 460.25(2)(a), however, clearly demonstrates that the New York Legislature understood that the acquisition of an interest in a criminal enterprise could take the form of a purchase of securities on the open market. The lack of a similar exception in the gambling statute shows that the Legislature intended no such exception.

---

[18] Defendants' arguments concerning the "dormant" Commerce Clause makes no sense. First, the actions of Defendants in violating § 1955(a) (owning illegal gambling businesses) and RICO (racketeering based on § 1955(a)) do not implicate the "dormant" Commerce Clause, because those are federal statutes. With respect to state law violations, Defendants offer a hypothetical concerning Parisian and New York investors who purchase shares of 888 or NETeller in London. This hypothetical, however, muddles the distinction between the wrongful acts of *the gambling companies* and the wrongful acts of *Defendants*.

The actions of the Internet gambling companies in violating state gambling laws (the predicates for the federal violations at issue) are not purely foreign conduct because those actions take place in the U.S. as much as in Gibraltar or the Isle of Man (*i.e.,* the illegal bets were made in the U.S. by U.S. gamblers). Consistent with the Commerce Clause, States may prohibit such activities because the burden of gambling regulation on interstate commerce is not "clearly excessive" in light of the legitimate state interests such regulation advances. *Rousso v. State*, 170 Wash. 2d 70, 91, 239 P.3d 1084, 1095 (2010) (*en banc*). To the extent Defendants violated state gambling statutes by, for example, having attempted, solicited and conspired to "knowingly advance or profit from unlawful gambling activity" in violation of N.Y. Penal Law § 225.05, their "profiting" or "advancing" took place at the principal place of business of Nominal Defendant in New York.

**J.        There Is No Implied Exception for Owners Who Claim Ignorance of the Criminal Law**

Defendants suggest that they cannot be guilty of violating § 1955 because the complaint does not specifically allege that they had actual knowledge that it is illegal to own part of an illegal gambling businesses. Ignorance of the law, however, is no defense. *See United States v. Tedder*, 403 F.3d 836, 838 (7th Cir. 2005) ("[Defendant] told the jury that he thought [the Internet gambling businesses] were upstanding businesses operated in compliance with all laws. This was essentially the tax protester's defense that he just didn't think that the law, however clear, applied to his endeavors. ... The district judge gave appropriate instructions to the jury, which … convicted him.") (citation omitted). *See generally*, *United States v. International Minerals & Chemical Corp.*, 402 U.S. 558, 565 (1971) (discussing "general rule that ignorance of the law is no excuse").

It is well-established that § 1955 is a crime of *general* criminal intent. *United States v. Ables*, 167 F.3d 1021, 1031 (6th Cir. 1999), *citing Hawes*, 529 F.2d at 481. There is no requirement that the defendant be shown to have known that his conduct actually violated the law. *Compare Cheek v. United States*, 498 U.S. 192, 199 (1990) (tax statute required "willful" violation, which requires knowledge of illegality).

Liability under § 1955 only requires knowledge of the facts – that the gambling businesses in which Defendants caused the Fund to invest were taking bets from gamblers in the United States or processing payments relating to such bets. It is uncontroverted that Defendants had the requisite knowledge.

Defendants argue that holding them liable would mean that the innocent investors who entrusted them with their savings might also be criminally liable. Contrary to Defendants' argument, mutual fund investors are in no danger of potential liability under § 1955. First, as

Defendants elsewhere argue, a shareholder of a corporation has no ownership interest in the assets of the corporation. *Smith v. Hurd*, 53 Mass. 371, 385 (1847). When the Fund purchased stock in the illegal gambling businesses, the Fund became the owner; Fund investors did not.

Second, professional mutual fund advisers typically perform due diligence research on the companies in which they invest and may therefore be charged with full knowledge of the business activities of those companies. In contrast, individuals who invest in mutual funds typically do so precisely to avoid having to conduct such research. There is therefore no danger that "innocent" individual investors in the U.S. being rendered unwitting felons.

## II. THE COURT SHOULD REJECT THE OTHER GROUNDS FOR DISMISSAL IF IT DETERMINES THAT DEFENDANTS VIOLATED THE GAMBLING ACT

If this Court concludes that the plain language of the Gambling Act applies to Defendants' investments in illegal gambling organizations, then the remainder of Defendants' arguments should be rejected too.

