**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BENJAMIN M. GAMORAN, derivatively on behalf
of the nominal defendant with respect to its
series mutual fund, the Neuberger Berman
International Fund,

                Plaintiff,

      - against -

NEUBERGER BERMAN MANAGEMENT LLC, *et al.*,

                Defendants,

      - and -

NEUBERGER BERMAN EQUITY FUNDS d/b/a
NEUBERGER BERMAN INTERNATIONAL FUND,

              Nominal
              Defendant.

---

11 Civ. 7957 (TPG) (KNF)

ECF Case

 

**MEMORANDUM OF LAW IN SUPPORT OF THE INVESTMENT**
**ADVISOR DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

James N. Benedict
Alan J. Stone
Douglas W. Henkin
Mia C. Korot
MILBANK, TWEED, HADLEY & McCLOY LLP
One Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

*Attorneys for Defendants Neuberger Berman*
*Management LLC, Neuberger Berman LLC,*
*Benjamin Segal, Peter E. Sundman, and Jack L.*
*Rivkin*

**TABLE OF CONTENTS**

GLOSSARY OF DEFINED TERMS ........................................................................ iii

TABLE OF AUTHORITIES ................................................................................ v

PRELIMINARY STATEMENT ............................................................................ 1

BACKGROUND AND RELATED ACTIONS ........................................................ 2

STATEMENT OF FACTS .................................................................................. 5

ARGUMENT ................................................................................................... 6

I.  STANDARD OF REVIEW ........................................................................... 6

II. CHOICE OF LAW ..................................................................................... 7

III. THE AMENDED COMPLAINT FAILS TO STATE A CLAIM ........................... 7

    A.  The Fund's Ownership Of NETeller And 888 Stock Was Not Illegal ................. 7

        1.  The Fund's Investments Did Not Violate § 1955 ....................................... 8

        2.  The Fund's Investments Did Not Violate New York Law ...................... 15

        3.  The Fund's Investments Did Not Violate Delaware Law........................ 16

        4.  Plaintiff's Claims Regarding Violations Of State Law Are Barred
            By The Dormant Commerce Clause ...................................................... 17

        5.  Even If Defendants' Alleged Activities Could Be Deemed To
            Have Violated Federal Or State Law, They Would Not Constitute
            Negligence *Per Se* ............................................................................ 18

    B.  The Amended Complaint Fails To Allege RICO Claims .................................... 20

        1.  Plaintiff Does Not Plead Any Predicate Acts ......................................... 20

        2.  Plaintiff Cannot Establish RICO Proximate Cause ............................... 21

        3.  There Are Additional Reasons The RICO Claims Fail ........................... 22

    C.  The Amended Complaint Fails To Allege Claims For Breach Of Fiduciary
        Duty Or Negligence ...................................................................................... 22

        1.  Plaintiff Has Not Alleged That Defendants Acted In "Bad Faith".......... 24

        2.  The Amended Complaint Does Not Plead Gross Negligence ................. 26

        3.  Plaintiff Cannot State A Claim For Breach Of Fiduciary Duty
            Against The Investment Advisor Defendants ........................................ 28

    D.  The Claim For Breach Of Contract Must Be Dismissed ................................... 28

    E.  The Amended Complaint Fails To State A Claim For Waste ............................. 29

    F.  The Claims In The Amended Complaint Are Time-Barred ............................... 30

i

IV.    THE AMENDED COMPLAINT SHOULD BE DISMISSED WITH
PREJUDICE ................................................................................................................. 31

CONCLUSION .......................................................................................................................... 32

## GLOSSARY OF DEFINED TERMS

| | |
|---|---|
| 888 | 888 Holdings plc |
| Amended Complaint or Compl. | Amended Verified Derivative Complaint, *Gamoran v. Neuberger Berman Management LLC*, No. 11 Civ. 7957 (TPG) (S.D.N.Y., filed July 16, 2012) [ECF No. 50] |
| DOJ | United States Department of Justice |
| Fund | Nominal defendant Neuberger Berman Equity Funds d/b/a Neuberger Berman International Fund |
| *Gamoran I* | *Gamoran v. Neuberger Berman Management LLC*, No. 08 Civ. 10807 (DLC) (S.D.N.Y.) |
| *Gamoran II* | *Gamoran v. Neuberger Berman Management LLC*, No. 10 Civ. 6234 (LBS) (S.D.N.Y.) |
| *Gamoran III* | *Gamoran v. Neuberger Berman Management LLC*, No. 11 Civ. 7957 (TPG) (S.D.N.Y.) |
| Henkin Declaration or Henkin Decl. | Declaration of Douglas W. Henkin in Support of the Investment Advisor Defendants' Motion to Dismiss the Complaint, dated August 24, 2012 |
| Investment Advisor Defendants | Defendants NB, NBM, Benjamin Segal, Peter E. Sundman, and Jack L. Rivkin |
| LSE | London Stock Exchange |
| Management Agreement | Management Agreement, dated November 3, 2003, between the Fund and NBM (Exhibit B to the Henkin Declaration) |
| NB | Defendant Neuberger Berman LLC |
| NBM | Defendant Neuberger Berman Management LLC |
| NETeller | NETeller plc |
| OCCA | Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 941 (1970) |

| | |
|---|---|
| RICO | Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* |
| SDNY | United States District Court for the Southern District of New York |
| SDC | The Special Demand Committee of the Fund's Board of Trustees consisting of Trustees Martha Clark Goss, George Morriss, and Michael Knetter |
| SEC | United States Securities and Exchange Commission |
| Trust Agreement | Amended and Restated Trust Agreement, dated December 14, 2005 (Exhibit C to the Henkin Declaration) |
| Trustees | Defendants Peter E. Sundman, Jack L. Rivkin, John Cannon, Faith Colish, C. Anne Harvey, Robert A. Kavesh, Howard A. Mileaf, Edward I. O'Brien, William E. Rulon, Cornelius T. Ryan, Tom D. Seip, Candace L. Straight, and Peter P. Trapp |
| Trustee Brief | Independent Trustees' Memorandum of Law in Support of Motion to Dismiss Plaintiff's Amended Verified Derivative Complaint, dated August 24, 2012 |

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alexander v. Sandoval,*
532 U.S. 275 (2001)................................................................19

*Am. Apparel USA, LLC v. Forsythe Cosmetic Grp., Ltd.,*
10 Civ. 6470, 2011 U.S. Dist. LEXIS 77537 (S.D.N.Y. July 7, 2011) ...................................7

*Am. Booksellers Found. v. Dean,*
342 F.3d 96 (2d Cir. 2003)................................................................17

*Arnold v. Petland, Inc.,*
No. 2:07-cv-01307, 2010 WL 2301194 (S.D. Ohio Jun. 4, 2010)........................................22

*Ashcroft v. Iqbal,*
586 U.S. 662 (2009) ................................................................ passim

*Att'y Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.,*
268 F.3d 103 (2d Cir. 2001)................................................................11

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988)................................................................29

*Brehm v. Eisner,*
746 A.2d 244 (Del. 2000) ................................................................29

*Broder v. Cablevision Sys. Corp.,*
418 F.3d 187 (2d Cir. 2005)................................................................19

*Burns Jackson Miller Summit & Spitzer v. Lindner,*
451 N.E.2d 459 (N.Y. 1983)................................................................20

*Cede & Co. v. Technicolor, Inc.,*
634 A.2d 345 (Del. 1993) ................................................................22

*Cornwell v. Credit Suisse Grp.,*
729 F. Supp. 2d 620 (S.D.N.Y. 2010)................................................................14

*Del. Elec. Coop. v. Duphily,*
703 A.2d 1202 (Del. 1997) ................................................................18

*DeSiano v. Warner-Lambert & Co.,*
467 F.3d 85 (2d Cir. 2006)................................................................7

*Dole v. United Steelworkers of Am.*,
    494 U.S. 26 (1990).................................................................................................9

*Elliott Assocs. v. Porsche Automobil Holdings, SE*,
    Nos. 10 Civ. 532 & 10 Civ. 4155 (HJB), 2010 U.S. Dist. LEXIS 138399 (S.D.N.Y.
    Dec. 30, 2010)...................................................................................................14

*Gamoran v. Neuberger Berman Mgmt., LLC*,
    10 Civ. 6234, 2010 U.S. Dist. LEXIS 119696 (S.D.N.Y. Nov. 8, 2010) ..................2

*Gamoran v. Neuberger Berman Mgmt., LLC*,
    10 Civ. 6234, 2011 U.S. Dist. LEXIS 17939 (S.D.N.Y. Feb. 9, 2011) ....................2

*Gomes v. Am. Century Cos.*,
    No. 10-00083-SOW (W.D. Mo., Feb. 16, 2012) ....................................3, 4, 21, 22

*GRT, Inc. v. Marathon GTF Tech., Ltd.*,
    C.A. No. 5571-CS, 2011 Del. Ch. LEXIS 99 (Del. Ch. July 11, 2011) ..................30

*Gustafson v. Alloyd Co., Inc.*,
    513 U.S. 561 (1995)...........................................................................................9

*Hartsel v. Vanguard Grp., Inc.*,
    C.A. No. 5394, 2011 Del. Ch. LEXIS 89 (Del. Ch. June 15, 2011)...................3, 21

*Hecht v. Commerce Clearing House, Inc.*,
    897 F.2d 21 (2d Cir. 1990).................................................................................22

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995)................................................................................7

*Horvath v. Banco Comercial Portugues, S.A.*,
    No. 10 Civ. 4697 (GBD), 2011 WL 666410 (S.D.N.Y. Feb. 15, 2011) ..................14

*In re Bendectin Litig.*,
    857 F.2d 290 (6th Cir. 1988) .............................................................................19

*In re Citigroup Inc. S'holder Derivative Litig.*,
    964 A.2d 106 (Del. Ch. 2009)................................................................... passim

*In re Direxion Shares ETF Trust*,
    No. 09-cv-8011 (KBF), 2012 WL 717967 (S.D.N.Y. Mar. 6, 2012) ......................31

*In re Lear Corp. S'holder Litig.*,
    967 A.2d 640 (Del. Ch. 2008).......................................................................26, 29

*In re Societe Generale Secs. Litig.*,
    No. 08 Civ. 2496 (RMB), 2010 WL 3910286 (S.D.N.Y. Sep. 29, 2010)................14

*In re Walt Disney Co. Derivative Litig.*,
   906 A.2d 27 (Del. 2006) ...........................................................................23, 24

*Jaghory v. N.Y. State Dep't of Educ.*,
   131 F.3d 326 (2d Cir. 1997)..............................................................................6

*Johnson v. United States*,
   130 S. Ct. 1265 (2010)......................................................................................9

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*,
   8 F.3d 130 (2d Cir. 1993) ................................................................................11

*Kaufman v. C.L. McCabe & Sons, Inc.*,
   603 A.2d 831 (Del. 1992) ................................................................................30

