UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BENJAMIN M. GAMORAN, derivatively on behalf of the nominal defendant with respect to its series mutual fund, the Neuberger Berman International Fund,

                    Plaintiff,

          - against -

NEUBERGER BERMAN, LLC, NEUBERGER BERMAN MANAGEMENT LLC, BENJAMIN SEGAL, PETER E. SUNDMAN, JACK L. RIVKIN, JOHN CANNON, FAITH COLISH, MARTHA C. GOSS, C. ANNE HARVEY, ROBERT A. KAVESH, HOWARD A. MILEAF, EDWARD I. O'BRIEN, WILLIAM E. RULON, CORNELIUS T. RYAN, TOM D. SEIP, CANDACE L. STRAIGHT, AND PETER P. TRAPP,

                    Defendants,

          - and -

NEUBERGER BERMAN EQUITY FUNDS d/b/a NEUBERGER BERMAN INTERNATIONAL FUND,

                    Nominal Defendant.

11 Civ. 7957 (TPG) (KNF)

ECF Case

---

# PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP
Thomas I. Sheridan, III
112 Madison Avenue
New York, NY 10016-7416
(212) 784-6404
tsheridan@hanlyconroy.com
*Attorneys for Plaintiff*

Dated: October 8, 2012

### TABLE OF CONTENTS

*Page*

Table of Contents ...................................................................................................... i

Table of Authorities ................................................................................................ iv

Preliminary Statement ..............................................................................................1

Summary of Argument ..............................................................................................2

Statement of Facts .....................................................................................................5

    The Parties ........................................................................................................5

    The Illegal Gambling Businesses....................................................................6

    Defendants' Investments in Illegal Gambling Businesses ...............................6

    Defendants Knew of the Illegality ..................................................................6

    The Law Enforcement Crackdown ..................................................................8

    The Losses Suffered.........................................................................................8

    Defendants' Violated the Gambling Act..........................................................8

    Defendants Violated RICO ..............................................................................9

    Defendants Breached Their Common Law Duties ..........................................9

    The Investment Advisors Violated the Management Agreement......................9

    The Board of the Fund Failed to Respond to Plaintiff's Demand Independently, In
        Good Faith, and With Due Care ...............................................................9

Argument ................................................................................................................10

I.    Defendants Violated Their Common Law Duties by Investing in Illegal Gambling
    Businesses and Seeking to Profit From Criminal Activity ...............................10

    A.    Defendants Are Guilty of Negligence.................................................11

    B.    Defendants Have Breached Their Fiduciary Duties ............................13

    C.    Defendants Have Committed Corporate Waste....................................16

    D.    The Fund's Overall Performance Cannot Insulate Defendants from Liability......17

E.      The Investment Advisors Breached the Management Agreement ........................17

II.     Defendants Violated the Gambling Act ...................................................................17

A.      "Owns" Means "Owns" ......................................................................18

B.      "Any Part" Means "Any Part" ..............................................................18

C.      The Statute Contains No Exception for "Passive" Ownership .............................19

D.      The Statute Contains No Exception for Criminal Enterprises Traded on
Foreign Stock Exchanges .................................................................20

E.      The Complaint Does Not Seek to Pierce Any Corporate Veil.............................21

F.      This Case Involves No Extraterritorial Application of U.S. Law.........................22

G.      Plaintiff Need Not Prove That Defendants Violated State Criminal Laws ..........22

H.      There Is No Exception for Owners Who Claim Ignorance of the Criminal
Law ............................................................................................24

I.      The "Rule of Lenity" Provides No Refuge to Defendants....................................25

III.    Defendants Violated RICO .....................................................................................26

IV.     Plaintiff's Allegations Raise a Reasonable Doubt Whether the Board Refused Plaintiff's
Demand in Bad Faith and Without Due Care ..................................................29

A.      Because the Board Failed to Give Final Decision-Making Authority to the
SLC, the Recommendation of the SLC Is Irrelevant ................................33

B.      The Board Was Interested as a Matter of Law ....................................35

C.      The Board and All Members of the SLC Also Have Other Irreconcilable
Conflicts of Interest...........................................................................37

D.      Plaintiff Has Alleged Particular Facts That Raise a Reasonable Doubt as to
the SLC's Independence ...................................................................40

E.      The Board's Investigation Has Not Been Sufficiently Transparent .....................43

F.      The Board Did Not Meet Established Requirements for Conducting an
Investigation Reasonably and With Due Care .......................................44

G.      The Board's Refusal Was Premised Not on a "Business Decision" But on an
Erroneous "Legal Conclusions" That Cannot Be Granted Deference from the
Court Because They Violate Public Policy...........................................45

H.    The Board's Continued Withholding of the Tolling Agreements
Demonstrates Their Bad Faith Hostility to Plaintiff ...............................................47

V.    The Fund's Claims Are Not Barred by Any Statute of Limitations ................................49

VI.    Plaintiff Is An Adequate Representative.............................................................................49

Conclusion ...............................................................................................................................50

TABLE OF AUTHORITIES

Page

## Cases

*Abbey v. Computer & Commc'n Tech. Corp.*, 457 A.2d 368 (Del. Ch. 1983) ............................ 35

*Alford v. Shaw*, 349 S.E.2d 41 (N.C. 1986) ................................................................. 32

*Am. Booksellers Found. v. Dean*, 342 F.3d 96 (2d Cir. 2003) ....................................... 23

*Amron v. Morgan Stanley Inv. Advisors, Inc.,* 464 F.3d 338 (2d Cir. 2006) .................... 42

*Arnold v. Petland, Inc.*, No. 2:07-cv-1307, 2011 WL 2301194 (S.D. Ohio Jun. 4, 2010) .......... 28

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), *overruled on other grounds*, *Brehm v. Eisner*,
        746 A.2d 244 (Del. 2000) ...................................................................... 46

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ..................... 42

*Auerbach v. Bennett*, 47 N.Y.2d 619 (1979) ................................................................. 46

*Beam v. Stewart*, 845 A.2d 1040 (Del. 2004) .............................................................. 31

*Boeing Co. v. Shrontz*, Civ. A. No. 11273, 1994 WL 30542 (Del. Ch. 1994) ...................... 43

*Boland v. Boland*, 31 A.3d 529 (Md. 2011) ........................................................... passim

*Booth Family Trust v. Jeffries*, 640 F.3d 134 (6th Cir. 2011) ...................................... 32

*Boyle v. United States*, 556 U.S. 938 (2009) .............................................................. 25

*Braddock v. Zimmerman*, 906 A.2d 776 (Del. 2006) .................................................... 34

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ...................................... 27

*Brock Built, LLC v. Blake*, 686 S.E.2d 425 (Ga. 2009) .............................................. 46

*Broder v. Cablevision Sys. Corp.*, 418 F.3d 187 (2d Cir. 2005) ................................... 13

*Burns Jackson Miller Summit & Spitzer v. Lindner*, 451 N.E.2d 459 (N.Y. 1983) ............. 13

*Cheek v. United States*, 498 U.S. 192 (1990) .............................................................. 24

*Clackamas Gastroenterology Associates, P. C. v. Wells*, 538 U.S. 440 (2003) .................. 18

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990) ............................................. 46

*Cullen v. Margiotta*, 811 F.2d 698 (2d Cir. 1987) ...................................................... 28

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984) ............................................... 42

*DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001) ...................................................... 26

*DeSimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007) ............................................... 14

*Exxon Corp. v. Hunt*, 475 U.S. 355 (1986) .............................................................. 20

*FLI Deep Marine LLC v. McKim*, 2009 WL 1204363 (Del. Ch. Apr. 21, 2009) .......... 36, 44

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005) ...................... 13

*Great Rivers Co-op. of Se. Iowa v. Farmland Indus., Inc.*, 198 F.3d 685 (8th Cir. 1999) .......... 46

*Grimes v. McDonald*, 673 A.2d 1207,(Del. 1996)............................................................... passim

*Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003) ........................................................ 14

*Hartsel v. Vanguard Group., Inc.,* C.A. No. 5394, 2011 WL 2421003 (Del. Ch. June 15,
    2011), *aff'd* 2012 WL 171881 (Jan. 19, 2012) .................................................. 24, 31

*Hasan v. CleveTrust Realty Invs.*, 729 F.2d 372 (6th Cir. 1984)................................... 40

*Hirsch v. Jones Intercable, Inc.* 984 P.2d 629 (Colo. 1999)........................................ 34

*House v. Estate of Edmondson*, 245 S.W.3d 372 (Tenn. 2008).................................. 46

*Ideal Steel Supply Corp. v. Anza*, 652 F. 3d 310 (2d Cir. 2011).................................. 27

*Ikuno v. Yip*, 912 F.2d 306 (9th Cir. 1990) ................................................................. 26

*In re Bendectin Litig.*, 857 F.2d 290 (6th Cir. 1988) .................................................. 13

*In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106 (Del. Ch. 2009) ........................ 11

*In re Delaware Sports Serv.*, 196 A.2d 215 (Super. Ct. 1963), *aff'd*, 202 A.2d 568 (Del.
    1964) ................................................................................................................. 10

*In re Direxion Shares ETF Trust*, 2012 WL 717967 (S.D.N.Y. Mar. 6, 2012)........................... 49

*In re Oracle Corp. Derivative Litig.*, 824 A.2d 917 (Del. Ch. 2003) .................................... passim

*In re Par Pharmacedtical, Inc., Derivative Litigation*, 750 F. Supp. 641 (S.D.N.Y. 1990)... 33, 36

*In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27 (Del. 2006)................................ 14

*Jackson v. Smith*, 254 U.S. 586 (1921) ..................................................................... 10

*Janssen v. Best & Flanagan*, 662 N.W.2d 876 (Minn. 2003)...................................... 34

*Johnson v. United States*, 130 S. Ct. 1265 (2010) ...................................................... 18

*Jones v. Harris Assocs. L.P.*, 130 S. Ct. 1418 (2010)............................................. 30, 42

*La. Mun. Police Employees' Ret. Sys. v. Pyott*, 46 A.3d 313 (Del. Ch. 2012) .......... 10, 36, 37, 50

*Laventhol, Krekstein, Horwath & Horwath v. Tuckman*, 372 A.2d 168 (Del. 1976)................... 10

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003) .......................................... 27

*Levine v. Smith*, 591 A.2d 194 (Del. 1991)................................................................. 30

*Lewis v. Fuqua*, 502 A.2d 962 (Del. Ch. 1985) ...................................................... 31, 48

*Long v. State*, 65 A.2d 489 (Del. 1949) .................................................................... 15

*Mark v. J. I. Racing, Inc.*, No. 92-cv-5285(FB), 1997 WL 403179 (E.D.N.Y. July 9, 1997)...... 28

*McBrearty v. The Vanguard Group, Inc.*, No. 08-CV-7650, 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *aff'd* 353 Fed. Appx. 640 (2d Cir. 2009) (summary order), *cert. denied*, 130 S. Ct. 3411 (2010) .................................................................................................. 26, 27

*Meinhard v. Salmon*, 164 N.E. 545 (N.Y. 1928) ........................................................ 14

*Meridian Horizon Fund, LP v. Tremont Group Holdings, Inc.*, 747 F. Supp. 2d 406 (S.D.N.Y. 2010), *aff'd*, 2012 WL 2754933 (2d Cir. July 10, 2012) ........................... 29

*Metro Communication Corp. BVI v. Advanced Mobilecomm Techn., Inc.*, 854 A.2d 121 (Del. Ch. 2004) ........................................................................................................ 14

*Michelson v. Duncan*, 407 A.2d 211 (Del. 1979) ....................................................... 17

*Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321 (4th Cir. 2001) ..................... 42

*Morrison v. Nat'l Aus. Bank Ltd.*, 130 S. Ct. 2869 (2010) ......................................... 22

*Mt. Moriah Cemetery v. Mortiz*, No. 11431, 1991 WL 50149 (Del. Ch. Apr. 4, 1991) .............. 35

*Nemec v. Shrader*, 991 A.2d 1120 (Del. 2010) .......................................................... 15

*NFL v, Governor of the State of Del.*, 435 F. Supp. 1372 (D. Del. 1977) ................... 13

*Peller v. S. Co.*, 707 F. Supp. 525 (N.D. Ga. 1988), *aff'd* 911 F.2d 1532 (11th Cir. 1990) ......... 44

*People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc. 2d 852 (N.Y. Co. Sup. Ct. 1999) ................................................................................................................. 6

*Perrin v. United States*, 444 U.S. 37 (1979) ............................................................. 18

*Picard v. Kohn*, No. 11-cv-01181-JSR, 2012 WL 566298 (S.D.N.Y. Feb. 22, 2012) ................ 28

*Pinkerton v. United States*, 328 U.S. 640 (1946) ..................................................... 2, 9

*PT China LLC v. PT Korea LLC*, CIV.A. 4456-VCN, 2010 WL 761145 (Del. Ch. Feb. 26, 2010) ......................................................................................................................... 15

*RCM Sec. Fund, Inc. v. Stanton*, 928 F.2d 1318 (2d Cir. 1991) .................................. 31

*Rewis v. United States*, 401 U.S. 808 (1971) ............................................................ 25

*Rousso v. State*, 170 Wash. 2d 70, 239 P.3d 1084 (2010) (*en banc*) ......................... 23

*Salinas v. United States*, 522 U.S. 52 (1997) ........................................................... 25

*Sammons v. Ridgeway*, 293 A.2d 547 (Del. 1972) ..................................................... 12

*Sanabria v. United States*, 437 U.S. 54 (1978) .................................................... 19, 25

*Scattered Corp. v. Chicago Stock Exchange, Inc.,* 701 A.2d 70 (Del. 1997), *overruled on other grounds, Brehm v. Eisner,* 746 A.2d 244 (2000) ................................... passim

*Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91 (2d Cir.1997) ................. 26, 28

*Schmeusser v. Schmeusser*, 559 A.2d 1294 (Del. 1989) ................................................ 14

*Scottrade, Inc. v. BroCo Invs., Inc.*, 774 F. Supp. 2d 573 (S.D.N.Y. 2011) ................. 25

*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985) ............................................ 26

*Seidl v. Am. Century Cos., Inc.*, 713 F. Supp. 2d 249 (S.D.N.Y. 2010), *aff'd* 427 Fed. Appx.