### A. Trustees Have Waived Their Right to Terminate Litigation Upon a Finding by the Court that Defendants Violated Criminal Statutes

The Trustees say that "any pronouncements by the Court on the substance of" the merits of Plaintiff's claims would "of course inform the board's response to plaintiff's demand." (Tr. Br. at 3) By representing that the Court's adjudication on the merits will guide their response, Defendants have linked the decision to pursue the Fund's claims to whether the Court believes the claims are viable. If the board believes that this action should be terminated *even if* the Court determines the claims to be viable, the board was required to affirmatively take that position. Because they failed to do so, they should be deemed to have taken a neutral position contingent only upon the finding of meritorious claims by the Court.

Delaware courts consistently have made clear that, "[w]hen a corporation takes a position regarding a derivative action asserted on its behalf, it cannot effectively stand neutral. … [I]t

must affirmatively object to or support the continuation of the litigation." *Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A2d 726, 731 (Del. 1988); *see In re Am. Intern. Group, Inc.*, 965 A2d 763, 810 (Del. Ch . 2009), *aff'd,* 11 A.3d 228 (2011); *Spiegel,* 571 A.2d at 775 ("[W]hen a board of directors is confronted with a derivative action asserted on its behalf, it cannot stand neutral").

The Trustees' invitation for a ruling on the merits from this Court therefore "must be viewed as tacit approval for the continuation of the litigation," *see Kaplan*, 540 A.2d at 731, contingent only upon a determination by this Court that Plaintiff's claims are viable.[19]

Indeed, the Trustees – who are *supposed* to be looking out for the best interest of the Fund's investors – waited over *five months* before taking *any action* with respect to Plaintiff's demand, and they did not even *tell* Plaintiff about the formation of a litigation committee until after suit was filed *six months* later. This delay is particularly egregious because both Defendants and Plaintiff had previously raised statute of limitations concerns.[20] Plaintiff filed suit *the day before* the limitations period expired on some of the Fund's claims. Defendants do not dispute that (i) nobody ever responded to Plaintiff's demand letter except to ask for some documents in April 2011; (ii) nobody informed Plaintiff that any of the tolling agreements were executed as

---

[19] The Court's pronouncements on the legal issues would almost be dispositive on the merits because the facts establishing Defendants' investments are not in dispute and can be established in their Defendants' SEC filings. It is difficult to see how Trustees could claim to be acting for the benefit of Fund investors if the merits of the claim are established as a matter of law, and the facts are not in dispute. Moreover, competent counsel is pursuing Plaintiff's claims on contingency, so the Fund would not incur any out of pocket expenses for vindicating the rights of the Fund's investors.

[20] Defendants cite cases where boards have been allowed many months to respond to a demand. None of those cases, however, involved a delay of over *five months before even commencing work*. Because the "reasonableness" of delay is case-specific – and because Trustees knew of the statute of limitations deadline that Plaintiff needed to satisfy to preserve the rights of the Funds' investors in this case – the Board's delay in this case is unreasonable given the circumstances. *See In re Am. Intern. Group, Inc.*, 965 A2d 763, 810 (Del. Ch . 2009), *aff'd,* 11 A.3d 228 (2011).

Defendants' counsel promised to Judge Sand; and (iii) Defendants have refused to provide a copy of any purported tolling agreements so that Plaintiff can evaluate their language, scope, enforceability, and date of execution. *See* Sheridan Decl. ¶ 11.

Trustees are charged with protecting the interests of the Fund's investors, but they have done nothing consistent with that obligation. There is no basis in the record to suppose that the litigation committee has conducted any meaningful investigation of Plaintiff's claims. To the contrary, they appear to be waiting for a ruling from this Court before doing anything of substance. Nor is there any basis in the record to assume that the alleged "tolling" agreements will be effective in saving investors' claims from forfeiture if this case is dismissed, because Defendants refuse to disclose the alleged agreements to Plaintiff or the Court. Since Defendants have requested the Court to determine the merits, and because Trustees have represented that the Court's pronouncements would guide their determination of Plaintiff's demand, Trustees should be deemed to have abdicated any authority to terminate this litigation if the Court determines that Defendants' actions, as alleged in the complaint, violated the Gambling Act.