*LAMPERS v. Blankfein*,
   No. 08 Civ. 7605 (LBS), 2009 U.S. Dist. LEXIS 42852 (S.D.N.Y. May 19, 2009)..............23

*Lerner v. Fleet Bank, N.A.*,
   318 F.3d 113 (2d Cir. 2003)............................................................................21

*Lewis ex rel. Am. Express Co. v. Rosinson (In re Am. Express Co. S'holder Litig.)*,
   39 F.3d 395 (2d Cir. 1994)................................................................................7

*Mark G. v. Sabol*,
   717 N.E.2d 1067 (N.Y. 1999)...........................................................................19

*McBoyle v. United States*,
   283 U.S. 25 (1931)............................................................................................9

*McBrearty v. Vanguard Grp., Inc.*,
   No. 08 Civ. 7650 (DLC), 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *aff'd*, 353 F.
   App'x 640 (2d Cir. Nov. 23, 2009), *cert. denied*, 130 S. Ct. 3411 (2010) ...............2, 3, 21, 22

*McGee v. State Farm Mut. Auto. Ins. Co.*,
   No. 08-CV-392 (FB) (CCP), 2009 WL 2132439 (E.D.N.Y. Jul. 10, 2009) ..........................32

*Meyer v. Holley*,
   537 U.S. 280 (2003)........................................................................................11

*Microsoft Corp. v. AT&T Corp.*,
   550 U.S. 437 (2007)........................................................................................13

*Morrison v. Nat'l Austl. Bank*,
   130 S. Ct. 2869 (2010).........................................................................13, 15, 18

*Nemec v. Shrader*,
   991 A.2d 1120 (Del. 2010) ..............................................................................28

*NFL v. Governor of the State of Del.*,
    435 F. Supp. 1372 (D. Del. 1977) ........................................................................20

*Nicholson v. S. Oaks Hosp.*,
    811 N.Y.S.2d 770 (App. Div. 2006) ..................................................................18

*Norex Petroleum Ltd. v. Access Indus. Inc.*,
    631 F.3d 29 (2d Cir. 2010) (*per curiam*) ..........................................................14

*Oberstein v. SunPower Corp.*,
    07-CV-1155 (JFB) (WDW), 2010 U.S. Dist. LEXIS 41402 (E.D.N.Y. Apr. 28, 2010).........29

*People ex rel. Vacco v. World Interactive Gaming Corp.*,
    714 N.Y.S.2d 844 (Sup. Ct. 1999) .............................................................16, 25

*People v. Brown*,
    447 N.Y.S.2d 129 (Crim. Ct. 1982) ..................................................................16

*People v. Byrne*,
    570 N.E.2d 1066 (N.Y. 1991) ..........................................................................11

*People v. Shing*,
    371 N.Y.S.2d 322 (Crim. Ct. 1975) .............................................................15, 16

*Picard v. Kohn*,
    11 Civ. 1181 (JSR), 2012 WL 566298 (S.D.N.Y. Feb. 22, 2012).........................21

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*,
    753 F. Supp. 2d 166 (S.D.N.Y. 2010) ...........................................................12, 14

*Rewis v. United States*,
    401 U.S. 808 (1971) ..................................................................................11, 12

*Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*,
    34 A.3d 1074 (Del. 2011) .................................................................................7

*Scottrade, Inc. v. BroCo Invs., Inc.*,
    774 F. Supp. 2d 573 (S.D.N.Y. 2011) ................................................................13

*Segal v. Bitar*,
    No. 11 Civ. 4521 (LBS), 2012 WL 273609 (S.D.N.Y. Jan 30, 2012) ....................21

*Seidl v. Am. Century Cos.*,
    713 F. Supp. 2d 249 (S.D.N.Y. 2010), *aff'd*, 427 F. App'x 35 (2d Cir.), *cert. denied*,
    132 S. Ct. 846 (2011) ...........................................................................2, 21, 22

*Smith v. Hurd*,
    53 Mass. 371 (Mass. 1847) ............................................................................11

*Sofi Classic S.A. de C.V. v. Hurowitz*,
    444 F. Supp. 2d 231 (S.D.N.Y. 2006) ........................................................................11

*Stackhouse v. Toyota Motor Co.*,
    No. CV 10-0922 (DSF), 2010 WL 3377409 (C.D. Cal. July 16, 2010) ..................................14

*State v. Colbert*,
    IN 86-10-0897, 1987 Del. LEXIS 1286 (Del. Nov. 23, 1987) ................................................11

*State v. Panaro*,
    28 Del. 230 (Del. 1914) ........................................................................20

*Sutherland v. Sutherland*,
    C.A. No. 2399-VCL, 2009 Del. Ch. LEXIS 46 (Del. Ch. Mar. 23, 2009) ...........................30

*Trinity BUI v. Indus. Enters. of Am. Inc.*,
    594 F. Supp. 2d 364 (S.D.N.Y. 2009) ........................................................................32

*United States v. Bass*,
    404 U.S. 336 (1971) ........................................................................11

*United States v. Murray*,
    928 F.2d 1242 (1st Cir. 1991) ........................................................................13

*United States v. Santos*,
    553 U.S. 507 (2008) ........................................................................13

*Walker v. City of N.Y.*,
    974 F.2d 293 (2d Cir. 1992) ........................................................................7

*Wash. State Dep't of Soc. & Health Svcs. v. Keffeler*,
    537 U.S. 371 (2003) ........................................................................9

*White v. Panic*,
    783 A.2d 543 (Del. 2001) ........................................................................29

*Wodka v. Causeway Capital Mgmt*,
    9 Civ. 2625 (C.D. Cal. Oct. 8, 2009), *aff'd,* 433 F. App'x 563 (9th Cir.), *cert. denied*,
    132 S. Ct. 769 (2011) ........................................................................3, 4, 21, 22

*Wodka v. Causeway Capital Mgmt. LLC*,
    No. BC463623 (Cal. Super. Ct., filed June 15, 2012) ........................................................................4

*Wood v. Baum*,
    953 A.2d 136 (Del. 2008) ........................................................................24

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc*,
    328 F. App'x 695 (2d Cir. May 19, 2009) ........................................................................30

*Wright v. Moffitt,*
    437 A.2d 554 (Del. 1981) ...........................................................................19

*Zupnick v. Goizueta,*
    698 A.2d 384 (Del. Ch. 1997)...................................................................29

**RULES**

Fed. R. Civ. P. 8 ............................................................................................16

Fed. R. Civ. P. 23.1 ....................................................................................1, 4

**STATUTES**

10 Del. C. § 8106 ..........................................................................................30

11 Del. C. § 282 ............................................................................................11

11 Del. C. §§ 1401-11 ..................................................................................17

12 Del. C. § 3302 ............................................................................11, 16, 30

12 Del. C. § 3302(c) ......................................................................................27

18 U.S.C. § 1084 ...........................................................................................14

18 U.S.C. § 1952 .....................................................................................11, 12

18 U.S.C. § 1955 ...................................................................................... passim

18 U.S.C. § 1961 ...........................................................................................20

28 U.S.C. § 1404 .............................................................................................7

31 U.S.C. § 5361 ...........................................................................................14

Del. Constitution, Art. 2, § 17......................................................................20

N.Y. Penal Law § 20.25................................................................................11

N.Y. Penal Law § 225.00.......................................................................15, 16

N.Y. Penal Law § 225.05...................................................................15, 16, 21

N.Y. Penal Law § 225.10..............................................................................15

N.Y. Penal Law § 225.15..............................................................................15

N.Y. Penal Law § 225.20..............................................................................15

N.Y. Penal Law § 225.30 ...................................................................................................15

N.Y. Penal Law § 980 (1909) ............................................................................................20

sections of the U.S. code ...................................................................................................19

**OTHER AUTHORITIES**

115 Cong. Rec. 10735 (1969) ............................................................................................10

116 Cong. Rec. 590 (1970) ................................................................................................10

116 Cong. Rec. 603 (1970) ................................................................................................10

H.R. Rep. No. 91-1549 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007 ........................10

*Organized Crime Control Act of 1970, Pub. L. No. 91-452, 83 Stat. 922, 923* ............19

Paul G. Haskell, *The Prudent Person Rule For Trustee Investment and Modern Portfolio Theory*, 69 N.C. L. Rev. 87 (1990) ...........................................................................26

The Investment Advisor Defendants respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint with prejudice.

## PRELIMINARY STATEMENT

This is the *fourth* complaint filed by this Plaintiff seeking to challenge the same two investments made by the Fund in 2005 and 2006.  The core of Plaintiff's allegations is that the Fund violated federal and state anti-gambling laws by investing in 888 and NETeller, two publicly traded non-U.S. companies that were listed and traded only on the LSE, but not on any U.S. markets.  Plaintiff asserts derivative claims premised on alleged violations of 18 U.S.C. § 1955, RICO, and state law.  The Court dismissed Plaintiff's second and third complaints for failure to comply with Delaware's demand requirement and Fed. R. Civ. P. 23.1.  Now that the Fund's Board has considered and rejected Plaintiff's claims, Plaintiff alleges that demand was wrongfully refused and, astonishingly, adds a new claim for which demand was never made.

Plaintiff's claims all fail because it is not illegal to own publicly traded stock. The RICO claims also fail because Plaintiff has not sufficiently alleged the predicate acts on which the claims are based and cannot establish proximate causation under RICO.  The common law claims fail because Plaintiff fails to allege facts sufficient to rebut the business judgment rule, has not alleged that Defendants acted in bad faith, and cannot state a claim for breach of fiduciary duty, breach of contract, or waste.

The Investment Advisor Defendants respectfully request that the Court end this saga once and for all.  Defendants have already spent substantial amounts defending these meritless cases, and Plaintiff should not be permitted to prolong the agony by raising additional baseless allegations.  Because Plaintiff's claims are fundamentally flawed, further amendment would be futile and a waste of the parties' and Court's time and resources.  Accordingly, the Amended Complaint should be dismissed with prejudice.

## BACKGROUND AND RELATED ACTIONS

*Gamoran I* was one of a group of cases filed in this Court by the same lead counsel alleging that investments by mutual funds in publicly traded stock of certain non-U.S. companies were "illegal."[1]  On April 2, 2009, Judge Cote dismissed the RICO claims asserted in one of the related cases (*McBrearty*), holding that the plaintiffs had failed to plead RICO proximate causation.  *See McBrearty*, 2009 WL 875220, at *3.  That decision was affirmed on appeal and became final.  As a result of that decision (which was then on appeal), Plaintiff voluntarily dismissed *Gamoran I* on May 19, 2009.  *See* Henkin Decl. Exh. A.