    35 (2d Cir. 2011) (summary order), *cert. denied*, 2011 WL 4344573 (Dec. 12, 2011) ..... 26, 27

*Seminaris v. Landa*, 662 A.2d 1350 (Del. Ch. 1995) ..................................................... 34

*Smith v. Hurd*, 53 Mass. 371 (Mass. 1847) ................................................................... 18

*Spiegel v. Buntrock*, 571 A.2d 767 (Del. 1990) ..................................................... 32, 34

*Trans World Airlines, Inc. v. Summa Corp.*, 1986 WL 5671 (Del. Ch. 1986) ............... 17

*United States v. Ables*, 167 F.3d 1021 (6th Cir. 1999) ................................................. 24

*United States v. BetOnSports Plc*, 2006 WL 3257797 (E.D. Mo. Nov. 9, 2006) ............. 8

*United States v. Busacca*, 936 F.2d 232 (6th Cir.1991) ............................................... 26

*United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001) ..................................................... 6

*United States v. Dauray*, 215 F.3d 257 (2d Cir. 2000) ................................................ 20

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) ...................................................... 6

*United States v. Guest*, 383 U.S. 745 (1966) ............................................................... 25

*United States v. Hawes*, 529 F.2d 472 (5th Cir. 1976) ............................................ 19, 24

*United States v. International Minerals & Chemical Corp.*, 402 U.S. 558 (1971) ...................... 24

*United States v. Merrell,* 701 F.2d 53 (6th Cir 1983) ................................................... 19

*United States v. Tedder*, 403 F.3d 836 (7th Cir. 2005) ................................................. 24

*Wash. State Dep't of Soc. & Health Svcs. v. Keffeler*, 537 U.S. 371 (2003) ............... 18

*Weems v. United States*, 217 U.S. 349 (1910) ............................................................ 21

*Werbowsky v. Collumb,* 766 A.2d 123 (Md. 2001) ..................................................... 31

*Youshah v. Staudinger,* 604 N.Y.S.2d 479 (N.Y. Supr. Ct., 1993) .............................. 10

*Zapata Corp. v. Maldonado*, 430 A.2d 770 (Del. 1980) ...................................... 5, 30, 34

## Statutes and Rules

15 U.S.C. § 80a-10(a) .................................................................................................... 39

18 U.S.C § 1955(a) .......................................................................................................... 1

18 U.S.C. § 1030 ............................................................................................................ 25

18 U.S.C. § 1955(b) ......................................................................................................... 1

18 U.S.C. § 1955(b)(1) ................................................................................................... 22

18 U.S.C. § 1961(1)(B) ........................................................................................ 2, 9

18 U.S.C. § 1961(5) ................................................................................................ 26

18 U.S.C. § 1962(c) ............................................................................................. 2, 9

18 U.S.C. § 2 ........................................................................................................ 2, 9

Del. Code Ann. tit. 12, § 3801(d) ........................................................................... 39

Fed. R. Civ. P. 15(a)(2) ........................................................................................... 50

Fed. R. Civ. P. 15(c) ............................................................................................... 49

Fed. R. Civ. P. 15(c)(1)(B) ...................................................................................... 49

Fed. R. Civ. P. 23.1 ................................................................................................. 49

Illegal Gambling Business Act of 1970, 18 U.S.C. § 1955 ....................................... 1

N.Y. Penal Law § 100.00 ......................................................................................... 23

N.Y. Penal Law § 110.00 ......................................................................................... 23

N.Y. Penal Law § 225.00(5) ..................................................................................... 23

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 .............................. 2

Unlawful Internet Gambling Enforcement Act of 2006, 31 U.S.C. § 5361 *et seq.* ................. 8, 12

## Other Authorities

C. Doyle, *Internet Gambling: Overview of Federal Criminal Law*, Congressional Research
   Service (Updated February 27, 2006) ...................................................................... 8

K. Eichenwald, *At PartyGaming, Everything's Wild*, N.Y. Times, June 26, 2005 ...................... 7

## PRELIMINARY STATEMENT

This is a case about investing in criminal enterprises. The essence of any investment is the right to participate in the profits of the enterprise. If the core activity of the enterprise is illegal, an investment in that enterprise is an attempt to profit from criminal activity. Plaintiff's case is based on the simple premise that it is wrongful for professional asset managers in the U.S. to purchase shares in foreign companies they know to be "illegal gambling businesses." Pursuant to its duty to avoid the promotion of illegality, this Court should reject Defendants' argument that an attempt to profit from criminal activity is a permissible exercise of "business judgment."

Defendants are mutual fund fiduciaries who squandered investors' money by knowingly investing in illegal gambling businesses. Defendants made the investments despite explicit warnings by the Department of Justice – prominently disclosed in the prospectus of one of the gambling companies – that the primary purpose of the gambling companies was to violate federal and state criminal laws and that law enforcement authorities in the U.S. considered them to be criminal organizations.

Defendants' conduct was wrongful not only because it violated the fundamental common law principle that one party may not knowingly seek to profit from the wrongdoing of another, but also because that principle is embodied in the Illegal Gambling Business Act of 1970 (the "Gambling Act"), which makes it a felony to "own[] all or part of an illegal gambling business." 18 U.S.C § 1955(a). The entities in which Defendants invested were "illegal gambling businesses" as defined in the Gambling Act. 18 U.S.C. § 1955(b). By causing their mutual fund to own "part" of illegal gambling businesses, Defendants violated – and caused their mutual fund to violate – the Gambling Act.[1]

---

[1] Defendants are liable as principals because (i) anyone who aids or abets the commission of a

A violation of the Gambling Act is a predicate crime under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961(1)(B) ("RICO"). By causing the mutual fund repeatedly to violate the Gambling Act, Defendants conducted the affairs of fund through a "pattern of racketeering activity" in violation of RICO. 18 U.S.C. § 1962(c).

The mutual fund and its innocent investors suffered millions of dollars of losses as a direct result of Defendants' illegal investments. Following a law enforcement crackdown by federal and state law enforcement, the share prices of the gambling companies plummeted in the foreign markets in which they traded.[2] Asserting claims for racketeering, negligence, breach of fiduciary duty, breach of contract, and waste, Plaintiff seeks recovery on behalf of the fund for the benefit of its shareholders.

SUMMARY OF ARGUMENT

Two separate groups of defendants advance two principal arguments for dismissals. The Investment Advisor Defendants ("Advisors") argue in their Memorandum of Law ("Ad. Br.") that it was not wrongful to invest in foreign criminal organizations because the investments were not overly risky given the fund's portfolio. They deny their conduct was criminal because, according to them, owning stock in an "illegal gambling business" does not fall within the Gambling Act's explicit prohibition against owning "all or part" of such business. The Trustee Defendants ("Trustees") argue in their Memorandum of Law ("Tr. Br.") that their refusal to seek to recover just compensation for the innocent victims of Defendants' wrongdoing is not subject

---

crime is punishable as a principal violator, 18 U.S.C. § 2, and (ii) anyone who conspires to commit a crime is also liable for the substantive crime committed. *Pinkerton v. United States*, 328 U.S. 640 (1946).

[2] In a futile attempt to evade U.S. law enforcement, their shares did not trade here.

to review by the Court, even though the complaint alleges that Trustees failed to act independently, in good faith, and with due care in refusing Plaintiff's demand for action.

Advisors' argument fails because Plaintiff is not complaining merely that the risk versus reward metrics of investing in the criminal enterprises was too low; rather, Plaintiff contends that it is *inherently* improper to invest in criminal enterprises, because any profits would be the fruit of criminal activity, and successful law enforcement would (and did) wipe out any such investments. As a matter of public policy, professional asset managers should not be allowed to "bet" against successful enforcement of the criminal laws.[3]

Although it is unnecessary for Plaintiff to prove a violation of criminal law to prevail on his claims for negligence, breach of fiduciary duty, waste, and breach of contract (because of the independent common law rule that prohibits one party from seeking to profit from the wrongdoing of another), the fact that Defendants' conduct *also* constituted felonies strengthens Plaintiff's claims. The violation of a statute, for example, supports liability on the basis of negligence *per se*. Because Advisors' management agreement with the fund obligates them to manage the fund in accordance with applicable law, Advisors also breached their contract with the fund.

---

[3] A simple illustration demonstrates the fallacy of Defendants' argument. From a pure dollars and cents perspective, the illegal drug trade offers what economists call a very favorable Sharpe (*i.e.,* excess return to risk) ratio. This is because, as experts point out, law enforcement would have to interdict over 90% of illegal drugs to make drug cartels unprofitable. Because law enforcement actually seize less than 15% of illegal drugs, providing capital to finance foreign drug cartels in return for a right to participate in their profits would almost certainly boost a mutual fund's returns. *See* Orioana Zill and Lowell Bergman, *Do the Math: Why the Illegal Drug Business is Thriving*, available at www.pbs.org/wgbh/pages/frontline/shows/drugs/special/math.html. But any such "investment" would be improper, and any asset manager who made such an investment would, at the very least, be committing bad faith, gross negligence, and waste. It would make no difference if foreign governments allowed drug cartels to offer shares to the public on their stock exchanges. Foreign governments and foreign stock exchanges cannot give U.S. citizens license to invest in criminal enterprises that violate U.S. law.

Advisors' argument that owning shares of illegal gambling businesses does not fall within the Gambling Act's prohibition against owning "all or part" of an illegal gambling business should be rejected because a corporation is "owned" by its shareholders. Defendants' argument that someone who owns 100 shares of Coca-Cola does not "own" Coca-Cola actually cuts against them, because someone who owns 100 shares of Coca-Cola undeniably owns "part" of the Coca-Cola.

Because Defendants' conduct violates the plain meaning of the Gambling Act, there can be refuge for them in the "rule of lenity." Contrary to Defendants assertion that holding them responsible would be "absurd," it makes perfect sense for Congress to prohibit U.S. investors from sharing in the profits of off-shore criminal enterprises formed for the primary purpose of violating U.S. criminal laws. Indeed, it would be *absurd* to allow investors to seek to profit from continuing criminal enterprises.

Trustees' argument fails because Trustees cannot establish conclusively at the pleading stage of this case that they satisfy the "beyond reproach" standard for determining, under Delaware law, whether a board has refused a plaintiff's demand in "good faith" and after reasonable investigation. The Delaware Supreme Court has ruled that a plaintiff who alleges facts "creating a reasonable doubt" that "the board acted independently or with due care in responding to [a] demand" may pursue a derivative action. *Grimes v. Donald*, 673 A.2 1207, 1219 (Del. 1996). Because Plaintiff has satisfied his pleading requirements under Delaware law, Trustees now bear a heavy burden to prove that their conduct was beyond reproach.

The law concerning whether a board has refused a shareholder demand independently, in good faith, and with due care was extensively analyzed and summarized in *Boland v. Boland*, 31 A.3d 529 (Md. 2011). Although *Boland* was decided by Maryland's highest court, it is

particularly relevant and persuasive with respect to the demand refusal issues in this case. First, the *Boland* court stressed that its decision analyzing whether a board has met its obligations to respond to a plaintiff's demand is the same as Delaware law. Second, *Boland* is the most recent decision on demand refusal cited by the parties, and it is the only decision cited that analyzes and takes into proper account the interplay between the "demand futility" and "demand refusal" doctrines. *Boland* recognized that courts have generally followed a trend towards increasingly stringent requirements for a plaintiff to satisfy demand futility prior to commencing a derivative action. Because injured shareholders are increasingly forced to make a demand, a board's refusal of such a demand should not be allowed to escape searching judicial review. Otherwise, injured shareholders would be placed in a "Catch-22" where they are required to make a demand in virtually all cases (often even when the board members are the alleged wrongdoers) but are later prevented from obtaining legal redress when the board members decide not to sue themselves. This would frustrate the "generally-recognized effectiveness [of derivative actions] as an intra-corporate means of policing boards of directors." *Zapata Corp. v. Maldonado*, 430 A.2d 779, 786 (Del. 1981). *Boland* is based on a comprehensive review Delaware law (and precedent from other jurisdictions) which have given real effect to the requirement that boards must act independently, in good faith, and with due care when responding to a shareholder's demand.

**STATEMENT OF FACTS**

**The Parties**

Plaintiff is a shareholder in Neuberger Berman Equity Funds (the "Fund"). The institutional defendants – Neuberger Berman, LLC ("NB") and Neuberger Berman Management LLC ("NBM") – are fiduciaries who manage the Fund. The individual defendants are managers, officers, or trustees of the institutional defendants involved in the wrongdoing. (Amended Verified Derivative Complaint ("AC") ¶ 11-23)

5

**The Illegal Gambling Businesses**

NETeller and 888 are Internet gambling businesses that earned most of their revenues from gamblers in the U.S. in violation of U.S. anti-gambling laws. (AC ¶¶ 26-41; *see also* Sheridan Decl. Ex. A) 888 is located in Gibraltar, and NETeller is located in the Isle of Man. (AC ¶¶ 27, 37) Seeking investment capital to expand their illegal businesses, both listed their shares on the London Stock Exchange. (AC ¶¶ 28-37) They sought to evade the reach of the U.S. criminal justice system by not listing their shares to be traded on any U.S. exchange. (AC ¶ 41)

**Defendants' Investments in Illegal Gambling Businesses**

Defendants caused the Fund to take ownership stakes worth approximately $25.4 million in NETeller and $18.5 million in 888. (AC ¶¶ 1-53, 55-58)

**Defendants Knew of the Illegality**

Before Defendants made the investments at issue, it was well-established that gambling businesses located outside the U.S. violated numerous federal and state criminal laws when they took wagers from U.S. gamblers. (AC ¶¶ 80-96 & 103-05)[4]

In 2003, the DOJ issued a public warning letter that:

> Notwithstanding their frequent claims of legitimacy, Internet gambling and offshore sportsbook operations that accept bets from customers in the United States violate Sections 1084, 1952, **and 1955** of [Title] 18 of the United States Code, each of which is a Class E felony. Additionally, pursuant to [18 U.S.C. § 2], any person or entity who aids or abets in the commission of any of the above-listed offenses is punishable as a principal violator of those statutes.