### B.   Plaintiff Has Properly Alleged RICO Claims Under the Second Circuit's Most Recent Decision Concerning Investment Injury

A violation of § 1955 is a predicate crime under RICO. 18 U.S.C. § 1961(1)(B). By causing the Fund to violate § 1955 repeatedly and over a significant period of time, Defendants conducted the affairs of the Fund through a "pattern of racketeering activity" in violation of § 1962(c).

The complaint alleges all of the factual elements needed to establish a RICO violation: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Defendants manage the affairs of the Fund; the Fund is an enterprise engaged in interstate commerce; and Defendants conducted the

affairs of the Fund through a pattern of violating § 1955. Defendants committed at least two predicate acts, 18 U.S.C. § 1961(5); *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001), and the predicate acts were related, and they amounted to, or posed a threat of, continuing criminal activity. *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 97 (2d Cir.1997). There is no reason to suppose that Defendants would have stopped investing in illegal gambling if prosecutions had not started. *See Ikuno v. Yip*, 912 F.2d 306, 308 (9th Cir. 1990); *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir.1991) ("lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict").

The Second Circuit had ruled, in two non-precedential summary orders, that RICO causation was lacking in similar cases because the mutual fund's investment losses directly followed the market's reaction to the effects of law enforcement on the gambling companies' prospects. *McBrearty v. The Vanguard Group, Inc.*, No. 08-CV-7650, 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *aff'd* 353 Fed. Appx. 640 (2d Cir. 2009) (summary order), *cert. denied*, 130 S. Ct. 3411 (2010); *Seidl v. Am. Century Cos., Inc.*, 713 F. Supp. 2d 249 (S.D.N.Y. 2010), *aff'd* 427 Fed. Appx. 35 (2d Cir. 2011) (summary order), *cert. denied*, 2011 WL 4344573 (Dec. 12, 2011). Two months before this case was filed, however, the Second Circuit issued a formal opinion that undercuts the reasoning of *McBrearty* and *Seidl* and confirms that Plaintiff has satisfied RICO proximate causation in this case.

In *Ideal Steel Supply Corp. v. Anza*, 652 F. 3d 310, 326 (2d Cir. 2011), the court held that in determining RICO proximate causation for injuries resulting from prohibited investments, the intervention of market forces is insufficient to supersede RICO liability. This is so because market forces are always necessary to price in the effect of wrongdoing, and if the rule were

otherwise it would be "difficult to envision anyone who could show injury proximately caused by that investment " *Id.* Since the reasoning of most recent and binding Second Circuit precedent supports Plaintiff's theory of RICO causation and conflicts with the reasoning upon which *McBrearty* and *Seidl* were based, Plaintiff urges the Court to follow the formal opinion in *Ideal Steel* and not the summary orders in *McBrearty* and *Seidl*.

Defendants caused the Fund repeatedly to violate the Gambling Act by making many investments in illegal gambling businesses. Those investments could only make money if the gambling companies successfully evaded U.S. law enforcement. The Fund's investors lost their money when reasonably foreseeable law enforcement successfully forced the companies to abandon their U.S. operations, and the market priced in the loss of the gambling companies' illegal U.S.-based revenue. Under *Ideal Steel*, this satisfies RICO causation.

### C.   The Board Lacks Authority to Terminate Suit by Mutual Fund Shareholders Seeking Redress under a Federal Remedial Statute Such as RICO

Plaintiff's right to pursue his federal statutory claims derivatively is an issue of federal law. *See Kamen v. Kemper Fin. Services, Inc.*, 500 U.S. 90 (1991). Plaintiff submits that, under federal law, the board of directors of a mutual fund cannot terminate litigation by investors against the fund's investment advisors which involves a federal remedial statute such as RICO.

In considering this issue, the Court should be mindful of the unique structure of mutual funds as distinguished from normal corporations. As the Supreme Court of the United States has explained:

> unlike most corporations, an investment company is typically created and managed by a pre-existing external organization known as an investment adviser …. Because the adviser generally supervises the daily operation of the fund and often selects affiliated persons to serve on the company's board of directors, *the relationship between investment advisers and mutual funds is fraught with potential conflicts of interest*.

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984) (emphasis added).