On July 16, 2010, Plaintiff re-filed the derivative claims he had asserted in *Gamoran I* — but not the RICO claims — in the Supreme Court of the State of New York, County of New York.[2]  Defendants removed that case to this Court.  Judge Sand denied Plaintiff's motions to remand and for reconsideration,[3] setting the stage for the Defendants to move to dismiss the case on the merits.  But Plaintiff had a different plan:  On February 17, 2011, just days before Defendants filed their motions to dismiss, Plaintiff demanded that the Fund's Board pursue the claims alleged in his second complaint.[4]  Because that was a concession that demand had not been excused in the first place (despite Plaintiff's allegations to the

---

[1]    *See McBrearty v. Vanguard Grp., Inc.*, No. 08 Civ. 7650 (DLC), 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *aff'd*, 353 F. App'x 640 (2d Cir. Nov. 23, 2009), *cert. denied*, 130 S. Ct. 3411 (2010).  Judge Cote dismissed the claims in the other related case on many of the same grounds. *See Seidl v. Am. Century Cos.*, 713 F. Supp. 2d 249 (S.D.N.Y. 2010), *aff'd*, 427 F. App'x 35 (2d Cir.), *cert. denied*, 132 S. Ct. 846 (2011).  Seidl made a post-dismissal demand, filed a separate lawsuit based on that demand, and then argued that the demand-refused complaint mooted the dismissal of the original case; the Second Circuit disagreed.  *See* 427 F. App'x 35, 37-38.

[2]    *See* Compl. ¶ 116; Henkin Decl. Exh. D.

[3]    *See Gamoran v. Neuberger Berman Mgmt., LLC*, 10 Civ. 6234, 2010 U.S. Dist. LEXIS 119696, at *15 (S.D.N.Y. Nov. 8, 2010); *Gamoran v. Neuberger Berman Mgmt., LLC*, 10 Civ. 6234, 2011 U.S. Dist. LEXIS 17939, at *8 (S.D.N.Y. Feb. 9, 2011).

[4]    Compl. ¶ 117.

contrary), Judge Sand dismissed the case without prejudice.[5]  Critically, Plaintiff did not demand

that the Board pursue a breach of contract claim (which had not been asserted in any complaint

prior to the Amended Complaint).

Meanwhile, Plaintiff's counsel refiled the *McBrearty* derivative claims in

Delaware Court of Chancery.  On June 15, 2011, Vice Chancellor Parsons dismissed that

complaint with prejudice.  He expressed skepticism of the theory that investments such as those

at issue here were "illegal," and his decision was later affirmed by the Delaware Supreme Court.[6]

There is more to this story:  After Judge Cote dismissed the RICO claims in

*McBrearty*, Plaintiff's counsel filed substantially similar complaints, including RICO claims,

against mutual funds in the United States District Courts for the Central District of California

(*Wodka v. Causeway Capital Management*) and Eastern District of California (*Gomes v.*

*American Century Companies, Inc.*).  Citing *McBrearty*, the *Wodka* court dismissed the RICO

claims, the Ninth Circuit affirmed, and the Supreme Court denied *certiorari.*[7]  Similarly, after

Plaintiff's counsel refiled the *Gomes* action in the Western District of Missouri, that court

dismissed the action.  Observing that "numerous courts have already expended time and

resources writing on the same legal issues," the *Gomes* court issued a short opinion stating that

"[t]he legal issues [had] been litigated and decided by several courts around the country" and that

it could "find no reason why the claims [there] should fare any better."[8]  Not surprisingly,

---

[5]      *Id.*; *see* Henkin Decl. Exh. E at 3.

[6]      *Hartsel v. Vanguard Grp., Inc.*, C.A. No. 5394, 2011 Del. Ch. LEXIS 89, at *109 (Del. Ch. June
         15, 2011) ("Plaintiffs' arguments essentially hinge on whether purchasing or owning the
         Challenged Securities is a crime under § 1955.  Having carefully considered the allegations in the
         [c]omplaint and the submissions and arguments of the parties, I am not convinced that this
         conduct is criminal."), *aff'd*, 38 A.3d 1254 (Del.), *cert. denied*, 80 U.S.L.W. 3708 (2012).

[7]      *Wodka v. Causeway Capital Mgmt*, 9 Civ. 2625 (C.D. Cal. Oct. 8, 2009), *aff'd*, 433 F. App'x 563
         (9th Cir.), *cert. denied*, 132 S. Ct. 769 (2011).

[8]      *Gomes v. Am. Century Cos.*, No. 10-00083-SOW (W.D. Mo., Feb. 16, 2012) (Henkin Decl.

Plaintiff's counsel refiled the *Wodka* derivative claims in state court and appealed the *Gomes* decision to the Eighth Circuit.[9]

Without waiting for the Fund's Board to act on his demand, Plaintiff filed his third case relating to the Fund on August 24, 2011.  In a blatant attempt to avoid the unfavorable rulings in this Court, the Second Circuit, and the Delaware Court of Chancery, Plaintiff filed his third case in the District of Delaware.  On November 4, 2011, Chief Judge Sleet granted the Investment Advisor Defendants' motion to transfer, calling Plaintiff's conduct "the epitome of forum shopping."[10]

On December 8, 2011, Defendants moved to dismiss the third case.  Shortly thereafter, on March 16, 2012, the Board sent Plaintiff's counsel a letter responding to Plaintiff's demand.  The letter explained that the Board had formed an SDC and that the SDC had (with assistance from independent counsel) investigated, reviewed, and analyzed the allegations and circumstances that were the subject of Plaintiff's demand.[11]  After extensive consideration, the SDC concluded that the evidence did not support claims for breach of fiduciary duty, negligence, or waste and also did not support civil RICO claims.[12]  On June 12, 2012, the Court dismissed the third case, holding that "plaintiff did not comply with Delaware's demand requirement and Fed. R. Civ. P. 23.1," but granted Plaintiff leave to file an amended complaint.[13]  On July 16, 2012, Plaintiff filed the Amended Complaint.

---

Exh. F).

[9]     *See Wodka v. Causeway Capital Mgmt. LLC*, No. BC463623 (Cal. Super. Ct., filed June 15, 2012); Henkin Decl. Exh. G.

[10]    Henkin Decl. Exh. H at 2 n.2.

[11]    Henkin Decl. Exh. I at 1.

[12]    *Id*. at 3.

[13]    Henkin Decl. Exh. J at 12.

## STATEMENT OF FACTS

Plaintiff.  Plaintiff alleges that he purchased shares in the Fund in 2000.  (Compl.

¶ 12.)  He purports to sue the Defendants derivatively on behalf of the Fund.[14]

The Fund and the Investment Advisor Defendants.  The Fund is an open-ended

investment company registered with the SEC, organized under Delaware law, with its principal

place of business in New York, and is a series of Neuberger Berman Equity Funds.  (Id. ¶¶ 13-

15.)  NBM is the Fund's investment advisor, responsible for managing the Fund's investment

portfolios and providing administrative services to the Fund, and NB is the Fund's sub-advisor.

(Id. ¶¶ 16-18.)  Although Plaintiff does not discuss the Fund's overall performance during the

period at issue, that publicly available fact is highly relevant:  During the alleged two-year period

in which the Fund held 888 and NETeller stock, the Fund's share price increased 23.2%.[15]

Mr. Segal was the portfolio manager of the Fund at all relevant times.[16]  (Compl.

¶ 19.)  Messrs. Sundman and Rivkin, in addition to holding various positions within NBM and/or

NB, served as interested directors of the Fund during the relevant period.[17]  (Id. ¶¶ 20-21.)

The Amended Complaint.  Plaintiff alleges that:

- The Defendants caused the Fund "to illegally invest in one or more entities whose primary businesses violated state and federal anti-gambling laws."[18]

- The nature of 888 and NETeller's business operations was disclosed to the public through public filings by 888 and NETeller, news media reports, and government sources.[19]

---

[14]    Plaintiff has been all over the map on this issue:  He originally sued directly and derivatively (the first case), then just derivatively (the second case), then directly and derivatively again (the third case), and now just derivatively again.

[15]    Henkin Decl. Exh. K.

[16]    Plaintiff dismissed all claims against Milu Komer on October 7, 2011.  Docket No. 12.

[17]    Mr. Sundman is no longer a Director.  See id. ¶ 23.

[18]    Id. ¶ 3; see also id. ¶¶ 51-58.

[19]    Id. ¶¶ 32-34, 38, 78-91.

- Defendants knew or were reckless in not knowing that 888 and NETeller were taking bets from gamblers in the U.S. or processing payments relating to such bets.[20]

- The share prices of 888 and NETeller fell dramatically after increased law enforcement efforts against gambling companies generally and, as a result, the Fund was injured.[21]

Despite acknowledging that the Fund disclosed the 888 and NETeller investments in regular SEC filings throughout the relevant period, Plaintiff also alleges that the defendants somehow conspired to conceal the Fund's alleged injuries.[22]

Asserting that simply buying and owning publicly traded stock was illegal, Plaintiff purports to bring civil RICO claims and claims for breach of contract, breach of fiduciary duty, negligence, and waste on behalf of the Fund.  (Compl. ¶¶ 149-180)

## ARGUMENT[23]

I.    **STANDARD OF REVIEW**

On a motion to dismiss, courts take a complaint's well-pled factual allegations as true, but conclusory allegations or legal conclusions masquerading as factual allegations are ignored and courts are not required to draw unreasonable inferences in a plaintiff's favor.[24]

---

[20]   *Id.* ¶ 78.

[21]   *Id.* ¶¶ 1, 106.  Plaintiff does not allege any law enforcement activity against 888.  Although he alleges that there was law enforcement activity against NETeller, he concedes that it occurred after the Fund sold its NETeller stock.  *Compare* Compl. ¶ 59 *with id.* ¶¶ 39-40.  Similarly, many of Plaintiff's allegations about legislative and law enforcement activity post-date the Fund's sales of its 888 and NETeller stock and are irrelevant to this case.  *See id.* ¶¶ 98-105.

[22]   *Compare* Compl. ¶ 48 (alleging conspiracy) *with id.* ¶¶ 51-53, 55-58 & 61-62 (acknowledging the Fund's disclosures of the 888 and NETeller investments in periodic SEC reports).

[23]   The Investment Advisor Defendants also join in and adopt herein the arguments made in Points I, II, and V of the Trustee Brief.  The Investment Advisor Defendants note that all of the arguments in the Trustee Brief are strengthened by the fact that the Amended Complaint states no claim upon which relief could be granted as a matter of law.  The SDC was right to decline to pursue claims presented to the Board that have no chance of success.  The Court could dismiss the Amended Complaint with prejudice because it fails to state a claim, because Plaintiff lacks standing, because the SDC properly rejected the demand, or for a combination of those reasons.