(AC ¶ 88) (emphasis added).

The complaint describes many prosecutions and other enforcement actions that put Defendants on notice that it was illegal to have dealings with offshore Internet gambling

---

[4] *See, e.g., United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) (affirming a 2003 conviction); *United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001); *People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc. 2d 852 (N.Y. Co. Sup. Ct. 1999).

companies. (AC ¶¶ 80-91) For example, in 2003, the DOJ brought suit against PayPal for processing transactions for an illegal Internet gambling business. PayPal had to pay $10 million in penalties. (AC ¶ 89) Similarly, in April 2004, the DOJ seized over $6 million from Discovery Communications for broadcasting commercials from illegal gambling companies. (AC ¶ 90)

NETeller disclosed in its 2004 prospectus that the DOJ considered its principal operations to violate various criminal statutes in the U.S. (AC ¶¶ 36-41, 91; *see also* Sheridan Decl. Ex. A) Similarly, 888 warned investors in 2005 that it was "exposed to legal and regulatory risks due to the level of revenue generated" from gamblers in the U.S. (AC ¶¶ 31-34)

Illegal gambling businesses made no secret of their illegality. In 2005, *The New York Times* reported that, for one of the largest Internet gambling companies, the "potential illegalities aren't just a secret hidden in its business plan – they are the centerpiece of its business plan."[5]

A recurring theme in Defendants' arguments is that they were subjectively ignorant of the prohibitions of the Gambling Act applied to owning shares of illegal gambling businesses. It is important for the Court to note two undisputed facts in assessing that purported defense.

First, no Defendant disputes that illegal gambling businesses in which Defendants invested were *in fact* "illegal gambling businesses." The successful prosecutions of NETeller's executives; the admissions of illegality that the company made in its criminal forfeiture agreement and its prospectus; and the shutdown of 888 and NETeller's illegal operations in the U.S. demonstrate beyond any reasonable dispute that those entities were "illegal gambling businesses." Second, no Defendant disputes that they knew or should have known that 888 and NETeller were "illegal gambling businesses." Thus, even if Defendants' claim of ignorance of

---

[5] K. Eichenwald, *At PartyGaming, Everything's Wild*, N.Y. Times, June 26, 2005. Available at www.nytimes.com/2005/06/26/business/yourmoney/26poker.html.

the criminal law were a viable affirmative defense – which it is not – the complaint alleges with sufficient particularity facts that negate Defendants' self-serving professions of ignorance.

**The Law Enforcement Crackdown**

A law enforcement crackdown launched by the DOJ in 2006 led to arrests and prosecution of NETeller's founders. They pleaded guilty to gambling offenses, including the Gambling Act, and agreed to forfeit $100 million in criminal proceeds. In addition, NETeller agreed to forfeit $136 million in criminal proceeds and admitted that its principal business violated federal law, including the Gambling Act. (AC ¶ 40; *see* Sheridan Decl. Ex. A) Other illegal gambling businesses were also successfully prosecuted. (AC ¶ 92-105) As part of the crackdown, Congress enacted the Unlawful Internet Gambling Enforcement Act of 2006, 31 U.S.C. § 5361 *et seq.*, which made it more difficult for illegal gambling businesses to operate by making it unlawful to transfer funds to or from such entities. (AC ¶ 97-99)

**The Losses Suffered**

The value of the illegal gambling businesses plummeted after law enforcement choked off their primary source of revenue. (AC ¶¶ 1, 91-95) The stock that Defendants purchased on behalf of the Fund lost all of the value attributable to the illegal revenue. (AC ¶¶ 106-12)

**Defendants' Violated the Gambling Act**

By knowingly causing the Fund to "own" a "part" of an "illegal gambling business,"[6] Defendants caused the Fund to violate the Gambling Act. Because they aided and abetted the

---

[6] "Illegality" under the Gambling Act is based on state law. The gambling companies in which Defendants invested violated the laws of virtually all fifty states. *See United States v. BetOnSports Plc*, 2006 WL 3257797, at *2 (E.D. Mo. Nov. 9, 2006); C. Doyle, *Internet Gambling: Overview of Federal Criminal Law*, Congressional Research Service (Updated February 27, 2006) at Ex. A.

Fund's violation of § 1955 and conspired to do so, Defendants are individually liable as aiders and abettors, 18 U.S.C. § 2, and co-conspirators. *Pinkerton v. United States*, 328 U.S. 640 (1946)

**Defendants Violated RICO**

By causing the Fund to violate the Gambling Act repeatedly, Defendants conducted the affairs of the Fund through a "pattern of racketeering activity" in violation of RICO. *See* 18 U.S.C. §§ 1961(1)(B), 1962(c). The violations of RICO are pled in support of Plaintiff's common law claims as well as civil RICO claims. The complaint alleges that "[t]he Fund has been injured in its business or property by reason of Defendants' violations of § 1962." (AC ¶ 67)

**Defendants Breached Their Common Law Duties**

The complaint states common law claims for breach of fiduciary duty, negligence, and waste. (AC ¶¶ 149-164) These claims are premised in part on the fundamental common law principle that it is wrongful for a party knowingly to profit from the wrongful conduct of another.

**The Investment Advisors Violated the Management Agreement**

Section 1.1 of Management Agreement obligates the Investment Advisor Defendants to manage the Fund's "investments in accordance with applicable law." (AC ¶ 165) Advisors breached the Agreement by causing the Fund to own shares in illegal gambling businesses contrary to numerous federal and state criminal law and the common law legal principle that it is wrongful to seek to profit from the wrongdoing of another. (AC ¶ 166)

**The Board of the Fund Failed to Respond to Plaintiff's Demand Independently, In Good Faith, and With Due Care**

On February 17, 2011, Plaintiff made a demand on the Board. (AC ¶ 117) After motions to dismiss the original complaint had been fully briefed, the Board – which had previously stated in their motion papers that the Court's determination of the merits of Plaintiff's claims would

guide their decision – changed its mind and, without awaiting the Court's guidance, refused Plaintiff's demand on March 16, 2012. (AC ¶ 126; Kornobis Decl. Ex. A) In doing so, the Board relied on a recommendation of a specially appointed Special Litigation Committee ("SLC").

The complaint pleads particularized facts that create a reasonable doubt that the Board (in rejecting Plaintiff's demand) and the SLC (in recommending that the Board do so) failed to act independently, in good faith, and with due care. As explained in Point IV of the Argument below, the facts alleged in ¶¶ 114-48 of complaint have been relied on by courts as demonstrating lack of independence, bad faith, and lack of due care, and they satisfy Plaintiff's pleading requirements under *Grimes*.

ARGUMENT

## I.  DEFENDANTS VIOLATED THEIR COMMON LAW DUTIES BY INVESTING IN ILLEGAL GAMBLING BUSINESSES AND SEEKING TO PROFIT FROM CRIMINAL ACTIVITY

Defendants violated their common law duties because it is wrongful and against public policy for one party knowingly to seek to profit from the wrongdoing of another – particularly from criminal wrongdoing.[7] The courts have a duty to avoid the promotion of such illegality.[8] "Delaware law does not charter law breakers .... Delaware law allows corporations to pursue diverse means to make a profit, subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue 'lawful business' by 'lawful acts.'" *La. Mun. Police Employees' Ret. Sys. v. Pyott*, 46 A.3d 313, 352 (Del. Ch. 2012) (internal citations omitted).

---

[7] *See Jackson v. Smith*, 254 U.S. 586, 589 (1921) (those who knowingly participate in a breach of fiduciary duty by a third party are jointly and severally liable for all profits obtained); *Laventhol, Krekstein, Horwath & Horwath v. Tuckman*, 372 A.2d 168, 170 (Del. 1976) (same); *Youshah v. Staudinger*, 604 N.Y.S.2d 479 (N.Y. Supr. Ct., 1993) ("It is the public policy of this State that no person shall profit from a criminal enterprise") (*citing* CPLR Article 13-A and listing numerous applications of general rule).

[8] *See In re Delaware Sports Serv.*, 196 A.2d 215, 219 (Super. Ct. 1963), *aff'd*, 202 A.2d 568 (Del. 1964); *Youshah*, 604 N.Y.S.2d at 480.

A.       **Defendants Are Guilty of Negligence**

Investing in criminal enterprises is highly imprudent, particularly because such investments can only return a profit so long as the criminal organization successfully evades law enforcement – and any such profits would be ill-begotten criminal proceeds subject to forfeiture.

Defendants argue that they were not negligent because they were entitled to make risky investments. This argument is a red herring. Plaintiff does not complain merely that the risk versus reward metrics of investing in these criminal enterprises was too low; rather, he contends that it is *inherently* improper to invest in them because any profits are ill-gotten, and successful law enforcement will wipe out the investments. As a matter of public policy, fiduciaries cannot take the risks associated with investing in criminal enterprises. *Pyott*, 46 A.3d at 352.

Defendants rely on *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 128 (Del. Ch. 2009), and quote that decision for the proposition that the "mere fact that a company takes a business risk and suffers loss ... does not evidence misconduct ...." In *Citigroup,* however, defendants were sued for making risky investments in sub-prime mortgages. Investing in sub-prime mortgages, however risky, was not a crime. By comparison, Defendants' conduct is much worse. Asset managers should be allowed to take risks, but this Court should draw the line at purposeful investment in known criminal enterprises.

Defendants argue that Plaintiff's claims are based on hindsight, but that is not true either. Plaintiff's claims are based on what Defendants knew before they made the illegal investments.

Defendants admit that prior to making their investments, they engaged in "extensive and well-researched" due diligence of the companies, including meeting "with executives from both companies" and closely monitoring "the progress of new anti-gambling legislation in Congress." (Tr. Br. at 6; Kornobis Decl. Ex. A at 4) That anti-gambling legislation was the UIGE, which made it more difficult for the illegal gambling businesses to transfer funds by giving law

11

enforcement *additional* tools to choke off their source of revenue. *See* 31 U.S.C. § 5361(b); AC ¶¶ 98-100. As a result of their close monitoring, Defendants must have learned that one of the primary Congressional sponsors of the UIGE (Rep. Goodlatte of Virginia) had warned that if "investment houses are knowingly supporting and promoting illegal [Internet gambling] enterprises [that would be] very bad." (AC ¶ 138(a), *citing* the *New York Times*, Dec. 25, 2005)

While proof of a federal crime is not an essential element of Plaintiff's negligence claim, violations of criminal statutes will support liability on the basis of negligence *per se.* Defendants acknowledge that to support negligence *per se*, recovery need only be "consistent" with the legislative scheme. *Sammons v. Ridgeway*, 293 A.2d 547 (Del. 1972). Defendants argue, however, that negligence *per se* would be inconsistent with the legislative scheme of the Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922 (the "OCCA"), under which § 1955 and RICO were both enacted. (Ad. Br. at 18-19) Defendants are mistaken. Plaintiff's recovery under negligence *per se* is not only consistent with the OCCA; it is squarely within the stated purposes of the statute. The statement of findings that prefaces the OCCA expressly refers to "harm to innocent investors" and the corruption of "legitimate businesses" in connection with "syndicated gambling." 84 Stat. 922-923. Plaintiff (an innocent investor) and the Fund (both a legitimate business that was corrupted by Defendants and an investor) were harmed by Defendants' investments in syndicated gambling, and both are therefore well within the class intended to be protected by the OCCA.

Defendants also say that their violations of New York law do not support negligence *per se* because the New York legislature repealed an explicit private right of action on behalf of *gamblers* complicit in illegal gambling for their gambling losses. This is irrelevant to Plaintiff's claims because he is not a gambler seeking to recover gambling losses. The cases upon which

Defendants rely[9] are inapposite because they merely held that there was no private cause of action under the particular statutes at issue; none of them involved a claim of negligence *per se*. There are countless cases involving negligence *per se* based on statutes and regulations that do not create a private cause of action.[10] Defendants' argument, if accepted, would essentially abolish the law of negligence *per se*. Defendants rely on *dicta* in *In re Bendectin Litig.*, 857 F.2d 290, 313-14 (6th Cir. 1988), for the proposition that Plaintiff may not rely on a violation of federal law to support his common law claim. *Bendectin*, however, expressly declined to address that issue. *Id.* at 313. In *dicta* the court merely indicated that a plaintiff *might* not be able to rely on a violation of a particular federal statue if Congress' decision not to create a private right of action for violation of that statute was intended to preempt and preclude all private enforcement. There is no basis for such a preemption argument here – particularly since here RICO creates an express right of action for injuries caused by reason of predicate crimes, and § 1955 is a predicate crime. Indeed, Defendants' argument borders on the frivolous. "'The violation of federal statutes and regulations is commonly given negligence *per se* effect in state tort proceedings.'" *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 318 (2005).

**B.    Defendants Have Breached Their Fiduciary Duties**

Defendants breached their fiduciary duties by using the Fund's assets to purchase ownership stakes in criminal entities and by seeking to profit from criminal activity. Plaintiff's claim can succeed even if Defendants' actions did not violate criminal statutes.