Because of the heightened danger associated with conflicts of interest in mutual funds, the Supreme Court in *Daily Income* interpreted the language of § 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-1 *et seq.* (the "1940 Act") – which allows investors to bring certain suits "on behalf of" their mutual funds – to bring such actions *without* making any demand on the board. *Id.* at 539-542. The Supreme Court noted that the 1940 Act reflected Congressional skepticism that it would be prudent to "rely solely on the fund's directors" to protect the interests of mutual fund investors given the inherent conflicts that those directors face. *Id.* at 541. Therefore, the Supreme Court held that it was appropriate to allow mutual fund investors the benefit of vindicating their federal rights under the 1940 Act without first making a demand on the fund's board despite the statute's language that such actions be brought "on behalf of" the funds. This result was deemed appropriate to fulfill the 1940 Act's "broad remedial purpose." *Id.*

Plaintiff acknowledges that the federal courts will ordinarily defer to state law concerning derivative actions. In this case, however, the Court should not defer to or apply state law because doing so would conflict with important federal policies.

In *Kamen v. Kemper Fin. Services, Inc.*, 500 U.S. 90 (1991), the Supreme Court was called upon to determine whether the Court should fashion a federal common law rule obliging the shareholder in a derivative action under § 20(a) of the 1940 Act to make a demand on the board of directors *even when such a demand would be excused as futile under state law*. In part "because a futility exception to demand does not impede the purposes of the … Act, [the Court] decline[d] to displace state law with a uniform rule abolishing the futility exception in federal derivative actions." 500 U.S. at 92. In *Kamen*, the Court made clear that state law should *not* be used when "application of [the particular] state law [in question] would frustrate specific

objectives of the federal programs." 500 U.S. at 98. And, as the *Kamen* Court reaffirmed, the 1940 Act "clearly envisions" the critical role that aggrieved shareholders would fulfill in "protecting investment companies from conflicts of interest" and from breaches of the investment adviser's fiduciary duties. *Id.* at 108.

Unlike *Kamen*, where state law *permitted* the derivative action based on the culpability of the directors – and the Supreme Court *refused* to abolish the demand futility exception to allow shareholders to fulfill their role in protecting their own interests – in this case, Defendants argue that state law does not permit the Fund's investors to seek remedy for their injuries. If Defendants' argument were accepted, the prosecution of the Fund's RICO claims would be left to the board – which is controlled by the Defendant Trustees. That would be patently inconsistent with the broad remedial purpose of RICO. In enacting RICO, Congress intended to provide a remedy for those who were injured by reason of racketeering activities, and the statute expressly provides that it is to "be liberally construed to effectuate its remedial purposes," Pub.L. 91-452, § 904(a), 84 Stat. 947 (1970). *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497-98 (1985). Moreover, the legislative history of RICO confirms that it was intended to provide "innocent investors" broad protection against injury suffered by the corruption of otherwise "legitimate businesses" through racketeering activity. *See* Pub. L. 91-452, 84 Stat. 922-923. Allowing Defendant Trustees, who have corrupted an otherwise legitimate business, to frustrate the claims of innocent investors, is patently inconsistent with RICO's specific remedial objectives.

Where, as here, federal rights are at stake, the Court should be vigilant to ensure that the significant injury suffered by mutual fund investors – which is uncontroverted – is not left unredressed by Trustees who have consistently expressed their hostility to holding themselves

and their co-defendants answerable for their wrongdoings. Under these circumstances, "it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Bell v. Hood*, 327 U.S. 678, 684 (1946). "It is a settled and invariable principle, that every right, when withheld, must have a remedy, and every injury its proper redress." *Marbury v. Madison*, 5 U.S. 137, 147 (1803).

Consistent with the reasoning of *Daily Income* and *Kamen*, Plaintiff submits that he is entitled to pursue his derivative RICO claims on behalf of the Fund regardless of what, if anything, the board decides to do in response to his demand.

## CONCLUSION

The motions to dismiss should be denied.

Dated:  January 27, 2012

/s/ Thomas I. Sheridan, III
      Thomas I. Sheridan, III
HANLY CONROY BIERSTEIN SHERIDAN
FISHER & HAYES, LLP
112 Madison Avenue
New York, NY 10016-7416
(212) 784-6404
tsheridan@hanlyconroy.com
*Attorney for Plaintiff*