[24]   *See Ashcroft v. Iqbal*, 586 U.S. 662, 677—79 (2009); *Jaghory v. N.Y. State Dep't of Educ.*, 131

Courts evaluating the sufficiency of a complaint must determine whether any non-conclusory allegations plausibly give rise to an entitlement to relief   Thus, to survive a motion to dismiss a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[25]   A complaint that offers labels and conclusions or "naked assertions" devoid of factual enhancement is insufficient, and where the well-pled facts do not permit the court to infer more than the mere possibility of misconduct, the complaint must be dismissed.[26]

II.     **CHOICE OF LAW**

Because Plaintiff filed this case in the District of Delaware and it was transferred pursuant to 28 U.S.C. § 1404, this court must apply Delaware choice of law rules.[27]   Delaware applies the "internal affairs" doctrine, which applies the law of the state of incorporation to corporate governance issues.[28]   At all relevant times, the Fund was governed by the Trust Agreement, which adopts Delaware law.[29]   To the extent Plaintiff's claims concern matters relating to the governance and administration of the Fund, Delaware law thus governs.

III.    **THE AMENDED COMPLAINT FAILS TO STATE A CLAIM**

A.      **The Fund's Ownership Of NETeller And 888 Stock Was Not Illegal**

All of Plaintiff's claims are premised on the notion that the Fund's purchase and ownership of NETeller and 888 stock was illegal.  (*E.g.,* Compl. ¶¶ 1, 50, 74.)  Because that is

---

F.3d 326, 329 (2d Cir. 1997); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995); *Lewis ex rel. Am. Express Co. v. Rosinson (In re Am. Express Co. S'holder Litig.*), 39 F.3d 395, 400 n.3 (2d Cir. 1994); *Walker v. City of N.Y.*, 974 F.2d 293, 298 (2d Cir. 1992).

[25]    *Iqbal*, 586 U.S. at 1949-50 (internal quotes omitted).

[26]    *Id.*

[27]    *See* Henkin Decl. Ex. H; *DeSiano v. Warner-Lambert & Co.*, 467 F.3d 85, 91 (2d Cir. 2006); *Am. Apparel USA, LLC v. Forsythe Cosmetic Grp., Ltd.*, 10 Civ. 6470, 2011 U.S. Dist. LEXIS 77537, at *8-9 (S.D.N.Y. July 7, 2011).

[28]    *See Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081 (Del. 2011).

[29]    Henkin Decl. Exh. C, Art. X, § 7.

wrong, all the claims necessarily fail.

1.     **The Fund's Investments Did Not Violate § 1955**

No court has ever held that the purchase or ownership of publicly traded stock is a violation of § 1955. Nor is there any indication that any prosecutor or regulator has pursued charges against a purchaser or owner of publicly traded shares for violating § 1955.[30] Nothing in the text of § 1955 or its legislative history supports Plaintiff's theory of liability or the notion that § 1955 could be read to regulate transactions on non-U.S. securities markets, and basic canons of statutory construction rule out Plaintiff's theory.

a.     **Section 1955's Use Of "Owns" Does Not Include Purchasing Or Owning Publicly Traded Stock**

Contrary to Plaintiff's assertion, the plain language of § 1955 does not support an interpretation that owning publicly traded stock can trigger liability under the statute. Section 1955 makes it a crime to "conduct[], finance[], manage[], supervise[], direct[], or own[] all or part of an illegal gambling business" (with "illegal gambling business" separately defined in the statute). The first five verbs clearly contemplate active participation in the operation of a business, and there is significant overlap in these five words' meanings — indeed, at least four are synonyms for each other.[31] Every prosecution Plaintiff cites in the Complaint is consistent with that construction, and *none* involved prosecuting owners of publicly traded stock.

Although the statute includes the word "own," using that word to include owning publicly traded stock purchased on the LSE makes no sense and is inconsistent with the normal

---

[30]     Although the Complaint discusses enforcement actions taken by the DOJ and certain states against gambling businesses and their officers, it cites nothing indicating that any actions have been taken against investors in publicly traded stock or investment advisors. *See* Compl. ¶¶ 77-105. Plaintiff's counsel has had years to identify any such action, and if there was even one for him to point to, he would long ago have presented it to one of the courts hearing these cases.

[31]     *See, e.g.,* www.thesaurus.com/browse/direct (listing "manage, oversee" as the definition of "direct" and including "conduct," "supervise," and "control" as synonyms) (last visited August 24, 2012).

canons of statutory construction:

- Courts consider the common usage of words and phrases when interpreting criminal statutes.[32]

- Context determines the meaning of words used in statutes.[33]  In particular, the canon *noscitur a sociis* requires that words grouped together in a list be given related meanings,[34] which prevents statutes from being given unintended breadth by not ascribing to one word a meaning so broad that it is inconsistent with the words accompanying it.[35]

- The canon *ejusdem generis* requires that where general words follow an enumeration of specific items, the general words apply only to items akin to those that were specifically enumerated.[36]  Thus, even if "own" could be viewed as more general than "conduct," "finance," "manage," "supervise," and "direct," this canon would require that it be limited to the scope of the more specific words preceding it.

All of these rules of construction foreclose Plaintiff's argument that buying or owning publicly traded stock violates § 1955.  *First*, the terms that precede "own" in § 1955 — "conduct[], finance[], manage[], supervise[], [and] direct[]" — connote influence over, responsibility for, or participation in the gambling operation itself,[37] and "own" must be read in the same context.  The fact that § 1955 starts with five definitional words that are not compatible with the notion that just owning publicly traded stock is sufficient to trigger the statute requires the conclusion that Congress did not intend to sweep broader conduct in with the catchall word in the definition.

---

[32]     *McBoyle v. United States*, 283 U.S. 25, 27 (1931).

[33]     *See Johnson v. United States*, 130 S. Ct. 1265, 1271 (2010) ("we 'do not force term-of-art definitions into contexts where they plainly do not fit and produce nonsense'").

[34]     *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 574-75 (1995) (rejecting broad interpretation of statute based on one word taken out of its statutory context); *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990) (disputed phrase in statute should be interpreted with reference to phrases surrounding it).

[35]     *See Gustafson*, 513 U.S. at 575.

[36]     *See Wash. State Dep't of Soc. & Health Svcs. v. Keffeler*, 537 U.S. 371, 384-85 (2003) (applying both *noscitur a sociis* and *ejusdem generis* to reject interpretation of catchall provision of statute that would have been broader than specific words in statutory enumeration).

[37]     Indeed, "control" is a synonym for four of these words.  *See supra* note 31.

*Second*, even if "own" could be viewed as more general than "conduct," "finance," "manage," "supervise," and "direct," the canon *ejusdem generis* would require that the scope of "own" be limited to the scope of the more specific words preceding it, which does not support Plaintiff's construction.

*Third*, under the common usage of "own," a minority stockholder does not "own" the corporation in which he holds stock — no one says that a person who owns 100 shares of Coca-Cola Company "owns" the Coca-Cola Company.  Rather, the common usage of "own" connotes *responsible* ownership, which requires significant influence over or responsibility for that which is "owned."  That reading of what triggers liability under § 1955 is consistent with the other five words Congress chose to define the scope of § 1955.  And it comports with what a reader using "everyday speech" would take from the text and legislative history of § 1955 to be the intended targets of the statute ― owner-operators and organized crime figures, not passive minority investors purchasing publicly traded stock on a major exchange.[38]

### b. Congress Did Not Intend To Criminalize The Mere Purchase Or Ownership of Stock

Congress stated that § 1955 was intended to reach "only those persons who prey systematically upon our citizens and *whose* syndicated operations are so continuous and so substantial as to be of national concern" and are "of considerably greater magnitude than simply meet[ing] the minimum definitions."[39]  The use of the word "whose" makes clear that the statute is directed at operators of gambling businesses, and the statute's goals clearly seek to reach active participation in a business rather than buying or owning publicly traded stock.  No one can

---

[38]   Section 1955 was aimed at curtailing syndicated gambling, a significant source of funds for organized crime.  *See* 115 Cong. Rec. 10735 (1969); 116 Cong. Rec. 590 (1970); 116 Cong. Rec. 603 (1970).

[39]   H.R. Rep. No. 91-1549, at 21 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007, 4029 (emphasis added).

say that buying or selling stock on a non-U.S. market regulated by a separate sovereign nation

counts as "preying upon" U.S. citizens, especially given that Delaware law expressly authorizes

fiduciaries to invest in foreign securities (12 Del. C. § 3302).

      A broad interpretation of "own" is also inconsistent with well-established legal

principles that purposely create a divide between corporate entities and their shareholders.

Congress legislates against a backdrop of common law and traditional concepts and intends for

its legislation to incorporate those rules and concepts unless it specifically says otherwise.[40]  One

of the primary purposes of a corporation is to insulate shareholders from legal liability,[41] and

state law is clear that owning stock in a company is not the same as owning the company or its

assets.[42]  Similarly, individuals are generally not liable for the criminal conduct of a corporation

unless they performed or caused to be performed the criminal conduct in question.[43]  In light of

these principles, the fact that neither the text nor the legislative history of § 1955 specifically

state that just buying or owning publicly traded stock could violate the statute "strongly suggests

that Congress did not intend [for] the statute [to] have [such] broad reach."[44]

      *Rewis v. United States*, 401 U.S. 808 (1971), provides a good example of these

principles.  *Rewis* considered whether 18 U.S.C. § 1952, which prohibits interstate travel in

---

[40]  *See generally Meyer v. Holley*, 537 U.S. 280, 285 (2003) ("when Congress creates a tort action, it legislates against a legal background of ordinary tort-related … liability rules and consequently intends its legislation to incorporate those rules"); *Att'y Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 128 (2d Cir. 2001) (to abrogate a common law principle, a statute must "speak directly" to the question addressed by the common law).

[41]  *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993); *Soft Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 240 (S.D.N.Y. 2006).

[42]  *See generally Smith v. Hurd*, 53 Mass. 371, 385 (12 Met.) (Mass. 1847) (shareholders are not legal owners of corporate property).

[43]  Both New York and Delaware recognize this principle.  *See* N.Y. Penal Law § 20.25; 11 Del. C. § 282; *People v. Byrne*, 570 N.E.2d 1066, 1069 (N.Y. 1991); *State v. Colbert*, IN 86-10-0897, 1987 Del. LEXIS 1286, at *5 (Del. Nov. 23, 1987).

[44]  *United States v. Bass*, 404 U.S. 336, 349-50 (1971).

furtherance of gambling, also prohibited gambling operations simply because they were patronized by out-of-state bettors.  The Court observed that persons in the United States can easily travel between states and that there are many multi-state metropolitan areas, creating a situation in which criminal activity is often patronized by out-of-state customers.[45]  The Court thus held that an expansive interpretation of § 1952 could "alter sensitive federal-state relationships … overextend limited federal police resources, and … produce situations in which the geographic origin of customers, a matter of happenstance, would transform relatively minor state offenses into federal felonies."  *See id*.  Although the Court refused to "weigh the merits of these factors," it held that the absence of any discussion of these factors in the legislative history showed that Congress did not intend § 1952 to apply to such gambling operations.  *See id*.