---

[9] *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005); *Burns Jackson Miller Summit & Spitzer v. Lindner*, 451 N.E.2d 459, 465 (N.Y. 1983), and *NFL v, Governor of the State of Del.*, 435 F. Supp. 1372, 1388 (D. Del. 1977).

[10] For example, there is no private cause of action against a driver who passes a stopped school bus, but a driver who passes a stopped school bus and injures a schoolchild may be held liable for negligence *per se*. *See Sammons,* 293 A.2d 547.

Moreover, Defendants' actions in causing the Fund to violate the Gambling Act also violated their fiduciary duties to the Fund. It is "utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully."[11] Moreover, "[a] failure to act in good faith may be shown ... where [a] fiduciary acts with intent to violate applicable positive law."[12] Thus, a "fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity."[13] Defendants failed to act in good faith when they managed the fund in an illegal way by attempting to profit from illegal gambling. "A trustee is held to something stricter than the morals of the market place,"[14] and "courts have an obligation to enforce that principle."[15]

Defendants argue that they did not act in bad faith because there were no red flags to warn them that the investments were illegal. (Ad. Br. 24-25) Defendants argue that even though Internet gambling companies had been prosecuted, there were no prosecutions of *investors* in the gambling companies. Defendants' argument is contrary to basic common law principles and important public policies: it is unlawful to seek to profit from wrongdoing and ignorance of the criminal law is no excuse for unlawful conduct. Furthermore, despite Defendants' denials, the complaint alleges sufficient facts to support the inference that Defendants knew that what they were doing was wrong. These include warnings from the DOJ that supporting illegal gambling was *itself* a crime; newspaper articles warning of the illegality; and prosecutions not just of

---

[11] *DeSimone v. Barrows*, 924 A.2d 908, 934-35 and n.89 (Del. Ch. 2007). *Accord Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003)).

[12] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006)).

[13] *Metro Communication Corp. BVI v. Advanced Mobilecomm Techn., Inc*., 854 A.2d 121, 131 (Del. Ch. 2004).

[14] *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928).

[15] *Schmeusser v. Schmeusser*, 559 A.2d 1294, 1298 n.1 (Del. 1989).

illegal gambling businesses, but also companies that provided any degree of support to them, such as running advertisements. (AC ¶¶ 89-90) Defendants' self-serving professions of ignorance should be disregarded for purposes of their motions to dismiss.

Even if ignorance of the law were a defense – and it is not – to avoid liability on that basis, each Defendant would have the burden to prove reasonable effort to ascertain and abide by the law. *Long v. State*, 65 A.2d 489, 497 (Del. 1949). Neither Trustees nor any of the Defendants has ever claimed to have made any such effort. Even if they had made some such effort, that would be in the nature of an affirmative defense that Defendants would have to plead and prove. Plaintiff need not negate affirmative defenses in his complaint.

Relying on *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010), Defendants argue that the breach of fiduciary claim "should be treated as a breach of contract claim" and therefore dismissed. (Ad. Br. at 28) Defendants misconstrue *Nemec*, which concerned a situation where the contract "created" duties that "superseded and negated any distinct fiduciary duties" arising from the same conduct. *Id.* The duties at issue in *Nemec* arose purely from the contract and thus were "intended to be defined solely by reference to that contract." *Id*. That is not the case here. Defendants' obligations to follow the law and to refrain from seeking to profit from criminal activity are preexisting duties that are not solely creatures of the Management Agreement. The fact that the Management Agreement *confirms* Defendants' preexisting common law duties *strengthens* Plaintiff's claims. Many Delaware cases allow the assertion of breach of fiduciary claims with breach of contract claims. *See, e.g., PT China LLC v. PT Korea LLC*, CIV.A. 4456-VCN, 2010 WL 761145 (Del. Ch. Feb. 26, 2010) (The "appropriate question instead is whether there exists an independent basis for the fiduciary duty claims apart from the contractual claims,

even if both are related to the same or similar conduct. If so, the fiduciary duty claims will survive.").

Trustees also argue that the complaint does not adequately allege *their* knowledge of the illegal investments. Trustees admit, however, that they knew about what was being invested based on the Performance Review Committee and that at least one report discussed by Trustees had identified NETeller and 888 as among the top ten worst performers in the entire portfolio. (Kornobis Decl. Ex. A at p.4) If these "watchdogs" lacked actual knowledge, then they were reckless, which is the legal equivalent of actual knowledge.

Finally, Advisors claim that their Management Agreement with the Fund excuses them for any "error of judgment or mistake of law." The Management Agreement does not excuse a purported "mistake" or "error of judgment" that constitutes "willful misfeasance, bad faith or gross negligence" that the complaint correctly states is the proper description of investing Fund assets in criminal enterprises. Moreover, Section 1.1 of the Management Agreement specifically charges them to carry out their duties with respect to the Fund's investments "in accordance with applicable law." (Henkin Decl. Ex. B at ¶ 1.1) This specific provision takes precedence over the more general ones purporting to exculpate them from liability.

## C.   Defendants Have Committed Corporate Waste

Defendants argue that the complaint fails to state a claim for waste because there is no allegation that they over-paid. (Def. Br. at 14) Plaintiff contends that it was wasteful for Defendants to have paid *anything* for the stock. Plaintiff is not quibbling over market value. The corporate waste claim, unlike Plaintiff's other claims, is governed by Delaware law. Under Delaware law, the question is whether the "investments" are properly characterized as the use of corporate assets for an "improper" or "unnecessary" purpose. *Michelson v. Duncan*, 407 A.2d

211, 217 (Del. 1979). Here, the complaint adequately alleges that the investments were improper and unnecessary.

### D.    The Fund's Overall Performance Cannot Insulate Defendants from Liability

Defendants question whether Plaintiff has been damaged because they say that during the time in which the Fund unlawfully owned part of 888 and NETeller, it posted a positive return overall. (Ad. Br. at 5) Defendants are not absolved from liability for losses suffered on improper investments just because they made a greater profit on other investments. "Even where the defendant's actions cause both a detriment and a benefit to the plaintiff, the value of the benefit offsets the detriment only when the benefits accruing to the plaintiff are sufficiently proximate to the wrong alleged and occur during the period of damage." *Trans World Airlines, Inc. v. Summa Corp.*, 1986 WL 5671 *413 (Del. Ch. 1986). The losses on illegal gambling were unrelated to any profitable investments Defendants may have made in lawful businesses.

### E.    The Investment Advisors Breached the Management Agreement

Defendants say that the breach of contract claim was not specifically mentioned in Plaintiff's demand, but the case they cite, *Grimes*, 673 A.2d at 1219, confirms that a demand encompasses "all legal theories arising out of the set of facts described in the demand letter." Because the breach of contract claim is based on the same facts upon which the other claims are based, it is within the scope of the demand.

## II.    DEFENDANTS VIOLATED THE GAMBLING ACT

The Gambling Act is clear and unambiguous. Whoever "owns all or part of an illegal gambling business" commits a felony. § 1955(a). Despite the plain language of the statute, Defendants argue that it should not apply to *them*. None of their arguments withstands scrutiny.

### A.      "Owns" Means "Owns"

Unless otherwise defined, words in a statute must be interpreted according to "their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). The gambling businesses at issue are corporations. According to the ordinary meaning of the term, a corporation is "owned" by its shareholders. *See, e.g., Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 442 (2003) (shareholders described as "own[ing]" a corporation).

Relying on *Smith v. Hurd*, 53 Mass. 371, 385 (Mass. 1847), Defendants argue that owning stock in a company is not the same as owning the company's assets. That is true but immaterial. The complaint alleges that Defendants violated the Gambling Act not by causing the Funds to own the *assets* of illegal gambling businesses, but rather by causing them to own "all or part" of the *businesses themselves*.

If Defendants' argument were accepted, nobody could "own" "all or part" of a corporation. Such an interpretation would be absurd and would eviscerate the statute.

Defendants' reliance on *Wash. State Dep't of Soc. & Health Svcs. v. Keffeler*, 537 U.S. 371, 384-85 (2003), is misplaced. In that case, the Court rejected an overly broad interpretation of a "catch-all" provision in a statute. Contrary to Defendants' assertion, the prohibition against owning an illegal gambling business is not a catch-all term, it is a specific prohibition.[16]

### B.      "Any Part" Means "Any Part"

The statute creates no exception for small shareholdings. Congress' use of the words "any part" demonstrates that Congress intended an absolute prohibition.

---

[16]Defendants' other authorities are similarly irrelevant cases that construe ambiguous statutory terms. For example, *Johnson v. United States*, 130 S. Ct. 1265, 1271 (2010) merely construed the use of "force" as a subcategory within the statutory definition of "violent felony" to require an element of violent force.

## C.    The Statute Contains No Exception for "Passive" Ownership

There is no exception in the statute for "passive" owners.[17] The essence of "ownership" is the right to participate in the profits of the enterprise. Ownership is by its nature passive, but it is hardly innocent. Indeed, passive owners of a criminal enterprise are among the most culpable, because they are entitled to reap the profits from the illegal activity – which is the ultimate goal of the enterprise. It was perfectly rational for Congress to prohibit any attempt to profit from illegal gambling, either as an active manager or passive profiteer.

The Supreme Court has said that the Gambling Act "proscribes any degree of participation in an illegal gambling business, except participation as a mere bettor." *Sanabria v. United States*, 437 U.S. 54, 70 n.26 (1978). Even waiters and janitors have been found to be sufficiently involved with illegal gambling operations be subject to criminal liability under the Act. *United States v. Merrell,* 701 F.2d 53 (6th Cir 1983). There is no rational basis for the Court to create an exception to the plain language of the statute for "passive" owners. Indeed, such an exception would eviscerate the statute.

In *United States v. Hawes*, 529 F.2d 472, 478 (5th Cir. 1976), the Fifth Circuit rejected virtually the same argument made by Defendants here, saying, "[w]e are unable to agree with this strained interpretation of an 'illegal gambling business.' Even upon a strict construction of the statutory language … we find no requirement that defendants must themselves engage in the act of illegal gambling."

Defendants argue that because *other* conduct proscribed by § 1955 (*e.g.*, "manages", "directs", *etc.*) involves active participation in gambling, "owns" should be judicially limited to ownership that involves active participation. Defendants' premise is flawed. Section 1955 also

---

[17] The complaint alleges that Defendants were *not* passive owners. (AC ¶¶ 60-63)

prohibits financing illegal gambling businesses, which does not involve active participation. Thus, two of the six forms of proscribed conduct are passive.

Contrary to Defendants' argument, the canon of construction *ejusdem generis* is inapplicable. "Owns" is not a general word that follows a specific enumeration. To the contrary, "owns" is a *specific* word that is *part of* the enumeration. *See United States v. Dauray*, 215 F.3d 257 (2d Cir. 2000).

Finally, this Court should avoid a construction that would render the words "owns" and "finances" redundant. *Exxon Corp. v. Hunt*, 475 U.S. 355, 369-70 (1986). The other forms of conduct prohibited by § 1955 cover all forms of active involvement in gambling. If "finances" and "owns" also required active participation, then those words would be surplusage.

### D.     The Statute Contains No Exception for Criminal Enterprises Traded on Foreign Stock Exchanges

The Gambling Act contains no exception for ownership of illegal businesses whose shares are traded on a foreign stock exchange. Defendants' proposed judicially-created loophole for illegal businesses listed on foreign exchanges would effectively legitimize off-shore havens for illegal conduct, and it would effectively permit foreign stock exchanges to veto U.S. law and give criminal enterprises the ability to access U.S. investment capital.

Defendants argue that their investments were lawful because Delaware law authorizes fiduciaries to invest in foreign securities. (Ad. Br. at 11) That is immaterial. Delaware law does not, and cannot, authorize fiduciaries to violate a federal criminal statute.

Defendants say that no court has held that the purchase or ownership of publicly traded stock violates the Gambling Act. Of course, neither has any court held the contrary. The issue is one of first impression. For that reason, it is particularly important for this Court to set a

precedent that makes clear that investors in the U.S. are not at liberty to provide financial support for foreign criminal enterprises whose primary purpose is to violate U.S. criminal law.

When the Gambling Act was enacted in 1970, the Internet did not exist. That did not stop the courts from applying the Gambling Act to Internet gambling once that industry developed in the 1990s. Similarly, prior to 2000, it was not possible for public investors to buy stock in illegal off-shore Internet gambling businesses. But that should not stop the courts from applying the plain language of the Gambling Act to conduct to which it expressly applies.

As the Supreme Court of the United States has explained:

> Legislation … is enacted, it is true, from an experience of evils but its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle, to be vital, must be capable of wider application than the mischief which gave it birth.

*Weems v. United States*, 217 U.S. 349, 373 (1910).

Defendants say that if the Court enforces the plain language of § 1955, those who obtain stock "inadvertently" might be rendered felons. Defendants, however, did not "inadvertently" purchase stock in criminal enterprises. They knowingly made those investments intending to profit from the higher returns from criminal activity. Someone who "inadvertently" receives such stock would lack the necessary *mens rea* to be held criminally liable.[18]

### E.    The Complaint Does Not Seek to Pierce Any Corporate Veil

Defendants argue that holding them liable would violate corporate law principles that shield shareholders of corporations from the crimes of the corporation. But Plaintiff does not

---

[18] Defendants ask rhetorically what would happen if a Parisian purchased shares and later moved to New York while still owning the shares. The question is not difficult. The Parisian would be beyond the reach of U.S. law at the time of purchase, but before he became a New York resident he would have to divest himself of ownership in the criminal organization (he would also have to leave behind any illegal narcotics or other contraband that he might own).

seek to pierce any corporate veil or impose vicarious liability on shareholders for the crimes of the illegal gambling businesses in *operating* illegal gambling businesses. Rather, Plaintiff seeks to impose liability based on the separate and independent crime of *owning* "all or part" of such businesses. Plaintiff seeks to hold Defendants liable for *their own crimes*, not the crimes of anyone else.