The answer must be the same here.  Investors can easily purchase stock on exchanges around the world without leaving "home."[46]  And they can become owners of stock without intending to purchase it, such as by receiving it as a gift, bequest, or charitable donation. Plaintiff's interpretation of § 1955 would (i) criminalize the mere ownership of stock (which is not traditionally prohibited by state or federal law), (ii) create conflicts with foreign sovereigns and regulators, and (iii) make criminals out of investors who do no more than participate in open-market transactions or obtain ownership of foreign stock inadvertently.  The text and legislative history of § 1955 address none of these issues.  This strongly suggests that Congress did not intend § 1955 to criminalize mere purchase or ownership of publicly traded stock.

---

[45]     *See* 401 U.S. at 812.

[46]     *See Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*, 753 F. Supp. 2d 166, 177-78 (S.D.N.Y. 2010).

c.   **The Rule Of Lenity Forecloses Plaintiff's Claims**

The rule of lenity requires ambiguities in a criminal statute to be resolved in a

defendant's favor, and it applies to civil cases in which criminal statutes are interpreted.[47]

Plaintiff alleges that the Fund violated § 1955's prohibition on "owning part of" an illegal

gambling operation.  (Compl. ¶ 171.)  The question is whether owning publicly traded shares in

lawfully listed and traded corporations is what Congress intended to prohibit in § 1955.  If

Plaintiff's theory was plausible, the term "own all or part of" would be ambiguous with regard to

open market purchases and ownership of publicly traded stock in lawfully listed corporations.

The rule of lenity would preclude Plaintiff's interpretation of § 1955 even if it were plausible.

d.   **Section 1955 Has No Extraterritorial Application**

Even if Plaintiff's construction of § 1955 was remotely plausible (it is not), the

statute could not apply here.  "When a statute gives no clear indication of an extraterritorial

application, it has none," and the presumption against extraterritoriality applies in *all* cases.[48]

Put differently, "[f]oreign conduct is generally the domain of foreign law."[49]

Following *Morrison*, courts have expressly rejected the theory that a purchase by

a U.S. investor of stock of a non-U.S. company on a non-U.S. market "occurs" in the U.S.  Such

purchases occur outside the U.S., and neither (i) the fact that an investor might have decided in

the U.S. to purchase stock outside the U.S. nor (ii) the location of the alleged harm are enough to

---

[47]   *See United States v. Santos*, 553 U.S. 507, 514 (2008) ("Under a long line of our decisions, the tie must go to the defendant.  The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them."); *see also United States v. Murray*, 928 F.2d 1242, 1246 (1st Cir. 1991) ("The doctrine of lenity 'rests on the fear that expansive judicial interpretations will create penalties not originally intended by the legislature.'") (citations omitted); *Scottrade, Inc. v. BroCo Invs., Inc.*, 774 F. Supp. 2d 573, 584 (S.D.N.Y. 2011) (applying rule of lenity to interpretation of Computer Fraud and Abuse Act in civil action).

[48]   *See Morrison v. Nat'l Austl. Bank*, 130 S. Ct. 2869, 2873, 2878 (2010).

[49]   *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455 (2007).

overcome the presumption that federal statutes do not apply extraterritorially.[50] Here, 888 and

NETeller were listed and traded on the LSE and Plaintiff concedes that the Fund's purchases of

those securities were made on the LSE.

      Although Congress knows how to write a statute to have extraterritorial effect,[51] §

1955 contains no indication that Congress intended it to apply extraterritorially.  Instead, § 1955

applies solely to conduct occurring in the U.S., which is not what this case involves.[52]  Indeed,

Plaintiff implicitly concedes that U.S. anti-gambling laws have no extraterritorial reach by

pleading that 888 and NETeller chose not to list their stock in the U.S. "to evade the reach of the

U.S. criminal justice system … ."  (Compl. ¶ 41.)  And all of this is consistent with the fact that §

1955 was enacted as part of the same legislation that produced the RICO statute, which itself has

no extraterritorial application.[53]  Thus, § 1955 could not apply to the Fund's purchase or

ownership of 888 and NETeller stock.[54]

---

[50]    *See Horvath v. Banco Comercial Portugues, S.A.*, No. 10 Civ. 4697 (GBD), 2011 WL 666410, at
*2-3 (S.D.N.Y. Feb. 15, 2011); *Swiss Reins. Co.*, 753 F. Supp. 2d at 177-79; *In re Societe
Generale Secs. Litig.*, No. 08 Civ. 2496 (RMB), 2010 WL 3910286, at *5 (S.D.N.Y. Sep. 29,
2010); *Stackhouse v. Toyota Motor Co.*, No. CV 10-0922 (DSF), 2010 WL 3377409, at *1 (C.D.
Cal. July 16, 2010); *Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 628 (S.D.N.Y. 2010).

[51]    For example, the Wire Act expressly applies to "the transmission in interstate *or foreign
commerce* of bets or wagers or information assisting in the placing of bets or wagers," 18 U.S.C.
§ 1084(a) (emphasis added), and the Unlawful Internet Gambling Enforcement Act was enacted
to proscribe gambling that "crosses State or national borders," 31 U.S.C. § 5361(a)(4).  In
contrast, § 1955 applies only to a business that is a violation "of the law of a State or political
subdivision in which it is conducted," and "State" means "any State of the United States, the
District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the
United States."  18 U.S.C. § 1955(b).

[52]    That some gaming companies were charged under § 1955 in connection with *their* participation in
gaming transactions with U.S. residents has nothing to do with whether § 1955 applies to
international securities transactions such as those at issue here.  The charged conduct with respect
to such companies was their interaction with U.S. residents in connection with gaming
transactions, not secondary market stock transactions involving entirely different parties.

[53]    *See Norex Petroleum Ltd. v. Access Indus. Inc.*, 631 F.3d 29, 32-33 (2d Cir. 2010) (*per curiam*).

[54]    *Accord Elliott Assocs. v. Porsche Automobil Holdings, SE*, Nos. 10 Civ. 532 & 10 Civ. 4155
(HJB), 2010 U.S. Dist. LEXIS 138399, at *24 (S.D.N.Y. Dec. 30, 2010) (noting that the '34 Act
was not intended to regulate foreign securities exchanges and noting *Morrison*'s "strong

2.    **The Fund's Investments Did Not Violate New York Law**

The only provision of the New York Penal Law that is even arguably applicable

here is § 225.05, which criminalizes "knowingly advanc[ing] or profit[ing] from unlawful

gambling activity."[55]  Those terms are both defined in the statute:

- "[A]dvanc[ing] gambling activity" means "conduct that materially aids any form of gambling activity."

- "[P]rofit[ing] from gambling activity" means "when, other than as a player, [defendant] accepts or receives money or other property pursuant to an agreement or understanding with any person whereby [defendant] participates or is to participate in the proceeds of gambling activity."[56]

Plaintiff does not allege that the Fund did either, instead alleging that the Fund bought and

owned publicly traded stock and engaged in normal shareholder behavior (such as attending

annual meetings by proxy and voting).  (Compl. ¶¶ 61-62.)  Such ordinary incidents to owning

publicly traded stock cannot qualify as "considerably" or to a "great extent" aiding gambling

---

pronouncement that U.S. courts ought not interfere with foreign securities regulation without a clear Congressional mandate").  The same reasoning applies here — U.S. courts should not interfere with foreign corporate or securities regulation without a clear legislative mandate, and there is no such mandate here.

Plaintiff's counsel has argued that § 1955 must be read broadly to ensure that foreign countries do not become safe havens for companies to violate U.S. laws.  That argument directly contradicts the presumption that U.S. statutes do not have extraterritorial application unless Congress says so specifically.  Indeed, in *Morrison* the Solicitor General argued that extraterritorial application of the securities laws was necessary to prevent the U.S. from becoming a Barbary Coast for wrongdoers perpetrating frauds in other markets, and the Supreme Court rejected that argument because it had no textual basis.  *See Morrison*, 130 S. Ct. at 2886.  This case is no different.

[55]    Other provisions of Article 225 cannot be at issue because Plaintiff does not allege that Defendants directly participated in operating any gambling enterprise.  *See* N.Y. Penal Law § 225.10 (prohibiting "bookmaking," lotteries, and "numbers games"); N.Y. Penal Law § 225.15 (possession of gambling records); N.Y. Penal Law § 225.20 (same); N.Y. Penal Law § 225.30 (possession of a gambling device).  Plaintiff does not allege that someone does any of the things prohibited by these statutes by buying or owning publicly traded stock (which would be inconsistent with the general principle that shareholders do not own a corporation's assets).

[56]    N.Y. Penal Law § 225.00.  "Materially" means "to a great extent; substantially; considerably." *See People v. Shing*, 371 N.Y.S.2d 322, 326 (Crim. Ct. 1975).

activity and thus do not qualify as "materially aiding" a gambling company.[57]  Plaintiff also does

not allege conduct that fits the statutory definition of "profit[ing] from gambling activity."[58]  In

any event, just as with § 1955, the rule of lenity would preclude Plaintiff's arguments even if

they were textually plausible.

That Article 225 cannot apply here can also be seen by looking at the specific

behaviors prohibited under § 225.05, including possessing gambling equipment, soliciting

persons to gamble, conducting gambling games, and allowing a building to be used for

gambling.[59]  That list shows that the intended scope of the statute is the *operation* of a gambling

business, which is how New York courts have applied it — to defendants who operated

gambling businesses.[60]  But no court has applied it to someone who bought or owned publicly

traded stock.  Indeed, in the only instance Plaintiff cites in which Article 225 was even applied to

an online casino company, the New York Attorney General did not prosecute passive owners of

stock in the gaming company.[61]

3.    **The Fund's Investments Did Not Violate Delaware Law**

Because Delaware law specifically allows fiduciaries to purchase foreign stocks

(12 Del. C. § 3302), the only way Plaintiff could assert claims for violations of Delaware law

would be if some other Delaware law prohibited buying and owning foreign securities that §

3302 allowed the Fund to buy.  There is no such law.  Certain Delaware statutes deal with

---

[57]    *See Shing*, 371 N.Y.S.2d at 326.  Because all Plaintiff has done is plead ordinary investor activity as opposed to actions that could plausibly be viewed as improper, the Amended Complaint does not satisfy the requirements of Fed. R. Civ. P. 8.  *See Iqbal*, 556 U.S. at 679—80.

[58]    Nor does Plaintiff allege "profit" in any other sense — he alleges that the Fund *lost* money on the 888 and NETeller investments.  *See* Compl. at p. 37 ("Prayer for Relief").

[59]    N.Y. Penal Law § 225.00.

[60]    *See Shing*, 371 N.Y.S.2d at 326-27; *People v. Brown*, 447 N.Y.S.2d 129, 131 (Crim. Ct. 1982).