### F.     This Case Involves No Extraterritorial Application of U.S. Law

Defendants argue that applying the Gambling Act and RICO to their conduct may be an impermissible extraterritorial application of U.S. law. This argument lacks merit. This case involves participation in illegal gambling through *ownership* of illegal gambling businesses. The Fund is a Delaware entity located in New York. Its *ownership* of the illegal gambling businesses occurred in the U.S. Thus, Plaintiff does not rely on any extraterritorial application of U.S. law.[19]

### G.     Plaintiff Need Not Prove That Defendants Violated State Criminal Laws

Defendants argue that their conduct did not violate state criminal laws. These arguments simply misconstrue the requirements of the Gambling Act.

To establish that Defendants violated the Gambling Act and RICO, Plaintiff need not prove that *Defendants* violated state criminal law. Violations of state criminal law are only relevant with respect to the operations of the illegal gambling businesses. To be an "illegal gambling business" under the Gambling Act, the gambling business must have violated at least one state anti-gambling law. 18 U.S.C. § 1955(b)(1). Here, the illegal gambling businesses

---

[19] Defendants' reliance on *Morrison v. Nat'l Aus. Bank Ltd.*, 130 S. Ct. 2869 (2010), and its progeny is misplaced. *Morrison* held that the U.S. *securities* laws do not apply to *purchases and sales* of securities outside the U.S. In contrast, this case involves participation in illegal gambling businesses through *ownership* of them. Therefore, the paramount concern in *Morrison* – avoiding conflict with foreign securities laws, *id.* at 2886 – is inapplicable.

violated state gambling laws by accepting bets from gamblers located within the U.S. (AC ¶¶ 4, 32, 39-41, 64, 81-85)

Because the gambling companies in which Defendants invested were "illegal gambling businesses" within the meaning of § 1955(b)(1), it is unnecessary for Plaintiff to allege that the Defendants *also* violated state gambling laws by *investing* in them.

In any event, Defendants *did* violate state law. Under N.Y. Penal Law § 225.00(5), "[a] person 'profits from gambling activity' when, other than as a player, he accepts or receives money or other property pursuant to an agreement or understanding with any person whereby he participates or is to participate in the proceeds of gambling activity." The only reason the Fund did not violate § 225.05, is that it *lost* money instead of profiting. The *attempt* to profit, however, was clearly a violation of N.Y. Penal Law § 110.00 (attempt). By attempting to cause the Fund to violate § 225.05, Defendants violated N.Y. Penal Law § 100.00 (criminal solicitation). And by conspiring to seek to profit from illegal gambling Defendants were guilty of violating N.Y. Penal Law § 100.00 (conspiracy). Thus, Defendants clearly violated state law.

Defendants argue that even if their conduct violated state law, enforcement of state law would be barred by the dormant Commerce Clause. Defendants rely exclusively on cases that apply the dormant Commerce Clause to transactions occurring entirely outside the boundaries of the state in question. (Ad. Br. at 17, *citing Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102 (2d Cir. 2003). This argument lacks merit. States may prohibit transactions between foreign gambling companies and in-state gamblers because the burden of gambling regulation on commerce is not "clearly excessive" in light of the legitimate state interests such regulation advances. *Rousso v. State*, 170 Wash. 2d 70, 91, 239 P.3d 1084, 1095 (2010) (*en banc*).

**H.    There Is No Exception for Owners Who Claim Ignorance of the Criminal Law**

Defendants suggest that they cannot be guilty of violating § 1955 because the complaint does not specifically allege that they had actual subjective knowledge that it is illegal to own part of an illegal gambling businesses. Ignorance of the law, however, is no defense. *See United States v. Tedder*, 403 F.3d 836, 838 (7th Cir. 2005) ("[Defendant] told the jury that he thought [the Internet gambling businesses] were upstanding businesses operated in compliance with all laws. This was essentially the tax protester's defense that he just didn't think that the law, however clear, applied to his endeavors. ... The district judge gave appropriate instructions to the jury, which … convicted him.") (citation omitted). *See generally*, *United States v. International Minerals & Chemical Corp.*, 402 U.S. 558, 565 (1971) (discussing "general rule that ignorance of the law is no excuse").

Section 1955 is a crime of *general* criminal intent. *United States v. Ables*, 167 F.3d 1021, 1031 (6th Cir. 1999), *citing Hawes*, 529 F.2d at 481. There is no requirement that the defendant be shown to have known that his conduct actually violated the law. *Compare Cheek v. United States*, 498 U.S. 192, 199 (1990) (tax statute required "willful" violation, which requires knowledge of illegality).

Liability under § 1955 only requires knowledge of the facts – that the gambling businesses in which Defendants caused the Fund to invest were taking bets from gamblers in the United States or processing payments relating to such bets. The complaint alleges that Defendants had the requisite knowledge.[20]

---

[20] Defendants cite *Hartsel v. Vanguard Group., Inc.,* C.A. No. 5394, 2011 WL 2421003 (Del. Ch. June 15, 2011), *aff'd* 2012 WL 171881 (Jan. 19, 2012), but *Hartsel* twice emphasized that its decision did "not address Defendants' ... argument that the complaint fails to state a claim." *Id.* at *1 & *28. In *dicta*, the court conjectured that, until a *federal* court determines whether the

## I.    The "Rule of Lenity" Provides No Refuge to Defendants

Defendants invoke the "rule of lenity." In applying criminal laws, however, courts "must follow the plain and unambiguous meaning of the statutory language." *Salinas v. United States*, 522 U.S. 52, 57 (1997).Where, as here, the statutory language is clear, courts may not resort to a narrowing construction. *Boyle v. United States*, 556 U.S. 938, 950-51 (2009). In fact, § 1955 has been construed broadly. *Sanabria v. United States*, 437 U.S. 54, 70 n.26 (1978).

Defendants rely principally on *Rewis v. United States*, 401 U.S. 808 (1971), which considered whether 18 U.S.C. § 1952, which prohibits interstate travel in furtherance of gambling, also created a federal felony just because a gambling establishment was patronized by an out-of-state customer. Observing that people often travel out of state, the Court merely said that nothing in the statute supported such an expansive interpretation, especially since doing so would alter the balance between federal and state powers and overextend limited federal resources. The difference here is that operations of the illegal gambling businesses in which Defendants invested were illegal *everywhere* in the country. The principal element that makes it criminal has nothing to do with the "happenstance" of interstate travel, an important Constitutional right. *See United States v. Guest*, 383 U.S. 745 (1966).[21]

---

Gambling Act applies to the defendants' conduct, the business judgment rule would protect *the funds' trustees* for the *purpose of determining demand futility* under Delaware law. The *Hartsel dicta* was based on the erroneous notion that – although the trustees in that case were "morally challenged in permitting such investments to be made and maintained in ventures that the government considers predatory and illegal" – they could not be held accountable unless they *subjectively knew the contents of federal criminal statutes. Id.* at *26. That is simply a state court's erroneous statement of federal criminal law, which this Court should correct.

[21] None of the other cases upon which Defendants rely support their argument because they merely construed ambiguous statutory terms according to their ordinary meaning. For example, Defendants' reliance on *Scottrade, Inc. v. BroCo Invs., Inc.*, 774 F. Supp. 2d 573, 584 (S.D.N.Y. 2011), is misplaced because the relevant statute, 18 U.S.C. § 1030, required that a defendant "access[] a protected computer without authorization." The court noted that the plaintiff "concedes that [defendant] did not access its computer systems without authorization." 774 F.

## III.   DEFENDANTS VIOLATED RICO

The complaint alleges each of the factual elements needed to establish a RICO violation: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Defendants manage the affairs of the Fund; the Fund is an enterprise engaged in interstate commerce; and Defendants conducted the affairs of the Fund through a pattern of violating § 1955. Defendants committed at least two predicate acts, 18 U.S.C. § 1961(5); *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001), and the predicate acts were related, and they amounted to, or posed a threat of, continuing criminal activity. *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 97 (2d Cir.1997). There is no reason to suppose that Defendants would have stopped investing in illegal gambling if prosecutions had not started. *See Ikuno v. Yip*, 912 F.2d 306, 308 (9th Cir. 1990); *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir.1991) ("lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict").

The Second Circuit ruled in *McBrearty* and *Seidl* – two non-precedential summary orders – that RICO causation was lacking in similar cases because the mutual fund's investment losses directly followed the market's reaction to the effects of law enforcement on the gambling companies' prospects.[22] Two months before this case was filed, however, the Second Circuit

---

Supp. 2d at 584. Not surprisingly, the court refused to *extend* the scope of the statute *beyond* what its plain terms required. Notably, Defendants do not cite *any* case that narrows the prohibited categories under the Gambling Act to active participants.

[22] *McBrearty v. The Vanguard Group, Inc.*, No. 08-CV-7650, 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *aff'd* 353 Fed. Appx. 640 (2d Cir. 2009) (summary order), *cert. denied*, 130 S. Ct. 3411 (2010); *Seidl v. Am. Century Cos., Inc.*, 713 F. Supp. 2d 249 (S.D.N.Y. 2010), *aff'd* 427 Fed. Appx. 35 (2d Cir. 2011) (summary order), *cert. denied*, 2011 WL 4344573 (Dec. 12, 2011).

issued a formal opinion that undercuts the reasoning of those orders and confirms that Plaintiff has satisfied RICO proximate causation in this case.

In *Ideal Steel Supply Corp. v. Anza*, 652 F. 3d 310, 326 (2d Cir. 2011), the court held that in determining RICO proximate causation for injuries resulting from prohibited investments, the intervention of market forces is insufficient to supersede RICO liability. This is so because market forces are always necessary to price in the effect of wrongdoing, and if the rule were otherwise it would be "difficult to envision anyone who could show injury proximately caused by that investment." *Id.* Since the reasoning of most recent and binding Second Circuit precedent supports Plaintiff's theory of RICO causation and conflicts with the reasoning upon which *McBrearty* and *Seidl* were based, Plaintiff urges the Court to follow the formal opinion in *Ideal Steel* and not the non-precedential orders in *McBrearty* and *Seidl*.

Defendants argue that Plaintiff is not a foreseeable *victim* of RICO violations, which tend to be the "targets, competitors and intended victims" of a racketeering enterprise. (Ad. Br. at 21, *citing Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 124 (2d Cir. 2003)) The crime here was investing in an illegal gambling business. There is no more foreseeable victim of such a crime than the innocent investors whose money was used to make the investment.[23]

The Fund's losses were the direct result of the loss of the gambling companies' enterprise values when law enforcement activity forced their U.S. operations to shut down, choking off the companies' primary source of illegal revenue. That loss was not just foreseeable; defendants

---

[23] Where, as here, a RICO plaintiff suffers a direct "first step" injury that is not merely "passed on" from third parties, the Supreme Court of the United States has unanimously held – contrary to *McBrearty* and *Seidl* – that foreseeability is relevant for determining proximate causation. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 656-58 (2008) (holding that intervening government action in awarding a greater number of auction bids to the defendants did not break the chain of proximate causation under RICO because the government action was the "foreseeable and natural consequence" of defendants' fraudulent conduct).

were actually warned about it before they invested. As *Ideal Steel* confirms, the chain of causation in this case is sufficiently direct to satisfy proximate causation under RICO.[24]

Defendants assert that Plaintiff fails to plead continuity, but their only argument misconstrues the complaint as alleging that open-ended continuity applies *solely* because the fund is "open-ended." (Ad. Br. at 22, n. 83) That is not so. The complaint alleges open-ended continuity because Defendants' conduct posed a threat of continuing criminal activity that was halted only because of law enforcement activity. (AC ¶ 64) That is sufficient to establish open-ended continuity. *Schlaifer,* 119 F.3d at 97. Nor do Defendants contest that, by virtue of the number of times and length during which Defendants invested in illegal gambling businesses, that close-ended continuity would be satisfied as well.

Citing *Arnold v. Petland, Inc.*, No. 2:07-cv-1307, 2011 WL 2301194, at *4 (S.D. Ohio Jun. 4, 2010), Defendants assert that the complaint fails to plead a RICO enterprise because the Fund cannot be both the enterprise and the victim of the racketeering. The reason that Defendants fail to cite a decision in this Circuit, , is because their argument has been rejected by the Second Circuit. In this Circuit, when the participants in the racketeering include *any* outside corporation or individuals, even when the individuals are officers or employees of the racketeering enterprise, the same entity can be part of the racketeering and the victim. *See, e.g., Cullen v. Margiotta*, 811 F.2d 698 (2d Cir. 1987); *accord, e.g., Mark v. J. I. Racing, Inc.*, No. 92-cv-5285 (FB), 1997 WL 403179 (E.D.N.Y. July 9, 1997). Defendants corrupted the Fund by

---

[24] Defendants also rely on *Picard v. Kohn*, No. 11-cv-01181-JSR, 2012 WL 566298 (S.D.N.Y. Feb. 22, 2012). In *Kohn*, Judge Rakoff held that a completely "independent" harm does not satisfy RICO proximate causation. The court stated that the injury suffered by investors in Madoff Securities "could have happened independently" of the defendants' wrongdoing. *Id.* at *3. That decision is simply irrelevant to this case.

causing it to engage in racketeering, and there is no good reason to bar injured mutual fund investors from recovering their losses from the wrongdoers.