[61]    *See People ex rel. Vacco v. World Interactive Gaming Corp.*, 714 N.Y.S.2d 844, 848 (Sup. Ct. 1999).

lotteries or numbers games (11 Del. C. §§ 1401-02), sports betting (11 Del. C. § 1403), providing premises for gambling or possessing gambling devices (11 Del. C. §§ 1404-06), engaging in a crap game (11 Del. C. § 1407), and disseminating gambling information (11 Decl. C. § 1411). None prohibit the purchase or ownership of publicly traded stock.  In each case, the statutes make clear that they only apply to those who actually participate in the gambling activity.  And once again any ambiguity would, under the rule of lenity, mean that Plaintiff's claims fail.

### 4.    Plaintiff's Claims Regarding Violations Of State Law Are Barred By The Dormant Commerce Clause

Even if Plaintiff's arguments about state criminal laws made textual sense and could survive under the rule of lenity, the application of such laws to transactions occurring outside the U.S. would violate the dormant Commerce Clause.[62]  A state statute violates the dormant Commerce Clause if it has the practical effect of exerting control over commerce occurring entirely outside the boundaries of the state in question.[63]  The conduct complained of here is the Fund's investments in 888 and NETeller, which were not domestic transactions and did not occur within the boundaries of any U.S. state.

That Plaintiff's theory of liability conflicts with the dormant Commerce Clause can be seen by noting the absurd results that would follow from Plaintiff's theory:

- First, assume that New York law made it a crime to buy or own publicly traded stock.
- Next, assume that at precisely the same moment in time, an investor in New York and an investor in Paris each directed their brokers to purchase one share of NETeller or 888 stock on the LSE.  Because both transactions took place on the LSE, both investors have done the same thing, at the same time, in the same place.  So which investor violated state law — both investors, only the Parisian investor, or only the New York investor?

---

[62]    This analysis would apply to any state's law Plaintiff might assert in opposing this motion.

[63]    *See Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102 (2d Cir. 2003) (Vermont law regulating internet communications containing sexually explicit materials violated dormant Commerce Clause).

▪ Because both transactions took place on the LSE and outside New York, there is no analytically consistent basis to avoid finding that the Paris investor violated Article 225 if the New York investor did so.  Indeed, assume there was such a basis, but that the Parisian investor moved to New York while he or she still owned the single NETeller or 888 share purchased on the LSE.  Would the Parisian investor then be guilty of violating New York law because he or she owned the stock while in New York?  Answering yes is absurd,[64] but answering no means there was no basis to distinguish between the New York and Parisian investors in the first instance.[65]

Because every analytically consistent interpretation of state law that would cover the Fund's investments in 888 and NETeller necessarily implies state regulation of purely foreign conduct, the dormant Commerce Clause precludes those interpretations and thus precludes the application of state law to the Fund's investments in 888 and NETeller.

5. **Even If Defendants' Alleged Activities Could Be Deemed To Have Violated Federal Or State Law, They Would Not Constitute Negligence *Per Se***

Plaintiff alleges that the Fund's investments in 888 and NETeller were negligence *per se*.  Negligence *per se* requires that a plaintiff asserting the negligence claim be a part of the class of persons that the statute he or she claims was violated was intended to protect.[66]  And because negligence *per se* effectively creates a private right of action for violation of a statute, the creation of such a right must be consistent with the legislative scheme in which the statute

---

[64] Such an interpretation of state law would frustrate world markets and international travel and raise significant foreign policy power issues:  Anyone owning stock, even stock purchased on a non-U.S. exchange, would have to study the laws of all fifty states before setting foot in the U.S. to avoid interpretations like the one Plaintiff advances.  And any U.S. citizen would need to investigate whether stock they owned would violate the laws of any state they traveled to, even if such a purchase was legal in their home state and the jurisdiction that was home to the exchange the purchase was made on.  And anyone receiving shares of stock as a gift or charitable donation would have to consider whether simply receiving such stock was a criminal act.  This is what limitations on state power like the dormant Commerce Clause are designed to avoid.

[65] This is precisely the sort of unpredictability and inconsistency *Morrison* sought to avoid by rejecting the conduct and effects tests.  *See* 130 S. Ct. at 2883.

[66] *Del. Elec. Coop. v. Duphily*, 703 A.2d 1202, 1209 (Del. 1997); *Nicholson v. S. Oaks Hosp.*, 811 N.Y.S.2d 770, 771 (App. Div. 2006).

was enacted.[67]  Because neither is true here, Plaintiff cannot assert negligence *per se*.

Section 1955.  Congress enacted § 1955 as part of the OCCA, which also enacted RICO.[68]  Congress intended the OCCA to halt the influence of organized crime, which threatened to "infiltrate and corrupt legitimate business and labor unions."[69]  But Plaintiff does not allege any conduct remotely like what Congress targeted through the OCCA — he alleges the purchase and ownership of stock that the LSE deemed appropriate for listing and trading on that market, something Congress has no say in.  Nor would allowing Plaintiff to proceed on a negligence *per se* theory based on § 1955 be consistent with the legislative scheme Congress enacted:

- Congress enacted § 1955 against the backdrop of general corporate law, in which shareholders are not held liable for acts of a corporation except in unusual situations not present (or even alleged) here.  If Congress had meant to change the ordinary rule that shareholders are not liable for the activities of the companies in which they invest, it would have said so specifically.

- Only Congress can create a private right of action to enforce federal law,[70] but it did not do so for § 1955 other than by means of a RICO claim (which fails here for the reasons discussed below).  Allowing Plaintiff to try to create a private right of action through the back door of state law would be inconsistent with Congress's intent in enacting § 1955 and is thus impermissible.[71]

New York Law.  Prior to 1967 (when the New York Legislature reformed New York's anti-gambling statutes), several New York statutes provided for civil remedies relating to

---

[67]  *See Wright v. Moffitt*, 437 A.2d 554, 559 (Del. 1981); *Mark G. v. Sabol*, 717 N.E.2d 1067, 1070 (N.Y. 1999).

[68]  *See* Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922 (codified in various sections of the U.S. code).

[69]  *See id.*, 84 Stat. at 923; *see also supra* note 38.

[70]  *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).

[71]  *See Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005); *In re Bendectin Litig.*, 857 F.2d 290, 313-14 (6th Cir. 1988).  Plaintiff seeks to use common law causes of action to pursue claims under federal and state statutes that on their face provide no private rights of action, precisely what *Broder* and *Bendectin* warned against.

gambling enterprises.  For example, under the previous statutory regime, persuading a person to visit a gambling establishment gave rise to a civil claim for that person's gambling losses.[72]  The 1967 enactment eliminated those remedies.  The New York Legislature clearly understood how to create civil claims for violations of criminal anti-gambling statutes, but chose to eliminate such claims when it created the Article 225 regime.  Where, as here, the New York legislature has repealed an explicit private right of action, no private right of action remains.[73]  Allowing Plaintiff to rely on negligence *per se* here would thus be inconsistent with New York law.

    Delaware Law.  Delaware's anti-gambling statutes and constitutional provision were enacted to protect Delaware citizens from the influence of gambling.[74]  The Delaware legislature did not intend for these provisions to protect businesses or investors, especially not investors several times removed.[75]  Because neither the Fund nor its investors are part of the class of persons intended to be protected by the Delaware anti-gambling statutes and constitutional provision, Plaintiff cannot rely on negligence *per se* here.

## B.   The Amended Complaint Fails To Allege RICO Claims

### 1.   Plaintiff Does Not Plead Any Predicate Acts

    A RICO plaintiff must allege at least two predicate acts as defined in the statute. *See* 18 U.S.C. § 1961.  The only predicate acts alleged by Plaintiff are owning shares of 888 and

---

[72]   N.Y. Penal Law § 980 (1909) (Henkin Decl. Exh. L).

[73]   *See Burns Jackson Miller Summit & Spitzer v. Lindner*, 451 N.E.2d 459, 465—66 (N.Y. 1983).

[74]   *See State v. Panaro*, 28 Del. 230, 233 (Del. 1914); *NFL v. Governor of the State of Del.*, 435 F. Supp. 1372, 1383 (D. Del. 1977).

[75]   In *National Football League*, the court rejected arguments that federal anti-gambling statutes were enacted to benefit "sports entrepreneurs," holding that such statutes were meant to protect citizens "from the demoralizing or corrupting influence of solicitations to gamble."  435 F. Supp. at 1388.  A Delaware court would likely reject arguments that Delaware's anti-gambling statutes and constitutional provision were enacted to protect mutual fund investors for similar reasons.

NETeller purportedly in violation of § 1955 and state law.[76]  As demonstrated above, Plaintiff

has not established that owning shares of NETeller and 888 was illegal under any law.  Because

Plaintiff has not (and cannot) allege predicate acts, the RICO claims fail.

2.    **Plaintiff Cannot Establish RICO Proximate Cause**

The RICO claims in this case are substantively identical to those at issue in

*McBrearty*, *Seidl*, *Wodka*, *and Gomes*.  Indeed, *McBrearty*, *Wodka*, and *Gomes* involved

investments in NETeller.[77]  All of the RICO claims in those cases were dismissed with prejudice

for lack of RICO proximate cause, and three of the four dismissals have been affirmed and are

final.[78]  Furthermore, Judges Sand and Rakoff recently relied on *McBrearty* in dismissing RICO

claims in *Picard v. Kohn,* 11 Civ. 1181 (JSR), 2012 WL 566298 (S.D.N.Y. Feb. 22, 2012) and

*Segal v. Bitar*, No. 11 Civ. 4521 (LBS), 2012 WL 273609 (S.D.N.Y. Jan 30, 2012), confirming

the viability, applicability, and persuasiveness of *McBrearty*.[79]

Plaintiff is unable to show that he or any other Fund investors were the target or

victim of the alleged RICO violation.  Indeed, the Second Circuit has repeatedly emphasized that

the reasonably foreseeable victims of an alleged RICO violation are the targets, competitors and

intended victims of the racketeering enterprise.[80]  As Judge Cote explained in *McBrearty*,

"Plaintiffs have raised no plausible claim that they are a member of any of these groups.  ...

---

[76]    *See* Compl. ¶ 5.  And Plaintiff has not even properly alleged state law predicate acts.  Only acts chargeable under state law "and punishable by imprisonment for more than one year" count as predicate acts under § 1961(1), but Plaintiff has not alleged that any state law satisfies that requirement, nor is it clear he could.  For example, even if it could apply here, a violation of New York Penal Law § 225.05 is a class A misdemeanor.

[77]    *See Hartsel*, 2011 WL 2421003, at *4; *Wodka*, 433 F. App'x at 564; Henkin Decl. Exh. F, at 3-4.

[78]    The *Gomes* appeal has not yet been decided.

[79]    Plaintiff has repeatedly argued that *McBrearty* and *Seidl* are "non-precedential summary orders," but *Wodka*, *Gomes*, *Picard*, and *Segal* show otherwise.

[80]    *See Lerner v. Fleet Bank*, N.A., 318 F.3d 113, 124 (2d Cir. 2003).