IV.   **PLAINTIFF'S ALLEGATIONS RAISE A REASONABLE DOUBT WHETHER THE BOARD REFUSED PLAINTIFF'S DEMAND IN BAD FAITH AND WITHOUT DUE CARE**

Under Delaware law, a board fails to act independently if it does not respond to a demand "in good faith" after "reasonable investigation." *Scattered Corp. v. Chicago Stock Exch., Inc.*, 701 A.2d 70, 74-75 (Del. 1997), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). *See also* Opinion dated June 12, 2012, at p. 10 [Dkt. No. 49]. A motion to dismiss based on demand refusal must be denied if the plaintiff alleges particular facts "creating a reasonable doubt" that "the board acted independently or with due care in responding to [a] demand." *Grimes*, 673 A.2 1207, 1219. In determining whether the complaint's allegations raise reasonable doubt concerning the board's independence, good faith, and due care, the "court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Meridian Horizon Fund, LP v. Tremont Group Holdings, Inc.*, 747 F. Supp. 2d 406, 411 (S.D.N.Y. 2010), *aff'd*, 2012 WL 2754933 (2d Cir. July 10, 2012). A complaint "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference" supporting Plaintiff's claims. *Id*. at 411.

Specific allegations of conduct that are sufficient to create a reasonable doubt that the board acted independently, in good faith, and with due care were extensively analyzed in *Boland v. Boland*, 31 A.3d 529 (Md. 2011). Like this case, the plaintiff in *Boland* made a demand on the board that was refused by an SLC. Reviewing the SLC's final determination under a business judgment inquiry "indistinguishable" to that applicable under Delaware law, Maryland's highest court held that the lower courts failed to make "an adequate inquiry in the SLC's independence and the reasonableness of its procedures. *Id.* at 538. Although *Boland* was decided under

Maryland law, Maryland law for determining demand refusal is the same as Delaware law. 423 Md. at 346 & n.37.[25]

*Boland* should be followed by this Court because it accurately reflects what the Delaware Supreme Court would decide in resolving the issues in this case. *Boland* is the most recent decision considering demand refusal in the wake of heightened awareness of the important public policy issues concerning non-responsive corporate boards that fail to adequately protect investors from malfeasance in the financial industry. Indeed, Defendants rely on *Jones v. Harris Assocs. L.P.,* 130 S. Ct. 1418, 1422 (2010), but the reasoning of that decision would counsel courts to exercise heightened vigilance to protect mutual fund shareholders from the inherent conflicts faced by mutual fund boards who cannot be relied upon to adequately protect shareholders from the investment advisors who manage the funds. *Id.* at 1422. Moreover, *Boland* is the only case cited by the parties to determine demand refusal in light of the growing "national

---

[25] *Boland* held that Maryland law is identical to Delaware law in that judicial review of a board's refusal of a Plaintiff's demand focuses on "whether the board acted independently, in good faith, and within the 'realm of sound business judgment.'" 423 Md. at 331. *Accord Scattered,* 701 A.2d at 75 (failure by "an otherwise independent-appearing board or committee to act independently is a failure to carry out its fiduciary duties in good faith or to conduct a reasonable investigation"); *see also* Opinion dated June 12, 2012, at p. 10 [Dkt. No. 49], *citing Levine v. Smith*, 591 A.2d 194, 212 (Del. 1991). The *Boland* court emphasized that its demand refusal analysis was "indistinguishable" in relevant part to Delaware law applicable to all demand refusal cases. *Boland*, 423 Md. at 346 & n. 37. *Boland* referred to the first prong of *Zapata Corp. v. Maldonado*, 430 A.2d 770 (Del. 1980), in analyzing whether demand has been refused in good faith and under the business judgment rule. Although *Zapata* was a "demand excused" case, its first prong – analyzing a board's demand refusal for "independence, good faith and [] reasonable investigation," *see* 430 A.2d at 788-89 – is generally applicable to all demand refused cases (even when demand is not futile). The second prong of *Zapata* – which is a more stringent merits-based analysis conducted under the court's "independent" judgment, *see id.* at 789 – is applicable only to cases where demand would have been futile. Because *Boland* declined to adopt *Zapata*'s second prong, its decision analyzing demand refusal is equivalent to Delaware law. *See Spiegel v. Buntrock*, 571 A.2d 767, 778 (Del. 1990) (confirming the first prong of *Zapata* is appropriate for determining whether demand has been improperly refused generally and that *Zapata's* second prong is limited to "demand excused" cases only).

trend" trend by courts to require derivative plaintiffs to make demands in all but the most

extraordinary cases by limiting the circumstances that will be accepted as excusing demand.[26]

That "national trend" is based on the theory that (i) plaintiffs should be encouraged to make pre-

suit demands because that allows boards the opportunity to reconsider a challenged transaction

and (ii) any conflicts faced by board members can be addressed by delegating decision-making

authority to a special litigation committee. *Boland*, 31 A.3d at 551 & n.25.

      Consistent with the teaching in *Grimes,* 673 A.2 at 1219, that a plaintiff need only plead

facts that raise a "reasonable doubt" concerning the board's independence, good faith, or due

care, *Boland* held that determining a board's wrongful refusal of a demand should ordinarily be

made not at the pleading stage but after full discovery and after an "engaged and thorough"

judicial review. 31 A.3d at 561.

      Relying on the Delaware Supreme Court's decision in *Beam v. Stewart*, 845 A.2d 1040,

1055 (Del. 2004), and the Court of Chancery's decision in *Lewis v. Fuqua*, 502 A.2d 962, 967

(Del. Ch. 1985), the *Boland* court emphasized that an SLC should not be allowed to terminate

---

[26] The cases cited by Defendants illustrate the need to consider the relationship between demand refusal and demand futility to avoid a result that effectively blocks injured mutual fund investors – to whom courts owe a duty of heightened vigilance under *Jones,* 130 S. Ct. at 1422 – from having any legal redress at all. For example, Defendants cite *RCM Sec. Fund, Inc. v. Stanton*, 928 F.2d 1318, 1331 (2d Cir. 1991). In that case, the court excused demand because the board was allegedly involved in a transaction that plaintiff had claimed to be wasteful even though the board members were not personally enriched by the transaction. *Id.* at 1330. Since that time, the trend in the law has been to limit the circumstances in a demand will be regarded as futile. In *Werbowsky v. Collumb,* 766 A.2d 123, 135 (Md. 2001)*,* the court refused to abolish the futility exception, but made clear that it was to be applied only in rare circumstances. In *Hartsel*, 2011 WL 2421003, the court refused to excuse demand even when the boards of the mutual funds and the investment advisor (which was the principal defendant) had a *100% overlapping board*. *Boland* recognized that because courts have increasingly accepted defendants' arguments that derivative plaintiffs should be required to make demands in all but the most extraordinary cases, courts should exercise meaningful judicial review of board decisions when shareholders make demands and boards refuse them. This is consistent with *Grimes*, which teaches that a finding of independence for demand futility purposes should not be binding in determining whether a demand has been wrongfully refused. *Grimes*, 673 A.2d at 1218-19; *see also Scattered*, 701 A.2d at 74-75.

meritorious litigation before trial unless defendants satisfy the court that the SLC's independence is "beyond reproach" sufficient to meet a "Caesar's wife" standard. *Boland,* 31 A.3d at 556; *see also Booth Family Trust v. Jeffries*, 640 F.3d 134, 146 (6th Cir. 2011). In placing this heavy burden on defendants, the court adopted the reasoning of the Supreme Court of Delaware:

> The only instance in American Jurisprudence where a defendant can free itself from a suit by merely appointing a committee to review the allegations of the complaint is in the context of a stockholder derivative suit. A defendant who desires to avail itself of this unique power to self destruct a suit brought against it ought to *make certain that the [SLC] is truly independent*.

*Boland,* 31 A.3d at 556 (emphasis added), *citing Lewis*, 502 A.2d at 967. The court also said that courts should be vigilant to ensure that the structural bias inherent in the SLC process does not "eviscerate[] plaintiff's opportunities as minority shareholders to vindicate their rights." 31 A.3d at 560, *quoting Alford v. Shaw*, 358 S.E.2d 323, 328 (N.C. 1987).

The Trustees appear to dispute that they must meet the "beyond reproach" standard, but the only authority they cite is the statement in *Spiegel v. Buntrock*, 571 A.2d 767 (Del. 1990) concerning a board's "presumption" of independence in the *demand futility* context. (Tr. Br. at 9) They cite no authority that the presumption of independence they enjoy in deciding whether a demand on them would be futile continues to apply after they have actually refused a demand. In fact, the *only* authority cited by any party on *that* issue is *Boland*.

Defendants ask this Court to rule as a matter of law that they have carried their burden of proving that they refused Plaintiff's demand independently, in good faith, and with due care based on such superficial and irrelevant as the number of documents their lawyers reviewed or the number of meetings they held. (Tr. Br. at 5) The Delaware courts long ago rejected appeals to such superficial metrics. In *In re Oracle Corp. Derivative Litig.*, 824, A.2d 917, 921 (Del. Ch. 2003), then Vice Chancellor Strine – now the Chancellor of the Court of Chancery for Delaware – refused to give deference to an SLC report that was over a 1,100 pages long and involved the

32

interviews of over 70 witnesses. *Oracle*, 824 A.2d at 925. As stated by *Boland*: "Page totals are a shallow metric, especially given the 'relative ease with which a committee could construct a record of apparently diligent investigation after having predetermined the outcome of the investigation.'" *Boland,* 31 A.3d at 566 (citations omitted).

A.     **Because the Board Failed to Give Final Decision-Making Authority to the SLC, the Recommendation of the SLC Is Irrelevant**

Over two-thirds of the members of the Board are interested persons antagonistic to the pursuit of the claims in this litigation because they are Defendants and are exposed to civil and criminal liability. (AC ¶ 128, 137) Recognizing that they could not possibly make a disinterested decision with respect to Plaintiff's demand, the Board appointed the SLC.

The SLC was not, however, given final authority to actually determine Plaintiff's demand, and it did not make the final decision. Instead, its authority was explicitly limited to making a "recommendation" to the Board, which retained final authority to decide how to respond to Plaintiff's demand. (AC ¶ 129; Kornobis Decl. Ex. A, at p. 5)

Where, as here, a board appoints a committee to investigate claims against board members but fails to give the committee final decision-making authority, the business judgment rule affords no protection to the board's decision. For example, in *In re Par Pharm., Inc., Derivative Litig.*, 750 F. Supp. 641, 646 (S.D.N.Y. 1990), a litigation committee recommended termination of a derivative suit, but the board (a majority of whose voting members were defendants) made the final decision. The court held that "the business judgment rule, while appropriate in evaluating decisions entrusted to an independent special litigation committee … is too lenient a standard by which to judge the decision of a Board of Directors, a majority of whose voting members are defendants in the federal and state claims they voted to dismiss." *Id.* at 645-46 (citations omitted). Citing, *inter alia*, the decision of the Delaware Supreme Court in

*Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del.1981), the court said, "[t]he leading cases under state law formulate standards for judicial review based on the premise that the decision to terminate is made by a special litigation committee rather than by the board itself." 750 F. Supp. at 646. A "mere advisory role" played by an SLC "fails to bestow sufficient legitimacy on the Board's decision to warrant deference to the Board by [the] Court." *Id.* at 647. *Accord Janssen v. Best & Flanagan*, 662 N.W.2d 876, 884 (Minn. 2003).

Other Delaware decisions are consistent with Judge Patterson's reading of *Zapata*. In *Spiegel*, the Delaware Supreme Court gave deference to decision of an SLC that had been given "complete authority" to determine and act upon the derivative plaintiff's demand. *Spiegel*, 571 A.2d at 770. Similarly, in *Oracle,* then Vice Chancellor Strine carefully noted that the SLC had been "granted *full authority* to decide … without the need for approval by the other members of the … board." 824 A.2d at 923 (emphasis added). *See also Boland,* 31 A.3d at 561 (the purpose of the SLC procedure is to "substitute" the SLC's independent judgment for the judgment of the directors accused of wrongdoing), *quoting Hirsch v. Jones Intercable, Inc.* 984 P.2d 629, 638 (Colo. 1999).

Defendants argue that they must delegate full power to an SLC only in a "demand excused" case, but neither logic nor the cases they cite support their position. *Braddock v. Zimmerman*, 906 A.2d 776, 785-86 (Del. 2006), says nothing at all even remotely supporting Defendants' argument. Instead, *Braddock* refutes it. The court's only mention of an SLC was the court's statement that a board may appoint an SLC "to determine" what action to take. In *Seminaris v. Landa*, 662 A.2d 1350, 1352-53 (Del. Ch. 1995), the court determined demand futility with respect to the full board; the court said nothing about the required authority of an SLC appointed to *respond* to a plaintiff's demand. The only ruling that the court made

34

concerning an SLC is that the appointment of an SLC does not result in any concession by defendants with respect to the demand futility issue. In *Mt. Moriah Cemetery v. Mortiz*, No. 11431, 1991 WL 50149, at **2-3 (Del. Ch. Apr. 4, 1991), this issue was never argued or contested by the parties before the court, and the court did not determine whether an SLC should be required to have final authority.

*Abbey v. Computer & Commc'n Tech. Corp.*, 457 A.2d 368, 373 (Del. Ch. 1983), and *Spiegel*, 571 A.2d 767, confirm that the Fund's board was required to delegate final decision-making authority to the SLC. In *Abbey,* the court ruled that by appointing an SLC, the board conceded its lack of independence for the purpose of responding to a shareholder demand. Subsequently, the Delaware Supreme Court decided *Spiegel*, which held that if a board first makes a motion to dismiss and delegates to the SLC "complete authority to act on a demand," then the *Abbey* waiver is avoided. 571 A.2d at 777. By failing to meet the specific requirements in *Spiegel*, including delegation of "complete authority" to the SLC, Trustees are deemed to have conceded their lack of independence under *Abbey*.

Put simply the Board did not trust the SLC to make the correct decision, so the SLC's recommendation is entitled to no deference from this Court.