Indeed, cases from this Circuit and elsewhere, when discussing victims of gambling enterprises, refer to those who gambled and lost, and not to investors in the enterprise."[81]  Because there is no allegation here that would permit a different result from those reached in *McBrearty*, *Seidl*, *Wodka*, and *Gomes*, the RICO claims must all be dismissed.[82]

### 3.    There Are Additional Reasons The RICO Claims Fail

Although failure to plead predicate acts and lack of proximate cause alone require dismissal of all RICO claims here, there are additional reasons those claims fail.  The Investment Advisor Defendants present these arguments in summary form and request that the Court allow them to address these arguments in more detail if any RICO claims survive this motion:

- RICO does not apply extraterritorially.  *See supra* note 53.
- Plaintiff fails to plead continuity.  Plaintiff does not try to plead closed-ended continuity, and the allegations of open-ended continuity are insufficient.[83]
- The Complaint fails to plead a proper RICO enterprise:  The Fund cannot be both the enterprise and the victim of the alleged racketeering activity.[84]

## C.    The Amended Complaint Fails To Allege Claims For Breach Of Fiduciary Duty Or Negligence

Under Delaware law, the business judgment rule applies to decisions by corporate officers and directors.[85]  Decisions will not be disturbed by courts unless the directors or officers were interested or lacked independence relative to the decision, did not act in good faith, acted in

---

[81]    *McBrearty*, 2009 WL 875220, at *3.

[82]    Although the Complaint alleges that "[a]ny other cause that may have contributed to the loss, including law enforcement efforts or the market reaction to those efforts, was not a superseding cause of the losses because it was reasonably foreseeable and part of the risk that Defendants' wrongful acts created" (Compl. ¶ 112), that conclusory allegation is insufficient.  *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990).

[83]    Plaintiff's continuity allegation is a single conclusory paragraph that appears to confuse open-ended continuity for RICO purposes with a fund being an "open-ended investment company" (Compl. ¶ 64), which are entirely different concepts.

[84]    *See Arnold v. Petland, Inc.*, No. 2:07-cv-01307, 2010 WL 2301194, at *4 (S.D. Ohio Jun. 4, 2010) (franchisees could not be both the enterprise and the victims of alleged RICO activity).

[85]    *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

a manner that cannot be attributed to a rational business purpose, or reached their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available; a plaintiff who fails to rebut the presumptions of the business judgment rule is not entitled to any remedy unless the transaction constituted waste.[86]  Plaintiff attempts to evade the business judgment rule by arguing that (1) 888 and NETeller operated illegal gambling operations and there was a known risk that federal authorities could crack down on these operations; (2) Defendants knew these risks but recklessly proceeded to invest in these corporations; and (3) if Defendants were ignorant of these risks, it was because they breached their duties to conduct due diligence and monitor the investment process.

Courts have rejected exactly this type of argument.[87]  In *Citigroup*, the plaintiffs alleged that the directors of Citigroup failed to monitor and manage the risks Citigroup faced from problems in the subprime lending market.[88]  Instead of specifically alleging how the directors had failed to monitor those risks, the plaintiffs argued that certain "red flags" should have given the defendants notice of the impending problems in the subprime mortgage market and that the defendants consciously ignored these risks in the reckless pursuit of profits or were ignorant of them because they failed to properly implement a system to identify risk.[89]  The Court of Chancery rejected that argument, holding that the plaintiffs' conclusory allegations failed to explain adequately what the directors did or did not do to violate their duties and reiterating that the mere fact that a company takes business risk and suffers losses (even

---

[86]   *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 52 n.62 & 73-74 (Del. 2006).

[87]   *See In re Citigroup Inc. S'holder Derivative Litig.,* 964 A.2d 106, 128 (Del. Ch. 2009); *La. Man. Police Emps. Ret. Sys. v. Blankfein,* No. 08 Civ. 7605 (LBS), 2009 U.S. Dist. LEXIS 42852 (S.D.N.Y. May 19, 2009).

[88]   *See Citigroup*, 964 A.2d at 111.

[89]   *See id.* at 126-27.

catastrophic ones) does not evidence misconduct and, without more, is not a basis for personal

director liability.[90]

Plaintiff does not allege that any Defendants had interests in the Fund's 888 or

NETeller investments or that any Defendants lacked independence relative to those investments.

Instead, Plaintiff appears to argue that Defendants did not act in good faith or could not

reasonably have chosen to invest in 888 or NETeller.  Both arguments fail.

### 1.   Plaintiff Has Not Alleged That Defendants Acted In "Bad Faith"

A fiduciary acts in bad faith when (1) he or she intentionally acts with a purpose

other than that of advancing the best interests of the corporation, (2) he or she acts with the intent

to violate applicable positive law, or (3) he or she intentionally fails to act in the face of a known

duty to act, demonstrating a conscious disregard for his or her duties.[91]  Plaintiff has not asserted

the first type of bad faith, because he does not allege that the defendants purchased stock in 888

or NETeller for any reason other than as part of the Fund's general investment strategy.

Plaintiff also fails to plead adequately that defendants knew that investing in 888

or NETeller violated any law.  To plead bad faith in this way, a plaintiff must plead "facts that

demonstrate that [Defendants] … had 'actual or constructive knowledge' that *their conduct* was

legally improper."[92]  Although Plaintiff cites various documents about whether certain conduct

engaged in by 888, NETeller, and other companies violated federal and state law, he cites

nothing suggesting any defendants knew or should have known that investments in publicly

traded securities could or did violate federal or state anti-gambling laws.  As demonstrated

above, such investments do not violate federal or state law, and Plaintiff has not identified any

---

[90]     *See id.* at 126-27 & 129-30.

[91]     *See In re Walt Disney*, 906 A.2d at 64, 66-67.  Plaintiff does not allege "subjective bad faith,"
          which would require a showing that Defendants intended to harm the Fund.  *See id.* at 64.

[92]     *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (emphasis added).

court or prosecutorial decision to the contrary, meaning that Plaintiff cannot point to any "red flags."  Indeed, in *World Interactive Gaming* (cited extensively in the Amended Complaint), the New York Attorney General did <u>not</u> pursue claims against outside investors.[93]

The Amended Complaint also fails to allege intentional failure to act in the face of a known duty to act.  Plaintiff alleges that defendants knew of the risk that 888 and NETeller's businesses might be harmed by a federal crackdown on illegal gambling operations, but nonetheless invested.[94]  But allegations that there was a known potential risk when an investment decision was made are insufficient to plead that defendants disregarded a duty to protect the Fund from investment losses.[95]  Indeed, the fact that the Fund had significantly positive returns during the period it was invested in 888 and NETeller means Plaintiff could not allege that the defendants disregarded a duty to protect the Fund from investment losses, because there is no duty to protect a mutual fund from all possible losses on every investment.[96]

Plaintiff also makes conclusory allegations that if the defendants were unaware of the risks posed to 888 and NETeller by a crackdown by federal authorities, then defendants failed in their duties to conduct due diligence or oversee the investment process.[97]  But Plaintiff pleads no *facts* demonstrating how the defendants' "oversight mechanisms" or due diligence processes were "inadequate," or how the defendants "knew of these inadequacies and consciously ignored them," the requirements for pleading this sort of claim.  Indeed, Plaintiff actually pleads that the defendants developed and implemented an investment strategy for the

---

[93]     *See* 714 N.Y.S.2d at 848.

[94]     *See* Compl. ¶¶ 77-78, 111.

[95]     *See Citigroup*, 964 A.2d at 130.

[96]     Put differently, all investment funds are expected to suffer some losses on some of their investments some of the time — that is an inevitable consequence of portfolio diversification.

[97]     Compl. ¶¶ 77-78.

Fund (Compl. ¶ 50), which is inconsistent with a claim like this.  Under *Iqbal*, this means that Plaintiff's allegations cannot be deemed plausible, and so they fail.

### 2.    The Amended Complaint Does Not Plead Gross Negligence

Gross negligence is "a reckless indifference to or a deliberate disregard of the whole body of stockholders[] or actions which are without the bounds of reason," an "extremely stringent" standard.[98]  The Amended Complaint does not meet that standard.

Plaintiff alleges that defendants invested in 888 and NETeller despite knowing that these companies were involved in illegal gambling operations and could be hurt by what Plaintiff calls — in pure hindsight — an impending crackdown by federal authorities.[99]  But such allegations regarding two investments in the Fund's portfolio are, without further allegations regarding the entire portfolio, insufficient to support a gross negligence claim.  A portfolio containing some higher-risk investments may be overall less risky than individual investments in the same instruments.[100]  In such a portfolio, some investments will be expected to lose money, sometimes as a result of known risks, but the portfolio may still be very profitable (as was the case here).[101]  A trustee or investment manager overseeing a portfolio of investments thus cannot be found grossly negligent based on the performance of one or two investments in the portfolio; their investment behavior can only be evaluated according to the composition and performance of the entire portfolio.[102]  Delaware has in fact codified this principle, requiring that courts

---

[98]    *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 & n.45 (Del. Ch. 2008).

[99]    Compl. ¶¶ 78-79, 112.

[100]    *See* Paul G. Haskell, *The Prudent Person Rule For Trustee Investment and Modern Portfolio Theory*, 69 N.C. L. Rev. 87, 100-04 (1990) (Henkin Decl. Exh. M).

[101]    *See id.*; *see also Citigroup*, 964 A.2d at 126 ("Businesses — and particularly financial institutions — make returns by taking on risk; a company or investor that is willing to take on more risk can earn a higher return.").

[102]    *See Citigroup*, 964 A.2d at 126.

considering "the propriety of an investment decision" examine "the inherent nature and expected performance" of the <u>entire</u> investment portfolio.  12 Del. C. § 3302(c).

Not surprisingly, Plaintiff fails to make a single allegation regarding the Fund's portfolio as a whole, probably because the Fund's share price increased 23.25% while it owned stock in 888 and NETeller, compared to the Dow Jones Industrial Average and the S&P 500, which increased 16.85% and 14.66%, respectively, over the same period.[103]  All Plaintiff alleges is that two particular Fund investments lost money.  Because Plaintiff has failed to allege any facts regarding the composition or performance of the Fund's entire portfolio — which outperformed the market despite the investments Plaintiff challenges — the Amended Complaint does not plead gross negligence.

Plaintiff also makes conclusory allegations that if defendants were unaware of 888 and/or NETeller's alleged involvement in illegal gambling or the supposedly impending crackdown by federal authorities, then defendants did not adequately conduct due diligence or oversee the investment process.  But such claims are pure hindsight and are not supported by any <u>factual</u> allegations regarding defendants' due diligence or oversight efforts, such as allegations about the due diligence that the Investment Advisor Defendants conducted, what a reasonable person could have concluded about the overall risks of the Fund's portfolio or particular investments, or how the Trustee Defendants supposedly failed to properly oversee the Fund's investment process.  As in *Citigroup*, Plaintiff simply relies on the flawed logic that, because the 888 and NETeller investments later lost value, the defendants must have breached duties.[104]  But the only particularized allegations in the Amended Complaint are actually inconsistent with

---

[103]     *Compare* Amended Complaint ¶¶ 51-59 (alleging that Fund owned stock in 888 and NETeller between September 1, 2005 and November 30, 2006) *with* Henkin Decl. Exh. K (Fund, DJIA, and S&P 500 prices during same period).