### B.    The Board Was Interested as a Matter of Law

Since it was the Board that made the decision to refuse Plaintiff's demand, the Court must evaluate the Board's independence. The Board cannot be deemed independent if its members were "*for any substantial reason,* incapable of making a decision with only the best interests of the corporation in mind." *Boland,* 31 A.3d at 557 (emphasis in original), *citing In re Oracle*, 824 A.2d 917. Here, the members of the board were not independent because, among other reasons, they are proposed defendants. Board members are not independent if they stand on

35

both sides of a transaction. *Id*. at 549. Therefore, their decision is not protected by the business judgment rule. *See Par Pharm.*

Defendants argue that Plaintiff conceded the board's independence for demand futility purposes by making a demand, and therefore that their independence has been established for determining wrongful demand refusal. This mistaken assumption is a recurring theme that underlies many of Defendants' arguments and choice of authority. The Delaware Supreme Court, however, long ago rejected the notion that if a board is deemed "independent" for purposes of demand futility, it must also be deemed "independent" when determining wrongful demand refusal. *Scattered Corp.*, 701 A.2d at 74-75; *Grimes*, 673 A.2d at 1218-19. Therefore, even if Plaintiff is now precluded from arguing that the Board was so inherently interested that demand would have been futile (even though it obviously was), Plaintiff is nevertheless entitled to plead that the Board lacked independence in *refusing* Plaintiff's demand. Indeed, the *Boland* court noted that it would not be uncommon for a board to be deemed independent for demand futility purposes but still lack the requisite independence to refuse a demand. Because the underlying rationale of the trend to narrow the futility exception is to "encourage[] derivative plaintiffs to file such a demand, including in cases where the Board may find it advisable to appoint an SLC … it is clear that the derivative plaintiff may continue to contest the independence of the board members after filing such a demand." *Boland,* 31 A.3d at 550, n. 25.

The most recent decision by the Delaware Court of Chancery casts substantial doubt on a minority of cases that appear to suggest a broad application of preclusion principles to bar a plaintiff from seeking to contest a board's independence for wrongful refusal purposes after making a demand. "Under *Grimes,* this holding appears incorrect." *Pyott*, 46 A.3d 313, 333 & n.12. Accordingly, any suggestion in *FLI Deep Marine LLC v. McKim*, Civ. A. No. 4138-VCN,

2009 WL 1204363 (Del. Ch. April 21, 2009), that a plaintiff's demand establishes the board's independence for demand refusal purposes should be rejected. Moreover, such a conclusion is contrary to reality. The fact that Trustees are defendants accused serious wrongdoing *does* create reasonable doubt over their independence, especially since Plaintiff's claims are meritorious and supported by substantial evidence. Based on Trustees' conduct in this case and their status as defendants, any reasonable investor whose interests are supposed to be protected by Trustees would be justified in harboring serious doubts concerning their independence and good faith. In predicting how the Delaware Supreme Court would decide this issue, the Court should be guided by the Delaware Supreme Court's actual decisions in *Grimes* and *Scattered Corp.*; and by the more recent, better-reasoned, and published decision by the Court of Chancery in *Pyott*.

Here, Trustees face a substantial likelihood of civil and criminal liability for their involvement in illegal investments. Defendants do not dispute that substantial likelihood of such liability *in fact* and as a practical matter renders them interested with respect to the prosecution of Plaintiff's claims. *See Pyott*, 46 A.3d at 349-51. Given their obvious conflict, Trustees were obligated to delegate full and final authority to an SLC to negate that conflict. They chose not to do so and instead made the final decision themselves. Accordingly, their decision is not protected by the business judgment rule.

### C.    The Board and All Members of the SLC Also Have Other Irreconcilable Conflicts of Interest

In addition, all the members of the Board and the SLC face an irreconcilable conflict of interest with respect to allowing the Fund to recover damages from Defendants because of the conflicting interests between among and between separate entities to whom they own separate fiduciary duties. The Fund is one of 26 "series" of shares offered by Nominal Defendant. None of these 26 "funds" is a separate legal entity, but they are treated as such under the securities

laws. The Board of the Nominal Defendant and the SLC have separate fiduciary obligations, including a duty of undivided loyalty, to each group of shareholders in all 26 of the funds offered by Nominal Defendant, including the Fund.

The irreconcilable conflict arises because defendants NBM and NB serve as investment advisors or sub-advisors to all 26 of the series funds offered by Nominal Defendant. NB and NBM are responsible for providing or arranging for all services necessary for the operation of all the separate funds that compose Nominal Defendant. NB and NBM obtain the funds to pay for all such operational expenses and overhead in large part from the fees allocated to the Fund. Were the Plaintiffs to prevail in this litigation, NB and NBM would be liable to forfeit all of the fees they have received on account of their management of the Fund's portfolio from the time that Defendants first caused Nominal Defendant to purchase shares in illegal gambling businesses. NB and NBM would also be liable for the money Defendants squandered on illegal gambling businesses. As a result, it is contrary to the interests of investors in the other 25 funds for Plaintiff to succeed in this action. All of the trustees and the SLC therefore have an irreconcilable conflict of interest with respect to any decision to vindicate the rights of the Fund against NB, NBM, or any other Defendant. (AC ¶¶ 139-148; Henkin Decl. Ex. C at §§ 1.2.1 – 1.2.2)

The court in *Boland* instructed that all possible conflicts of interest must be examined with a high degree of scrutiny. Defendants chose to appoint to the SLC individuals who have separate and independent fiduciary duties to 26 separate funds, and it is uncontroverted that the pursuit of this action is not in the best interests of those 25 other funds. That being the case, the independence of the members of the SLC is not "beyond reproach."

Defendants say that the Board does not lack independence just because they sit on multiple boards in the Neuberger Berman mutual fund complex, saying that such arrangements are the prevailing industry practice. (Tr. Br. at 18) Defendants' citation to *Jones*, 130 S. Ct. at 142, however, demonstrates why Defendants' argument cuts against them. In *Jones,* the Supreme Court noted that such prevailing practices are part of the reason mutual funds face an inherent conflict of interest. This is why a board's refusal of a mutual fund shareholder's demand should be treated by courts differently and with greater scrutiny than a demand refusal for ordinary corporations. These considerations also militate in favor of requiring mutual fund boards to delegate full authority to SLC members who are *not connected* with the mutual fund complex.

Relying on Del. Code Ann. tit. 12, § 3801(d), Defendants argue that an independent trustee as defined under the Investment Companies Act of 1940, 15 U.S.C. §§ 80a-1, *et seq.* (the "ICA") must be "deemed to be independent and disinterested for all purposes" including responding to a demand. The Delaware Supreme Court has conclusively ruled that a board's refusal must be determined by the *actual* conduct of the Board in responding to a demand, and not by any prior determinations of independence. *Scattered,* 701 A.2d at 74-75; *Grimes*, 673 A.2d at 1218-19. Indeed, no other rule would make any sense. According to Defendants, if trustees are *qualified* to serve as independent trustees on the board of a mutual fund under the ICA – the purpose of which was to give *additional* protections to shareholders of mutual funds by setting *minimum* qualifications to serve on the board of a mutual fund as an "independent" trustee[27] – they *automatically* must be deemed independent both for demand futility purposes

---

[27] The definition of "interested person" under the ICA has nothing to do with determining whether a board has responded to a demand in good faith. It was drafted for entirely different purposes, such as the ICA's provisions requiring that requiring a minimum percentage of trustees of a mutual fund to be "independent" from the investment advisor. 15 U.S.C. § 80a-10(a). It seeks to identify persons who are *necessarily* "interested" and therefore disqualified *ab initio*

and in deciding any demand. The trustees would then be free, for example, to steal from the Fund without any fear of liability because any action by shareholders to recover the stolen assets would require a demand, and any refusal of that demand would be unreviewable. Defendants' proposed rule is contrary to the rulings of the Delaware Supreme Court, which require courts to judge the *actual* conduct of the board on a case-specific basis.

### D. Plaintiff Has Alleged Particular Facts That Raise a Reasonable Doubt as to the SLC's Independence

Assuming *arguendo* that the SLC's recommendation is in any way relevant to this case even though the SLC was not granted final authority to respond to Plaintiff's demand, Trustees' motion to dismiss should be denied if the members of the SLC are "*for any substantial reason,* incapable of making a decision with only the best interests of the corporation in mind." *Boland,* 31 A.3d at 557 (emphasis in original), *citing In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 938 (Del. Ch. 2003). That inquiry requires the Court to consider whether the members of the SLC are in fact independent of the members of the board whose conduct and potential liability they are called upon to judge. And that, in turn requires the court to examine the relationships between the members of the SLC and the members of the board. Disqualifying relationships include, for example, "previous business relationships" – and even when a member of an SLC is junior to the director defendants and "depended on them for advancement in her career." *Boland,* 31 A.3d at 558, *citing Hasan v. CleveTrust Realty Invs.*, 729 F.2d 372, 379 (6th Cir. 1984); and *Houle v. Low*, 556 N.E.2d 51, 59 (Mass. 1990). In addition to considering whether there are any "significant business relationship or affiliations" between the SLC and the defendants, a court should also "take notice of informal business influences and incentives potentially affecting the

---

from serving in roles that require disinterest. In contrast, a demand refusal inquiry is fact-specific. It has nothing to do with whether the trustee is independent for purposes of general service on the board.

SLC." *Boland,* 31 A.3d at 564. Such disqualifying influences could be outside interests that create "a strong incentive to stay on good terms with the defendants." *Id.* Relevant influences include "significant personal or social relationships." 31 A.3d at 564. For example, participation in a "parallel network of influence and relationships in the fundraising world" could be enough to raise an issue of material fact to defeat defendants' motion to dismiss or for summary judgment. *Id.* In *Boland* the court cautioned that the law should not

> ignore the social nature of humans. To be direct, corporate directors are generally the sort of people deeply enmeshed in social institutions. Such institutions have norms, expectations that, explicitly and implicitly, influence and channel the behavior of those who participate in their operations. Some things are "just not done," or only at a cost, which … may involve a loss of standing in the institution.

*Boland,* 31 A.3d at 558, n. 36, *quoting Oracle*, 824 A.2d at 938.[28]

The allegations of the complaint are more than sufficient to give rise to a strong inference that the members of the SLC are not genuinely independent. Each of the members of the SLC serves on the boards of forty-five (45) funds within the Neuberger Berman mutual fund complex, including but not limited to the other funds within Nominal Defendant. The SLC members serve on these boards along with the Defendant Trustees. NBM and NB receive substantial revenue (in the hundreds of millions of dollars) from these 45 other funds. Each of the SLC Members was appointed to his or her position by NBM and NB or persons controlled by NMB and NB and

---

[28] In *Oracle*, members of an SLC were professors at Stanford University who were asked to investigate Oracle directors who had ties to Stanford as well. The court noted that it is already "no easy task" to accuse a fellow director of wrongdoing, and compounding that difficulty by choosing SLC members with ties to the same institution to which the SLC members were also connected created a sufficient "possibility that these extraneous considerations biased the inquiry of the SLC." 824 A.2d at 921. The court noted that the fact that the SCL inquiry concerned "conduct that is rightly considered a violation of criminal laws" was an important factor in determining whether there was "reasonable doubt about the impartiality of the SLC." *Id.* at 921. Notably, *Oracle* was not a "demand refused" case, and the court determined the impropriety of the SLC's decision to terminate litigation without ruling on whether demand would was excused. This negates any suggestion by Defendants that the standard for determining wrongful refusal should be lower if there has been no previous determination of futility.

they receive substantial income (exceeding $150,000 per year) from those appointments. (AC ¶ 131)[29] Where, as here, the material facts are solely within the defendant's knowledge, more detailed pleading is not required. *See ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007).

With respect to mutual funds, the Court can take judicial notice that "[b]ecause the [investment] adviser generally supervises the daily operation of the fund and often selects affiliated persons to serve on the company's board of directors, the relationship between investment advisers and mutual funds is fraught with potential conflicts of interest." *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 536 (1984); *accord Jones*, 130 S. Ct. at 142. Thus, there is no reason for this Court to indulge in a presumption of independence that would be contrary to common experience and reality. In this regard, it is particularly significant that the board, in appointing members of the SLC, elected not to go outside the Neuberger Berman family of funds. From this choice, it may reasonably be inferred that the SLC members were appointed not because of their independence but because of their lack of it. Where, as here, the conduct of *insiders* is to be judged by the SLC, the members of the SLC should be "appointed from outside the corporation." *See Boland*, 31 A.3d at 551.

---

[29] Defendants cite *Amron v. Morgan Stanley Inv. Advisors, Inc.,* 464 F.3d 338, 345 (2d Cir. 2006) and *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 329-31 (4th Cir. 2001), for the proposition that service on multiple boards and receipt of compensation by itself does not cause a director to be "interested" for demand futility purposes. That is a completely different question from whether the members of the SLC are independent of the board members and the other defendants for demand refusal purposes. The *Amron* and *Migdal* decisions permit mutual fund trustees to sit on multiple boards despite the serious concerns over conflicts of interest that might arise. *See Jones,* 130 S. Ct. at 1422. Those cases to not, however, require the courts to assume that such trustees have actually acted with independence, in good faith, and with due care *after a dispute arises*. Service on multiple boards is a reason for *heightened vigilance* for mutual funds; it is not a reason to ignore conflicts of interest that would otherwise be sufficient to raise a reasonable doubt over a board's wrongful refusal with respect to ordinary corporations.