[104]     *See* Compl. ¶¶ 77-78; *Citigroup*, 964 A.2d at 128.

wrongdoing — Plaintiff affirmatively pleads that the Fund's trustees hired a professional advisor for the Fund, that the Fund's advisor developed and implemented investment strategies for the Fund, that the Fund voted at annual meetings of the companies in which the Fund invested, and that the Fund's trustees received regular reports regarding the Fund.[105]  Those allegations are more consistent with the defendants upholding the Fund's interests than with gross negligence. The claims must therefore be dismissed under *Iqbal*.

3.    **Plaintiff Cannot State A Claim For Breach Of Fiduciary Duty Against The Investment Advisor Defendants**

When a dispute relates to obligations that arise under a contract, that dispute should be treated as a breach of contract claim, and any breach of fiduciary duty claim should be dismissed.[106]  Here, the relationship between the Fund and the Investment Advisor Defendants is governed by the Management Agreement.[107]  Because Plaintiff's claim that the Investment Advisor Defendants breached their fiduciary duties is governed by the Management Agreement, the claim should be dismissed.

D.    **The Claim For Breach Of Contract Must Be Dismissed**

The breach of contract claim fails for several reasons:

- The Fund contractually waived any possible claims against the Investment Advisor Defendants for "any error of judgment or mistake of law or for any loss suffered by [the Fund] in connection with any matter to which" the Management Agreement related except for claims against the Advisor for "willful misfeasance, bad faith, or gross negligence."[108]  To the extent the Investment Advisor Defendants were mistaken about the legality of investing in the stock of a public company listed on a foreign exchange, the Management Agreement exculpates them from liability.  And Plaintiff has not alleged any facts that fit within the carveout to the exculpation clause.

---

[105]    Compl. ¶¶ 13, 47, 50, 61-62.

[106]    *See Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010).

[107]    Henkin Decl. Exh. B, § 1.1.

[108]    Henkin Decl. Exh. B § 9.

- Because NB and Messrs. Segal, Sundman, and Rivkin are not parties to the Management Agreement, they cannot be sued for allegedly breaching it.[109]

Accordingly, the breach of contract claim must be dismissed.[110]

### E.   The Amended Complaint Fails To State A Claim For Waste

Waste is an exchange so one-sided that no business person of ordinary, sound judgment could think the corporation received adequate consideration.[111]  To plead waste, a plaintiff must plead that defendants irrationally squandered corporate assets (for example, where the challenged transaction served no corporate purpose or the corporation received no consideration at all).[112]  Waste claims trigger "an extreme test, very rarely satisfied by a shareholder plaintiff."[113]  Put differently, "[i]f given the facts pled in the complaint, 'any reasonable person might conclude that the deal made sense, then the judicial inquiry ends.'"[114]  Thus, a waste claim requires a plaintiff to plead that no rational person would have done the transaction being attacked.  Plaintiff does not even come close to meeting this test:

- The Amended Complaint does not allege that the Fund "received no consideration" for its 888 and NETeller investments or even paid too much for the investments.[115]  Plaintiff concedes that the Fund purchased and sold shares

---

[109]   *See Oberstein v. SunPower Corp.*, 07-CV-1155 (JFB) (WDW), 2010 U.S. Dist. LEXIS 41402, at *11-12 (E.D.N.Y. Apr. 28, 2010) (dismissing contract claims against non-signatories).

[110]   Plaintiff also lacks standing to assert a breach of contract claim because he failed to make demand on the Board with respect to such a claim.  But it would be futile to let Plaintiff make demand now because the claim is both time-barred (*see infra* pp. 30-31) and inconsistent with the contract.

[111]   *White v. Panic*, 783 A.2d 543, 554 (Del. 2001); *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000).

[112]   *Panic*, 783 A.2d at 554; *Brehm*, 746 A.2d at 263.

[113]   *Zupnick v. Goizueta*, 698 A.2d 384, 387 (Del. Ch. 1997).

[114]   *In re Lear Corp.*, 967 A.2d at 656.

[115]   Nor could Plaintiff allege anything like this, because according to Plaintiff the public (and thus the markets) knew all about the potential that 888 and NETeller might be impacted by a federal crackdown on internet gambling at all relevant times.  *See* Compl. ¶¶ 28-30, 34, 70.  The efficient market hypothesis thus dictates that the market prices for 888 and NETeller — the prices the Fund paid and received — accurately reflected the value of the securities (including all the information discussed in the Amended Complaint) at all relevant times.  *See Basic Inc. v.*

in LSE-listed companies in open-market, arm's-length transactions, received and owned those shares, and took normal shareholder actions (such as voting the shares). In each transaction, including the Fund's sales of the shares, there was someone (who the Court must presume was rational) willing to take the other side of the transaction in an impersonal market. That means Plaintiff cannot show that no rational person would have engaged in the transactions.

- The sole basis Plaintiff pleads for the waste claim is that the 888 and NETeller investments were "illegal."[116] As demonstrated above, that argument has no merit. Other than that, the Amended Complaint alleges only that the Fund lost money on the 888 and NETeller investments. But Delaware does not permit waste claims based on alleged underperformance of a subset of publicly traded investments out of a portfolio that otherwise met a fund's overall investment objectives (which Plaintiff does not dispute).[117]

If the Amended Complaint sufficed to assert a waste claim then every underperforming investment could be challenged as "waste," which would be inconsistent with the fact that waste claims are the exception rather than the rule. The waste claim must be dismissed.

F.    **The Claims In The Amended Complaint Are Time-Barred**

The limitations period for the amended complaint's state law claims is three years, and the limitations period for the RICO claims is four years.[118] Those periods began to run no later than November 6, 2006, when the fund disclosed its last purchase of 888 and NETeller stock and after Plaintiff claims to have been injured by a drop in share prices of that stock on July 16, 2006.[119] Therefore, unless they were tolled, the limitations periods expired no

---

*Levinson*, 485 U.S. 224, 245-47 (1988).

[116]    Compl. ¶¶ 162-63; *see also id.* ¶ 30 (alleging that Fund's investments were "unlawful").

[117]    *See* 12 Del. C. § 3302(c).

[118]    *See* 10 Del. C. § 8106; *World Wrestling Entm't, Inc. v. Jakks Pac., Inc,* 328 F. App'x 695, 698 (2d Cir. May 19, 2009); *Sutherland v. Sutherland*, C.A. No. 2399-VCL, 2009 Del. Ch. LEXIS 46, at *17 (Del. Ch. Mar. 23, 2009).

[119]    *See* Compl. ¶¶ 53, 58, ECF No. 50. RICO claims accrue when the plaintiff discovers, or should have reasonably discovered, the alleged injury. *See World Wrestling Entm't.*, 328 F. App'x at 697. Breach of fiduciary duty, breach of contract, and waste claims accrue at the time of breach. *See Sutherland,* 2009 Del. Ch. LEXIS 46, at *17; *GRT, Inc. v. Marathon GTF Tech., Ltd.*, C.A. No. 5571-CS, 2011 Del. Ch. LEXIS 99, at *18 (Del. Ch. July 11, 2011). Negligence claims accrue at the time of injury. *See Kaufman v. C.L. McCabe & Sons, Inc.*, 603 A.2d 831, 834 (Del. 1992).

later than November 6, 2009 for the state law claims asserted in the Amended Complaint and no

later than November 6, 2010 for the RICO claims.

Although there was an initial tolling period relating to some of the claims asserted

in the Amended Complaint, that period expired.  The stipulation of dismissal in *Gamoran I*

permitted Plaintiff to file *one* new action under certain circumstances.[120]  But Plaintiff wasted

that opportunity by filing *Gamoran II* without having standing, that case was dismissed, and the

tolling period did not continue running after it was dismissed.[121]  Indeed, Plaintiff conceded that

the limitation periods continued to run after *Gamoran II* was dismissed, stating that he filed

*Gamoran III* when he did because the claims would have become time-barred on August 25,

2011.[122]  But then *Gamoran III* was also dismissed, and any limitation periods that even arguably

had not already expired did so between the time *Gamoran III* was dismissed and the Amended

Complaint was filed.  All the claims asserted in the Amended Complaint are thus time-barred:

Their statute of limitations ran out, at the latest, between the time the third complaint was

dismissed and the fourth complaint was filed.

## IV.    THE AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

Plaintiff has had multiple opportunities to plead claims — his counsel has had

four opportunities in these cases, and many more in the other related cases.  Repleading would

also be futile because the claims cannot be fixed; indeed, the substance of the claims has not

---

[120]    Henkin Decl. Exh. A ¶ 5.

[121]    Because *Gamoran II* was dismissed without prejudice and without an order providing for reinstatement within a specified period of time, the statutes of limitation were not tolled following dismissal.  *See In re Direxion Shares ETF Trust*, No. 09-cv-8011 (KBF), 2012 WL 717967, at *6 (S.D.N.Y. Mar. 6, 2012).  And the filing of *Gamoran III* did nothing to toll the RICO claims or the breach of contract claim:  Because Plaintiff did not assert those claims at all in *Gamoran II*, the limitations period on those claims continued to run even while *Gamoran II* was being litigated.

[122]    *See Gamoran III* Complaint ¶ 122.

changed in all the cases Plaintiff has filed.  Dismissal should thus be with prejudice.[123]  The

Investment Advisor Defendants are entitled to be done with Plaintiff's accusations.

## <u>CONCLUSION</u>

        For all the foregoing reasons, the Amended Complaint should be dismissed in its

entirety with prejudice.

Dated:  August 24, 2012

                           MILBANK, TWEED, HADLEY & McCLOY
                           LLP

                           By:   s/ Douglas W. Henkin
                                James N. Benedict
                                jbenedict@milbank.com
                                Alan J. Stone
                                astone@milbank.com
                                Douglas W. Henkin
                                dhenkin@milbank.com
                                Mia C. Korot
                                mkorot@milbank.com
                           1 Chase Manhattan Plaza
                           New York, NY  10005-1413
                           (212) 530-5000

                           *Attorneys for Defendants Neuberger Berman Management LLC, Neuberger Berman LLC, Benjamin Segal, Peter E. Sundman, and Jack L. Rivkin*

---

[123]    *Trinity BUI v. Indus. Enters. of Am. Inc.,* 594 F. Supp. 2d 364, 373-74 (S.D.N.Y. 2009); *McGee v. State Farm Mut. Auto. Ins. Co.*, No. 08-CV-392 (FB) (CCP), 2009 WL 2132439, at *6 (E.D.N.Y. Jul. 10, 2009).