### E.        The Board's Investigation Has Not Been Sufficiently Transparent

The SLC's process "requires near-complete transparency." *Boland,* 31 A.3d at 562. Regardless of its apparent "thoroughness," the decision of an SLC investigation does not exhibit "good faith" and should be disregarded when the SLC has "insulated its investigation from scrutiny by plaintiff." *Id.* at 559, *quoting Peller.* Courts should also consider whether the SLC "pursued its investigation with zeal or whether it played softball with critical players." 31 A.3d at 559. It is therefore important that the SLC must have allowed plaintiff, for example, "an opportunity to review the annotated summaries of interviews" of witnesses. *Id.*

Defendants have failed to satisfy any of these requirements. There was no transparency in SLC's purported "investigation." Defendants denied Plaintiff's offer of assistance; they flatly denied Plaintiff any involvement in the "investigation," denied Plaintiff any contact with the SLC, and barred Plaintiff from any access to any of the underlying documents gathered, reviewed, or generated in the course of the SLC's "investigation." They certainly did not allow plaintiff "an opportunity to review the annotated summaries of interviews" of any witnesses. The SLC conducted its purported investigation in complete secrecy and refused Plaintiff access to any portion of the SLC's so-called "investigation." (¶ 134)

Under *Boeing Co. v. Shrontz*, Civ. A. No. 11273, 1994 WL 30542, at *2 (Del. Ch. 1994), a board is not required to "continuously inform a plaintiff of developments in the investigation during that period," but a failure to provide *any* access to Plaintiff to any part of the investigation and the basis of the Board's refusal, both *during* the investigation and *after* refusal, is strong evidence that the Board did not conduct the investigation in good faith. As *Boland* demonstrates, allegations of such a lack of transparency are sufficient to survive a motion to dismiss.

Defendants also rely on *Boeing* for the proposition that they are not obligated to provide Plaintiff *any* of the committee's work product. The unpublished decision in *Boeing*, however,

43

was decided well before Chancellor Strine's decision in *Oracle*, the Delaware Supreme Court's decision in *Beam*, and the well-reasoned decision *Boland* – all of which require a degree of scrutiny of an SLC's refusal greater than what was assumed by the court in *Boeing*. Moreover, even the *Boeing* court noted that demand refusal analyses are case-specific, and the various reasons to question a board's response for independence, good faith, and due care should be viewed "collectively." 1994 WL 30542, at *2. The facts of *Boeing* – which notably did not involve a mutual fund board that subject to a heightened degree of judicial scrutiny under *Jones* – did not include many of the other indicia of bad faith and interestedness alleged in the present complaint. Plaintiff submits that, in predicting how the Delaware Supreme Court would rule on this issue today, the approaches taken by *Boland* and *Beam* would be preferred over that taken by *Boeing*.

### F.     The Board Did Not Meet Established Requirements for Conducting an Investigation Reasonably and With Due Care

None of the SLC Members participated in any witness interviews and *completely* delegated that responsibility to counsel. (AC ¶ 135) The *Boland* court confirmed that an SLC demonstrates unreasonable inquiry and bad faith when the SLC relies almost exclusively on independent counsel "to conduct the substantive aspects of the investigation." *Id.* at 559, *quoting Peller v. S. Co.*, 707 F. Supp. 525, 529 (N.D. Ga. 1988), *aff'd,* 911 F.2d 1532 (11th Cir. 1990).

Relying on *FLI Deep Marine LLC v. McKim*, 2009 WL 1204363, at *3 (Del. Ch. Apr. 21, 2009), Defendants argue that Plaintiff is improperly seeking to "dictate the manner" in which the Board investigated the demand. That is not true. Merely because Plaintiff cannot "dictate" the precise manner in which the SLC conducts its investigation does not mean that there are no *minimum* standards that the Board and SLC were obligated to meet.

Defendants also say that that they are entitled to delegate some responsibility to counsel. That is true but irrelevant. Just because Defendants are entitled to delegate *some* responsibility to counsel does not absolve them completely of their minimum responsibilities of personal involvement in the investigation that courts have required. *Boland* confirms this.

### G.     The Board's Refusal Was Premised Not on a "Business Decision" But on an Erroneous "Legal Conclusions" That Cannot Be Granted Deference from the Court Because They Violate Public Policy

The SLC premised its recommendation not on any legitimate business judgment but on incorrect legal assumptions and erroneous legal principles contrary to public policy. Accordingly, its recommendation is entitled to no deference from the Court.

Indeed, the *Boland* court viewed some of the arguments raised by the SLC against the derivative plaintiffs as casting doubt on the "objectivity" of the SLC and whether the SLC had adopted a "hostile attitude" towards the plaintiffs' claims. For example, the SLC questioned whether the plaintiffs could adequately represent shareholders because the majority of the shareholders disagreed with them. The court noted that such a "faulty" reasoning would "effectively preclude *all* suits by minority shareholders" and was thus indicative of a lack of independence. *Boland,* 31 A.3d at 563, n. 41. Moreover, the SLC's identification of a possible "hidden agenda" by the minority shareholders was inconsistent with "an independent committee tasked with making an objective decision for the corporation about a stock transaction benefitting some of the directors." *Id.*

The scrutiny applied by the *Boland* to the conclusions of the SLC is consistent with familiar principles of jurisprudence. In the context of appellate review of judicial discretion exercised by trial courts, it is well-established that a court abuses its discretion "if it based its

ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence."[30]

So too, a fiduciary fails to exercise sound discretion if it bases its recommendations on an

erroneous view of the law or on clearly erroneous factual assumptions. The business judgment

rule does not give fiduciaries license to abuse their discretion.[31] Nor does it mandate judicial

deference to objectively unreasonable SLC recommendations contrary to public policy.[32]

The premise of the business judgment rule is that courts should defer to the "business

decisions" made by business people. *Boland,* 31 A.3d at 548. While acknowledging that courts

are "ill equipped" to review business decisions, *Boland* made clear that courts should exercise

greater review, for example, over the "methodologies and procedures best suited to the conduct

of an investigation of facts and the determination of legal liability" because "courts are well

equipped by long and continuing experience and practice" to make such determinations and that

they are "[i]n fact they are better qualified" in this regard than directors.[33]

Here, the SLC specifically found that prior to making the investments, Defendants were

aware of issues concerning the legality of NETeller and 888 but discounted the "risk" that the

laws would be successfully enforced or that Congress would pass enforcement legislation that

---

[30] *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) (reviewing decisions).

[31] *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ("Absent an abuse of discretion, that judgment will be respected by the courts"); *Great Rivers Co-op. of Se. Iowa v. Farmland Indus., Inc.*, 198 F.3d 685, 704 (8th Cir. 1999); *Brock Built, LLC v. Blake*, 686 S.E.2d 425, 430 (Ga. 2009).

[32] *See Houle v. Low*, 556 N.E.2d 51, 59 (Mass. 1990) ("The judge must determine, on the basis of the evidence presented, whether the committee reached a reasonable and principled decision."); *House v. Estate of Edmondson*, 245 S.W.3d 372, 382 (Tenn. 2008) (stating that courts must take into consideration "the soundness of the committee's conclusions and recommendations"). *Boland* twice cited *Houle* with approval as correctly describing the review a court must undertake in determining whether to defer to board's refusal to authorize a derivative suit. *See, e.g., Boland,* 31 A.3d at 558 & 560-61.

[33] *Boland*, 31 A.3d at 552 *citing Auerbach v. Bennett*, 47 N.Y.2d 619 (1979).

would provide law enforcement authorities with more powerful tools to pursue the illegal gambling businesses. Indeed, the SLC confirmed that some Defendants "met with executives from" NETeller and 888 and monitored the possible passage of the UIGE with legislative consultants prior to making their investments. However, the SLC "played softball with critical players," *Boland* 31 A.3d at 559, by drawing the impermissible legal conclusion that asset managers may properly weigh the risks associated with seeking to profit from criminal activity – as if that were a legitimate business decision. Moreover, the SLC purported to base its recommendation on purely legal conclusions, such whether Defendants are required to have knowledge of criminal statutes. On these types of issues, courts have superior expertise to business people. (AC ¶ 136)

### H.  The Board's Continued Withholding of the Tolling Agreements Demonstrates Their Bad Faith Hostility to Plaintiff

Trustees' continued stonewalling with respect to the *alleged* tolling agreements that they promised Judge Sand demonstrates a lack of good faith and transparency. (AC ¶¶ 122-25) This Court, in its Opinion dated June 12, 2012 [Dkt. No. 49], at p. 12 & n.5, held that there is no evidence that the board delayed in responding to the demand for the purpose of extinguishing Plaintiff's claims, because there is no dispute that the agreements exist – even though Defendants refuse to let Plaintiff (or the Court) see them.

The important point to note, however, is that even though Plaintiff does not have any evidence to dispute *the existence* of a document that Defendants refer to as a "tolling agreement" – there is *no evidence* that what Defendants call a "tolling agreement" actually functions as one. Plaintiff respectfully submits that even if this Court believes that Defendants were not intentionally seeking to extinguish the Fund's claims on statute of limitations grounds so as to excuse demand, Defendants' *continued withholding* of the tolling agreements demonstrates an

unreasonable hostility to Plaintiff's demand that can only be characterized as bad faith demonstrating a lack of independence.

This is no mere cavil. This action was filed on by Plaintiff on behalf of the Fund on August 24, 2012 – while Defendants claim to have been secretly conducting an "investigation" of Plaintiff's demand. Defendants repeat their argument to this Court that the claims Plaintiff alleges on behalf of the Fund are barred by unspecified statutes of limitations. (Ad. Br. at 30-31) Because Fed. R. Civ. P. 15(c)(1)(B) confirms that Plaintiff's amended complaint relates back to the filing of the original complaint on August 24, Defendants' statute of limitations argument can only mean that they do not believe the purported tolling agreements were effective in preserving the Fund's claims *while the Board was supposedly conducting its investigation*.

In order to persuade Judge Sand to dismiss Case No. 1:10-cv-06234-LBS Defendants' counsel represented to the judge that they would have their clients agree to a reasonable tolling arrangement that would preserve Plaintiff's claims from being time-barred. (AC ¶ 122; Sheridan Decl. ¶ 8) Either Defendants made a misrepresentation to Judge Sand, or Defendants have submitted a frivolous argument to this Court that is inconsistent with the terms of a tolling agreement that they, for some unexplained reason, continue to conceal from Plaintiff (and this Court). Whatever the explanation, it is clear that Defendants' withholding of the tolling agreement from the very investors whose interests they *claim* to represent, at a minimum evinces a bad faith hostility to Plaintiff. When "considered as a whole" with the other allegations of bad faith and lack of due care, *see Lewis v. Fuqua*, 502 A.2d 962, 967 (Del. Ch. 1985), a reasonable and objective observer would be justified in holding a reasonable doubt that Trustees have conducted an independent investigation in good faith, but have merely papered a predetermined

decision to shield themselves and their co-defendants from liability at the expense of innocent investors.

## V.   THE FUND'S CLAIMS ARE NOT BARRED BY ANY STATUTE OF LIMITATIONS

Defendants do not actually make any cogent argument that any claims were time-barred before August 25, 2011 – the day after this case was filed. Instead, Defendants argue that by the time this Court dismissed the complaint with leave to re-plead, the period of limitations had run. That is a meritless argument because an amended complaint relates back to the date of filing of the original complaint. Fed. R. Civ. P. 15(c)(1)(B).[34] In any event, because Defendants claim to have entered into tolling agreements, on this record the Court must assume that the Fund's claims were preserved while the Board was investigating Plaintiff's demand.

## VI.   PLAINTIFF IS AN ADEQUATE REPRESENTATIVE

Defendants argue that Plaintiff's "utter disregard for the burden and expense he causes the Fund" by zealously pursuing the claims in the complaint means that he will not fairly and adequately represent shareholders within the meaning of Fed. R. Civ. P. 23.1. (Tr. Br. at 2) This is ironic. Defendants engaged in criminal wrongdoing that caused millions of dollars of losses to the shareholders for whom they purport to act as fiduciaries. Instead of taking steps to vindicate the interests of the shareholders they purport to represent, Trustees circled the wagons with their co-defendants and did everything they could to insulate themselves from liability. They now accuse Plaintiff – an injured shareholder and the *only* party in the case who has ever acted in the best interests of the Fund's shareholders by seeking to recover the value that Defendants knowingly squandered on criminal enterprises – of not being an adequate representative. This is

---

[34] Defendants' reliance *In re Direxion Shares ETF Trust*, No. 09-cv-8011 (KBF), 2012 WL 717967 (S.D.N.Y. Mar. 6, 2012), is misplaced. That case involved a statute of repose not subject to the relation back doctrine under Fed. R. Civ. P. 15(c). In any event, the court *rejected* defendants' argument based on the statute of repose.

nothing but another transparent litigation tactic to prevent innocent victims from obtaining just compensation from their faithless, irresponsible, self-interested fiduciaries.

Defendants complain that Plaintiff's zealous pursuit of his claims is suggestive of "harassment." Defendants cite *La. Mun. Police Employees' Retirement Sys. v. Pyott*, 46 A.3d 313, 349-51 (Del. Ch. 2012), but that case demonstrates the opposite. In *Pyott*, the Delaware Court of Chancery determined whether to give preclusive effect to a failed derivative action that had previously been brought by another plaintiff who hastily rushed to file a derivative action without proper investigation. The other plaintiff rushed to file without proper due diligence for the purpose of beating competing derivative plaintiffs to the courthouse. Nothing remotely like that happened here. Every allegation of the complaint is fully investigated – and completely accurate. Plaintiff has the utmost regard for the interests of the Fund. That is why he zealously pursues this litigation.

### CONCLUSION

The motions to dismiss should be denied. In the event that the Court concludes that the complaint is in any way deficient, Plaintiff should be granted leave to amend the complaint under Fed. R. Civ. P. 15(a)(2) to cure the deficiency.

Dated:  October 8, 2012

/s/ Thomas I. Sheridan, III
    Thomas I. Sheridan, III
HANLY CONROY BIERSTEIN SHERIDAN
FISHER & HAYES, LLP
112 Madison Avenue
New York, NY 10016-7416
(212) 784-6404
tsheridan@hanlyconroy.com
*Attorney for Plaintiff*
