UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BENJAMIN M. GAMORAN, derivatively on behalf of the nominal defendant with respect to its series mutual fund, the Neuberger Berman International Fund,

Plaintiff,

-against-

NEUBERGER BERMAN MANAGEMENT LLC, *et al.*,

Defendants,

-and-

NEUBERGER BERMAN EQUITY FUNDS d/b/a NEUBERGER BERMAN INTERNATIONAL FUND,

Nominal Defendant.

11 Civ. 7957 (TPG) (KNF)

ECF Case

**ORAL ARGUMENT REQUESTED**

---

**REPLY MEMORANDUM OF LAW IN SUPPORT OF THE INVESTMENT ADVISOR
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

James N. Benedict
Alan J. Stone
Douglas W. Henkin
Mia C. Korot
MILBANK, TWEED, HADLEY &
MᶜCLOY LLP

1 Chase Manhattan Plaza
New York, NY  10005-1413
(212) 530-5000

*Attorneys for Defendants Neuberger Berman
Management LLC, Neuberger Berman, LLC,
Benjamin Segal, Peter E. Sundman, and
Jack L. Rivkin.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ................................................................................................................3

I.   THE AMENDED COMPLAINT DOES NOT PLEAD VALID CLAIMS THAT
     ANY DEFENDANT VIOLATED 18 U.S.C. § 1955 ..............................................3

   A.   Section 1955 Does Not Criminalize Ownership Of Publicly Traded Stock ...................... 3

   B.   Section 1955 Cannot Be Applied Extraterritorially ............................................. 6

   C.   Plaintiff's Own Example Undermines His Entire Case ......................................... 7

   D.   The Fund's Investments In 888 And NETeller Did Not Violate State Law ..................... 8

II.  THE AMENDED COMPLAINT FAILS TO ALLEGE RICO CLAIMS ...........................9

   A.   Plaintiff Has Not Alleged Predicate Acts ..................................................... 9

   B.   Plaintiff Cannot Establish RICO Proximate Cause .......................................... 9

   C.   Plaintiff's RICO Claims Fail For Other Reasons As Well ................................. 11

III. PLAINTIFF'S STATE LAW CLAIMS MUST BE DISMISSED .....................................12

   A.   Plaintiff Has Not Stated A Claim for Breach Of Fiduciary Duty Or Gross Negligence .. 12

   B.   Plaintiff Has Not Stated A Claim For Waste ................................................ 14

   C.   Plaintiff Has Not Stated A Claim For Breach Of Contract ............................... 15

IV.  PLAINTIFF'S CLAIMS ARE TIME BARRED .....................................................16

V.   PLAINTIFF SHOULD NOT BE GIVEN LEAVE TO AMEND ...................................17

CONCLUSION ...........................................................................................................18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C ASES

*Am. Booksellers Found. v. Dean,*
   342 F.3d 96 (2d Cir. 2003).................................................................................8

*Anza v. Ideal Steel Supply Corp.,*
   547 U.S. 451 (2006)..........................................................................................10

*Brehm v. Eisner,*
   746 A.2d 244 (Del. 2000) .................................................................................15

*Bridge v. Phx. Bond & Indem. Co.,*
   553 U.S. 639 (2008)..........................................................................................10

*Broder v. Cablevision Sys. Corp.,*
   418 F.3d 187 (2d Cir. 2005)..............................................................................14

*Burns Jackson Miller Summit & Spitzer v. Linder,*
   451 N.E.2d 459 (N.Y. 1983).............................................................................14

*Cedeno v. Intech Grp., Inc.,*
   733 F. Supp. 2d 471 (S.D.N.Y. 2010)................................................................6

*Clackamas Gastroenterology Assocs., P.C. v. Wells,*
   538 U.S. 440 (2003)............................................................................................4

*Cullen v. Margiotta,*
   811 F.2d 698 (2d Cir. 1987)..............................................................................11

*Dole Food Co. v. Patrickson,*
   538 U.S. 468 (2003)............................................................................................4

*Dorchster Investors v. Peak Trends Trust,*
   No. 99 Civ. 4696 (LMM), 2003 WL 223466 (S.D.N.Y. Feb. 3, 2003)...................8

*Dowling v. United States,*
   473 U.S. 207 (1985)............................................................................................5

*Dubai Islamic Bank v. Citibank, N.A.,*
   126 F. Supp. 2d 659 (S.D.N.Y. 2000)................................................................8

*European Cmty. v. RJR Nabisco, Inc.,*
   814 F. Supp. 2d 189 (E.D.N.Y. 2011) ................................................................6

*GICC Capital Corp. v. Tech. Fin. Grp.*,
    67 F.3d 463 (2d Cir. 1995)..................................................................12

*Grimes v. McDonald*,
    673 A.2d 1207 (Del. 1996) ...............................................................15

*Hartsel v. Vanguard Grp., Inc.*,
    CA No. 5394, 2011 Del. Ch. LEXIS 89 (Del. Ch. Jun. 15, 2011), *aff'd*, 38 A.3d 1254
    (Del. 2012), *cert. denied*, 80 U.S.L.W. 3708 (U.S. June 25, 2012)............................4

*Ideal Steel Supply Corp. v. Anza*,
    652 F.3d 310 (2d Cir. 2011)...............................................................10

*In re Citigroup Inc. S'holder Derivative Litig.*,
    964 A.2d 106 (Del. Ch. 2009)........................................................12, 13

*Johnson v. United States*,
    130 S. Ct. 1265 (2010) .........................................................................5

*Long v. State*,
    65 A.2d 489 (Del. 1949) .....................................................................12

*Mark v. J.I. Racing, Inc.*,
    11-cv-01181-JSR, 2012 WL 566298 (S.D.N.Y. Feb 22, 2012)................11

*McBrearty v. Vanguard Grp., Inc.*,
    No. 08 Civ. 7650 (DLC), 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *aff'd*, 353 Fed.
    App'x 640 (2d Cir. 2009), *cert. denied*, 130 S. Ct. 3411 (2010)......................9, 10

*Morrison v. Nat'l Austl. Bank Ltd.*,
    130 S. Ct. 2869 (2010)......................................................................6, 7

*Nemec v. Shrader*,
    991 A.2d 1120 (Del. 2010) .................................................................13

*Norex Petroleum Ltd. v. Access Indus.*,
    631 F.3d 29 (2d Cir. 2010)...................................................................6

*People v. W. Express Int'l Inc.*,
    No. 156, 2012 N.Y. LEXIS 2726 (N.Y. Oct. 18, 2012) .........................11

*Perrin v. United States*,
    444 U.S. 37 (1979)...............................................................................4

*Rousso v. State*,
    239 P.3d 1084 (Wash. 2010) (*en banc*) .................................................8

*Sanabria v. United States*,
437 U.S. 54 (1978)................................................................................................4

*Schlaifer Nance & Co. v. Estate of Andy Warhol*,
119 F.3d 91 (2d Cir. 1997)................................................................................11

*Seidl v. Am. Century Cos., Inc.*,
713 F. Supp. 2d 249 (S.D.N.Y. 2010), *aff'd,* 427 Fed. App'x 35 (2d Cir.), *cert. denied*, 132 S. Ct. 846 (2011) ..........................................................................10

*Taylor v. Kissner*,
C.A. No. 11–635–RGA, 2012 WL 4461528 (D. Del. Sep. 27, 2012) ....................15

*Trans World Airlines, Inc. v. Summa Corp.*,
No. 1607, 1986 WL 5671 (Del. Ch. May 15, 1986)..............................................13

*United States v. Dauray*,
215 F.3d 257 (2d Cir. 2000).............................................................................4, 5

*United States v. Hawes*,
529 F.2d 472 (5th Cir. 1976) ...............................................................................4

*United States v. Philip Morris USA, Inc.*,
C.A. No. 99-2496 (GK), 2011 U.S. Dist. LEXIS 32053 (D.D.C. Mar. 28, 2011) ..................6

*United States v. Santos*,
553 U.S. 507 (2008)..............................................................................................5

*United States v. Wallach*,
935 F.2d 445 (2d Cir. 1991)..................................................................................4

*Weems v. United States*,
217 U.S. 349 (1910)..............................................................................................4

*White v. Panic*,
783 A.2d 543 (Del. 2001) ...................................................................................15

*Wodka v. Causeway Capital Mgmt.*,
433 Fed. Appx. 563 (9th Cir. 2011).....................................................................10

**STATUTES**

15 U.S.C. § 78t.................................................................................................4, 5

18 U.S.C. § 1084...................................................................................................5

18 U.S.C. § 1955.........................................................................................passim

18 U.S.C. § 1961...................................................................................................9

18 U.S.C. § 1962 .................................................................................................8, 10

Del. Code Ann. tit. 12 § 3302 (2012) .............................................................15, 16

N.Y. Penal Law § 100.00 ...................................................................................9

N.Y. Penal Law § 110.00 ...................................................................................8

N.Y. Penal Law § 225.00 ...................................................................................8

N.Y. Penal Law § 460.25 ...................................................................................8

**OTHER AUTHORITIES**

115 Cong. Rec. 10735 (1969) ...........................................................................14

116 Cong. Rec. 590 (1970) ...............................................................................14

116 Cong. Rec. 603 (1970) ...............................................................................14

H.R. Rep. No. 91-1549, pt. 802 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007 ...........5

S. Rep. No. 91-617 91st Cong. (1969) ..............................................................5

# PRELIMINARY STATEMENT[1]

For years, the primary claim in this case (and the others like it) has been that 18 U.S.C. § 1955, a statute enacted to prevent organized crime from infiltrating legitimate businesses, also made it a felony to buy and own publicly-traded stock listed on an exchange regulated by a foreign sovereign, conduct that foreign law expressly permits. Despite more than three years of litigating this and similar cases, Plaintiff's counsel cannot cite a single case in which anyone has been held criminally liable (or even charged) under Section 1955 for buying publicly-traded stock on a non-U.S. market.[2] That is because buying stock on a public market (and then owning it) is not illegal under U.S. law, and if Congress had intended to change that in enacting Section 1955, it would have had to (i) say that it was doing so and (ii) say that it intended to regulate transactions outside the U.S. — Congress did neither.

In light of this history, the Opposition Brief displays two surprising changes of position. *First*, Plaintiff initially claimed that his federal statutory argument would have no impact on individual purchasers of stocks like 888 and NETeller. But Plaintiff now admits that he means his theory to directly regulate transactions by even individual retail purchasers on foreign markets, conceding that his interpretation would make a French citizen who purchased

---

[1]     Capitalized terms not defined herein have the meanings set forth in the Memorandum of Law in Support of the Investment Advisor Defendants' Motion to Dismiss the Complaint, dated August 24, 2012 (the "IA Def. Br."). References to Plaintiff's Opposition Brief are in the form "Opposition Brief" or "Opp. Br."

[2]     This answers Plaintiff's assertion that creating an "exception" for passive owners of stock "would eviscerate" Section 1955. (Opp. Br. at 19) For an "exception" to be necessary, a statute has to apply to conduct in the first instance, and Plaintiff has not shown that Section 1955 criminalizes buying and owning publicly-traded stock. (This also answers Plaintiff's assertion that he only wants to hold defendants liable for "*their own crimes*." (Opp. Br. at 22) (emphasis in original) To do that, Plaintiff has to have some basis to assert that merely buying or owning stock can be a "crime.") As for Plaintiff's "eviscerat[ion]" argument, the complete absence of prosecutions for merely buying or owning publicly traded stock shows that rejecting Plaintiff's interpretation of Section 1955 would not create an enforcement void.

888 stock <u>in Paris</u> a felon if he or she moved to the U.S. without selling the stock.[3]  The amount of conflict such a rule would create between U.S. and foreign law cannot be overstated, and this is precisely the sort of conflict the presumption against extraterritoriality is designed to avoid.[4]

        *Second*, perhaps realizing that his statutory theory goes too far, Plaintiff has now tried to focus the case away from it.  Although the Amended Complaint is full of assertions that the defendants committed federal crimes (*e.g.*, Compl. ¶¶ 3, 4, 5, 7, 50, 74, 166, 171, 178), Plaintiff now asserts that "Defendants' conduct was wrongful *not only* because it violated the fundamental common law principle that one party may not knowingly seek to profit from the wrongdoing of another, *but also* because that principle is embodied in" Section 1955.[5]  So now Plaintiff purports to base his complaint on the notion that owning certain publicly traded stock is just "wrong[]" and has relegated his statutory arguments to "but also" status.  This greatly magnifies the conflict between Plaintiff's claims and foreign law — under which Plaintiff concedes the conduct at issue here is perfectly legal — and makes clear that Plaintiff is in fact arguing that <u>everyone</u> who invested in companies like 888 and NETeller did something inherently wrongful.  But this Court has no authority or basis to decide that vast numbers of

---

[3]    *See* Opp. Br. at 21 n.18.  Plaintiff's position is even more absurd than it sounds.  Suppose that instead of simply moving to the U.S. permanently, our hypothetical Parisian visits for a few months while thinking about whether to accept permanent employment in the U.S.  If he or she decides to go back to Paris, were they not a felon while they were here because they had not yet decided to live here?  And if they decide to stay in the U.S. after three months, is that when they "become" a felon?  Not only do these questions (and others that follow from Plaintiff's position) boggle the mind, Plaintiff's position seemingly introduces a specific intent requirement into a statute Plaintiff asserts has none.  *See* Opp. Br. at 24.  Plaintiff's argument thus has the distinction of being (i) inconsistent with Section 1955, (ii) inconsistent with the rules of statutory construction, and (iii) internally inconsistent.

[4]    *See generally Equal Empl. Opp. Comm'n v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord").

[5]    *See* Opp. Br. at 1 (emphasis added).  Plaintiff concedes that his argument is based on his self-serving views of what "public policy" should allow mutual funds to invest in.  *See id.* at 3; *see also id.* at 9 ("These claims are premised in part on the fundamental common law principle that it is wrongful for a party knowingly to profit from the wrongful conduct of another.").

investors around the world acted improperly by investing in ways Plaintiff does not like, and it especially has no basis to do so (i) in the absence of even a hint that any U.S. legislature intended that result and (ii) in the face of decisions by other sovereigns that what Plaintiff thinks was "wrong[]" was just fine with them.[6]

Plaintiff's Opposition Brief confirms that the Amended Complaint fails to state any claim and must be dismissed. And Plaintiff's boilerplate request for leave to amend yet again is offensive. This is Plaintiff's fourth complaint (not counting his counsel's numerous attempts to plead similar claims in related cases). Because further amendment would be futile and the Investment Advisor Defendants are entitled to be done with Plaintiff's baseless accusations, the Amended Complaint should be dismissed with prejudice.

## ARGUMENT

I.  **THE AMENDED COMPLAINT DOES NOT PLEAD VALID CLAIMS THAT ANY DEFENDANT VIOLATED 18 U.S.C. § 1955**

A.  **Section 1955 Does Not Criminalize Ownership Of Publicly Traded Stock**

Plaintiff argues that purchasing even one share of publicly traded stock on a non-U.S. secondary market means that the purchaser "owns all or part of [the] ... business" in violation of Section 1955. As an initial matter, Plaintiff has not cited even a single case in which

---

[6]     Plaintiff's reliance on *La. Mun. Police Employees' Ret. Sys. v. Pyott*, 46 A.3d 313 (Del. Ch. 2012) (Opp. Br. at 10, 36, 37, 50) is misplaced. Although *Pyott* noted that Delaware law does not sanction illegal behavior, it does not say that investing in publicly traded securities is illegal, which is what Plaintiff's claims depend on. The same is true of the cases referenced in footnotes 7 and 8 of the Opposition Brief — none say that investing in publicly traded securities is illegal or improper. Indeed, one of the cases Plaintiff relies on was a lawsuit by one participant in a criminal enterprise against another and was decided without any participation by the defendant. *See Youshah v Staudinger*, 604 N.Y.S.2d 479 (N.Y. Sup. Ct. 1993). Another concerned a court's appellate review of the Delaware Public Service Commission's determination that a telephone company could terminate services to a company accused of facilitating gambling; it did not address what Plaintiff calls courts' duties to avoid the promotion of illegality. *See In re Del. Sports Serv.*, 196 A.2d 215 (Del. Super. Ct. 1963), *aff'd*, 202 A.2d 568 (Del. 1964) (*per curiam*), *cert. denied sub nom. Del. Sports Serv. v. Diamond State Tel. Co.*, 379 U.S. 965 (1965). None of these cases say that investing in publicly traded securities is illegal, improper, or "wrong[]" in any actionable way.

a court has agreed with his interpretation of Section 1955,[7] and the only court to consider it

stated that it was "not convinced that this conduct is criminal."[8]  None of this is a surprise,

because Plaintiff's argument violates fundamental principles of statutory construction.

When a word in a criminal statute is not defined, courts use the word's ordinary,

contemporary, common meaning.[9]  Under the common usage of "owns," a minority stockholder

does not "own" the corporation in which he holds stock.  The structure of Section 1955 depends

on responsible ownership, which requires significant influence over or responsibility for that

which is owned in order to create liability.  This is consistent with (i) the principle that an

individual shareholder does not own a corporation's assets merely because he or she owns

stock,[10] (ii) the general structure of the U.S. securities laws (which only make individuals

responsible for a corporation's actions if they are "control persons"),[11] and (iii) what a reader

---

[7]   Plaintiff cites *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440 (2003) to argue that a shareholder "owns" a company.  (Opp. Br. at 18)  But *Clackamas* decided whether four physician shareholders who owned their medical practice through a closely-held professional corporation were employees for purposes of the Americans with Disabilities Act.  *Weems v. United States*, 217 U.S. 349 (1910) (Opp. Br. at 21) was not even about determining the scope of a federal criminal statute — it was about whether a Philippine statute violated the prohibition on cruel and unusual punishment.  Although *Sanabria v. United States*, 437 U.S. 54 (1978) (Opp. Br. at 19, 25) and *United States v. Hawes*, 529 F.2d 472 (5th Cir. 1976) (Opp. Br. at 19) both address Section 1955, neither case addressed (or even mentioned) whether a shareholder of a publicly-traded corporation "owns" that corporation for the purposes of Section 1955.  Plaintiff's argument that *Hawes* "rejected virtually the same argument made by Defendants here" (Opp. Br. at 19) is thus nonsense.  Indeed, Plaintiff admits that on the very next page of his brief by noting that the issue here "is one of first impression."  *See* Opp. Br. at 20.

[8]   *Hartsel v. Vanguard Grp., Inc.*, CA No. 5394, 2011 Del. Ch. LEXIS 89, at *109 (Del. Ch. Jun. 15, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012), *cert. denied*, 80 U.S.L.W. 3708 (U.S. June 25, 2012) (11-1259).

[9]   *See Perrin v. United States*, 444 U.S. 37, 42 (1979); *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000).

[10]   *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003).

[11]   *See, e.g.,* 15 U.S.C. § 78t(a).  Minority shareholders generally have no control or influence over the day-to-day management and operation of corporations in which they own stock.  *See United States v. Wallach*, 935 F.2d 445, 462 (2d Cir. 1991).  These established principles directly contradict Plaintiff's unsupported assertion that "[o]wnership is by its nature passive, but it is hardly innocent."  (Opp. Br. at 19)  If that was true, Congress would not need to pass statutes like

using "everyday speech" would take from the text and legislative history to be the intended

targets of Section 1955 — owner-operators and organized crime figures (S. Rep. No. 91-617 91st

Cong., at 86, 88 (1969)), not passive investors who purchase listed stock in a public market.

   Other basic principles of statutory construction also confirm that Plaintiff's

interpretation of "own" must be rejected:

- Context determines meaning for statutes. *See Johnson v. United States,* 130 S. Ct. 1265, 1271 (2010). The terms that precede "owns" in Section 1955 — conduct, finance, manage, supervise, and direct — connote influence over, responsibility for, or participation in the gambling operation itself, and "owns" should be read in the same context.

- When assessing the reach of a federal criminal statute, courts "must pay close heed to language, legislative history, and purpose ... ." *Dowling v. United States*, 473 U.S. 207, 213 (1985). That the text and legislative history of Section 1955 do not specifically address whether owning publicly-traded stock would violate the statute (H.R. Rep. No. 91-1549, pt. 802 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007, 4029) strongly suggests that Plaintiff's interpretation of "own" is inconsistent with Congress' intent.

- "A statute should be interpreted in a way that avoids absurd results." *Dauray*, 215 F.3d at 264. Plaintiff now admits that under his theory, simply moving to the U.S. while owning 888 or NETeller stock would be a felony. *See* Opp. Br. at 21 n.18. If Congress intended that it would have said so very, very clearly.

- Finally, ambiguous criminal statutes are *never* interpreted expansively because the rule of lenity *always* requires ambiguities to be resolved in a defendant's favor.[12] Contrary to Plaintiff's contention, it is not clear that "own all or part of" includes the ownership of publicly-traded shares of corporations listed on non-U.S. markets.[13] The rule of lenity would thus preclude Plaintiff's interpretation of Section 1955 even if it were plausible.

---

15 U.S.C. § 78t(a).

[12]  *See generally United States v. Santos*, 553 U.S. 507, 514 (2008) ("Under a long line of our decisions, the tie must go to the defendant.").

[13]  A recent opinion by the Department of Justice regarding the Wire Act (18 U.S.C. § 1084) confirms that Plaintiff's interpretation of Section 1955 is at best suspect. The Wire Act was the basis for many of the cases Plaintiff claims were "red flags" that should have given notice that the operations of companies like 888 and NETeller were illegal. The DOJ recently examined the text and legislative history of the Wire Act and opined that the Wire Act prohibits *only* sports-related gambling activities, *see* Henkin Reply Decl. Exh. A, which neither 888 nor NETeller engaged in with U.S. customers. Not only does that analysis cast doubt on Plaintiff's "red flag" allegations, it confirms that Section 1955 is at the very least ambiguous with respect to the purchase and ownership of publicly-traded stock listed on a non-U.S. exchange.

B.    **Section 1955 Cannot Be Applied Extraterritorially**

At the most basic level, Plaintiff's effort to show that his construction of Section 1955 is valid fails because his view of what "extraterritorial" means is wrong.  Plaintiff asserts that foreign sovereigns "cannot give U.S. citizens license to invest in criminal enterprises that violate U.S. law."  (Opp. Br. at 3 n.3)  But foreign sovereigns can permit what they want within their own jurisdictions — the question is whether any federal statute can be interpreted to punish conduct that occurs in those jurisdictions and complies with their laws.[14]  The presumption against extraterritoriality states that unless Congress clearly and specifically states that its intent is for a statute to apply to foreign conduct, the statute cannot be interpreted to do so.

In that context, it is critical that Plaintiff does not dispute that the Fund's purchases of 888 and NETeller were made on the LSE and were legal in the U.K.  Instead, Plaintiff argues there is no extraterritorial application of U.S. law here because the ownership of the 888 and NETeller shares "occurred in the U.S."  (Opp. Br. at 22)  Plaintiff cites no authority to support that argument and ignores decisions confirming that where the purchaser of stock is located does not permit statutes to apply to what is otherwise foreign conduct.[15]  Indeed, Plaintiff concedes that his interpretation would apply to a transaction that took place entirely outside the

---

[14]    *See generally Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2885 (2010) (rejecting precisely the sort of disdain for foreign regulatory authorities Plaintiff's arguments reflect, the Supreme Court held that a securities transaction that took place in Australia should be regulated by Australia under Australian law).  Plaintiff tries to evade *Morrison* by asserting that it only applies to U.S. securities laws (Opp. Br. at 22 n.19), but that is wrong.  *Morrison* stated a general rule of construction for *all* federal statutes.  *See Morrison*, 130 S. Ct. at 2877; *see also European Cmty. v. RJR Nabisco, Inc.,* 814 F. Supp. 2d 189, 193 (E.D.N.Y. 2011) (*Morrison* "bars the extraterritorial application of federal statutes that are silent on or unclear concerning extraterritoriality").

[15]    *See IA Def. Br. at 13-14 & nn.50 & 54; accord Norex Petroleum Ltd. v. Access Indus.*, 631 F.3d 29, 33 (2d Cir. 2010) (isolated domestic conduct did not permit RICO to apply to essentially foreign activity); *United States v. Philip Morris USA, Inc.*, C.A. No. 99-2496 (GK), 2011 U.S. Dist. LEXIS 32053, at *28-29 (D.D.C. Mar. 28, 2011) (similar); *Cedeno v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 473 (S.D.N.Y. 2010) (similar).

U.S. and was legal where it happened, claiming that a purchaser would violate Section 1955 by moving to the U.S. after buying 888 stock.  (Opp. Br. at 21 n.18)  As in *Morrison*, there is no textual basis to interpret Section 1955 as Plaintiff seeks to interpret it.

Moreover, Plaintiff's argument that Section 1955 should not be read to create an implied exception here (Opp. Br. at 20) gets the inquiry backwards and contradicts the established presumption that <u>no</u> U.S. statutes have extraterritorial application unless Congress says so specifically.  In *Morrison*, the Solicitor General argued that extraterritorial application of the securities laws was necessary to prevent the U.S. from becoming a Barbary Coast for wrongdoers perpetrating frauds in other markets, and the Supreme Court rejected the argument because it had no textual basis.  Plaintiff's argument here is substantively identical to the argument that was rejected in *Morrison*.[16]  Because Section 1955 contains no indication that it was intended to apply extraterritorially, it is inapplicable to the Fund's purchase and ownership of 888 and NETeller shares on the LSE.

C.     **Plaintiff's Own Example Undermines His Entire Case**

In response to a question posed in the Investment Advisor Defendants' Opening Brief about whether Plaintiff's legal theory could make a Parisian investor liable for purchasing NETeller or 888 stock on the LSE, Plaintiff states that such an investor would violate Section 1955 if he or she did not sell the stock before moving to the U.S.  (Opp. Br. at 21 n. 18)  That concession underscores the absurdity of Plaintiff's argument.

Under Plaintiff's theory, every time someone considers moving to the U.S., he or she must take inventory of his or her investment portfolio to make sure that he or she does not

---

[16]     *Compare* 130 S. Ct. 2869 at 2886 *with* Opp. Br. at 20 ("Defendants' proposed judicially-created loophole for illegal businesses listed on foreign exchanges would effectively legitimize off-shore havens for illegal conduct, and it would effectively permit foreign stock exchanges to veto U.S. law and given criminal enterprises the ability to access U.S. investment capital").

own any shares of stock that could be deemed to violate any U.S. criminal law.  In Plaintiff's

view, if that person owns any such stock, he or she must sell it before becoming a U.S. resident

or risk being deemed a criminal.  Plaintiff cites nothing interpreting Section 1955 in that way.

And the structure of the OCCA — through which Section 1955 was enacted — confirms that

Congress' failure to say that investing in publicly-traded stock was illegal under Section 1955

means it did not intend that result:  Congress did make certain purchases of publicly-traded stock

illegal through 18 U.S.C. § 1962(a), which prohibits using the proceeds of racketeering activity

to purchase any publicly-traded stock in certain circumstances.  Congress knew how to prohibit

the purchase of publicly-traded stock when it intended that result and did so in another part of the

law in which Section 1955 itself was enacted.  That compels the conclusion that Congress did

not intend Section 1955 to do the same thing.

D.     **The Fund's Investments In 888 And NETeller Did Not Violate State Law**[17]

        The Opposition Brief does not address Delaware anti-gambling law and thus

concedes that the Fund's investments did not violate that law.[18]  And Plaintiff flatly admits that

the Defendants did not violate N.Y. Penal Law § 225.00 and § 460.25.  (Opp. Br. at 22-23)

Instead, Plaintiff alleges that Defendants (i) violated N.Y. Penal Law § 110.00 by attempting to

---

[17]     Plaintiff's attempt to get around the Dormant Commerce Cause (Opp. Br. at 23) fails.  Because Plaintiff's proposed interpretations of state laws would result in states regulating conduct outside their borders — which the Dormant Commerce Clause prohibits, *see Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102 (2d Cir. 2003) — those interpretations must be rejected.  Plaintiff attempts to get around this problem by arguing that states may prohibit transactions between in-state gamblers and out-of-state gambling companies (Opp. Br. at 23), but this misses the point for the same reasons Plaintiff's arguments about Section 1955 fail — purchasing stock in the secondary market on the LSE is not the same as the direct contacts between companies and gamblers Plaintiff relies on.  *Rousso v. State*, 239 P.3d 1084 (Wash. 2010) (*en banc*), was about prohibiting transactions between gamblers and in-state residents, not foreign secondary market stock transactions.  In any event, *Rousso* is not binding on this Court because, *inter alia*, it is a state court interpretation of federal law.  *See* Opp. Br. at 24 n.20 (acknowledging this principle).

[18]     *See Dorchster Investors v. Peak Trends Trust*, No. 99 Civ. 4696 (LMM), 2003 WL 223466, at *2 (S.D.N.Y. Feb. 3, 2003); *Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 670 (S.D.N.Y. 2000).

violate § 225.05 and (ii) violated N.Y. Penal Law §100.00 by conspiring to violate or soliciting

violation of § 225.05.  (Opp. Br. at 23)  But the Fund purchased stock on the LSE, and Plaintiff

alleges no transactions directly between the Fund and 888 or NETeller.  Thus, the Fund's

secondary market investments cannot conceivably qualify as "materially aiding" a gambling

company, nor could the transactions qualify as "solicit[ing], request[ing], command[ing],

importune[ing] or otherwise attempt [ing]to cause" another person to engage in illegal conduct

because Plaintiff does not allege that any Defendant participated in the operations of 888 or

NETeller.[19]  And just as with his main argument based on Section 1955, Plaintiff cites no

decisions applying New York law in the way Plaintiff claims it should be applied.

II.     **THE AMENDED COMPLAINT FAILS TO ALLEGE RICO CLAIMS**

A.     **Plaintiff Has Not Alleged Predicate Acts**

Plaintiff has created a new problem for himself by trying to re-ground his claims

in public policy arguments about what mutual funds should and should not be allowed to invest

in, because (i) such claims are not enumerated RICO predicate acts under 18 U.S.C. § 1961(1)

and (ii) without predicate acts as defined in § 1961(1), RICO claims necessarily fail.  In any

event, Plaintiff concedes that the only predicate act alleged that conceivably fits within § 1961(1)

is the alleged violation of Section 1955.[20]  Because owning 888 and NETeller stock did not

violate Section 1955, Plaintiff has pleaded no RICO predicate acts and the RICO claims fail.

B.     **Plaintiff Cannot Establish RICO Proximate Cause**

Although he concedes that *McBrearty v. Vanguard Group, Inc.,* No. 08 Civ 7650

---

[19]     Indeed, for Plaintiff to press these claims under New York law with sincerity, he would have to
allege that the counterparties to the Fund's LSE transactions themselves violated the same
statutes, which would confirm that Plaintiff is seeking the blanket application of U.S. law to LSE
transactions.

[20]     Opp. Br. at 26.  Plaintiff does not purport to allege any state law predicate acts (nor could he).
*See* IA Def. Br. at 21 n.76.

(DLC), 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *aff'd,* 353 Fed. App'x 640 (2d Cir. 2009), *cert. denied,* 130 S. Ct. 3411 (2010) and *Seidl v. Am. Century Cos., Inc.,* 713 F. Supp. 2d 249 (S.D.N.Y. 2010), *aff'd,* 427 Fed. App'x 35 (2d Cir.), *cert. denied,* 132 S. Ct. 846 (2011) are "similar cases" which were dismissed for lack of RICO proximate causation, Plaintiff argues that the Court should ignore those decisions because *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310 (2d Cir. 2011) supposedly "undercuts" their "reasoning."  (Opp. Br. at 26-27)  Plaintiff is wrong.

Like this case, *McBrearty* and *Seidl* involved claims brought under § 1962(c) and (d), whereas *Ideal Steel* involved claims brought under § 1962(a).  The district court dismissed Ideal Steel's § 1962(a) claim for lack of proximate causation.  The Second Circuit reversed, concluding that the proximate causation standards under § 1962(a) and § 1962(c) are different and that the act constituting the alleged violation in *Ideal Steel* — the use or investment of the proceeds of racketeering activity to open a competing store — was the act that caused Ideal Steel's alleged injury.  *See* 652 F.3d at 323.  That is different from § 1962(c), which requires the racketeering injury to flow directly from the alleged predicate acts themselves.  The Second Circuit confirmed that distinction in *Ideal Steel* itself (*see id.* at 326-27), the Supreme Court had previously noted it in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006), and Judges Sand and Rakoff recently noted the continuing vitality of *McBrearty* (*see* IA Def. Br. at 21).  *McBrearty* and *Seidl* thus require that the RICO claims be dismissed.[21]

---

[21]   Plaintiff's reliance on *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008) (Opp. Br. at 27 n.21) is also misplaced.  *Bridge* addressed whether a plaintiff asserting a RICO claim predicated on allegations of mail fraud must plead and prove that it relied on the alleged misrepresentations. *See* 553 U.S. at 641.  That is not the RICO proximate cause issue decided in *McBrearty* and *Seidl*, and the courts that have considered the issue have held that *Bridge* does not save claims like those asserted here.  *See Wodka v. Causeway Capital Mgmt.*, 433 Fed. Appx. 563, at *1 (9th Cir. 2011) (affirming dismissal despite arguments based on *Bridge*); *McBrearty*, 353 Fed.Appx. 640, at *1 n.2 (similar).  And the Supreme Court denied *certiorari* in *McBrearty*, *Seidl*, and *Wodka* despite Plaintiff's counsel's arguments that the decisions were inconsistent with *Bridge*.

C.     **Plaintiff's RICO Claims Fail For Other Reasons As Well**

As set forth in the Investment Advisor Defendants' Opening Brief, Plaintiff's

RICO claims fail for three additional reasons:  (i) RICO does not apply extraterritorially, (ii)

Plaintiff fails to plead a proper RICO enterprise, and (iii) Plaintiff fails to plead continuity.  (IA

Def' Br. at 22)  Plaintiff does not respond to the argument that RICO does not apply

extraterritorially, thus conceding that argument.

Trying to respond to the fact that he has failed to plead a proper RICO enterprise

because the Fund cannot be both the victim and the enterprise, Plaintiff relies on *Cullen v.*

*Margiotta*, 811 F.2d 698 (2d Cir. 1987) and *Mark v. J.I. Racing, Inc.*, 92-cv-5285(FB), 1997 WL

403179 (S.D.N.Y. July9, 1997).  (Opp. Br. at 28)  But neither case addressed whether one entity

can be both the RICO enterprise and the RICO victim.

Plaintiff argues that he has adequately pleaded open-ended continuity "because

Defendants' conduct posed a threat of continuing criminal activity that was halted only because

of law enforcement activity."  (Opp. Br. at 28)  But in determining whether the threat of long-

term criminal conduct necessary for open-ended continuity exists, a court must examine the

nature of the predicate acts alleged and the enterprise at whose behest the predicate acts were

performed.[22]  Because secondary market stock purchases are not illegal, the predicate acts

alleged do not suffice to plead open-ended continuity.  Similarly, Plaintiff does not allege that

the Fund had a propensity to engage in criminal conduct, and so Plaintiff cannot rely on the

nature of the alleged enterprise to establish open-ended continuity.[23]  Plaintiff also has not

---

[22]     *Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 97 (2d Cir. 1997).

[23]     All Plaintiff has alleged is that the Fund did what mutual funds do — invest in securities.  That is
not sufficient to plead a RICO claim.  *Cf. People v. W. Express Int'l Inc.*, No. 156, 2012 N.Y.
LEXIS 2726, at *12-14 (N.Y. Oct. 18, 2012) (the normal way that a business is configured did
not suffice to indicate a distinct structured criminal enterprise for the purposes of New York's
RICO statute).

adequately alleged closed-ended continuity.  The Second Circuit will not find closed-ended

continuity "where the predicate acts spanned fewer than two years."[24]  By Plaintiff's own

admission, the alleged wrongdoings here spanned less than two years (Compl. ¶¶ 51-59).[25]

      Accordingly, the RICO claims fail and must be dismissed.

III.    **PLAINTIFF'S STATE LAW CLAIMS MUST BE DISMISSED**

    A.    **Plaintiff Has Not Stated A Claim for Breach Of Fiduciary Duty Or Gross Negligence**

      Plaintiff argues that he has adequately pleaded breach of fiduciary duty and gross

negligence by alleging that it was "illegal" to invest in NETeller and 888, which Plaintiff calls

"known criminal enterprises."  But as discussed in detail in the Investment Advisor Defendants'

Opening Brief, Plaintiff has failed to allege any facts even suggesting that the Investment

Advisor Defendants knew or should have known that investing in NETeller and 888 violated any

federal or state anti-gambling laws.[26]  Nor has Plaintiff cited any cases holding (or even

prosecutorial actions claiming) that such investments are illegal.

      Plaintiff attempts to distinguish *In re Citigroup Inc. Shareholder Derivative*

*Litigation*, 964 A.2d 106 (Del. Ch. 2009) by arguing that this case involves allegations of

---

[24]    *See Fresh Meadow Food Servs. LLC*, 282 Fed. App'x. at 94, 98; *see also GICC Capital Corp. v. Tech. Fin. Grp.*, 67 F.3d 463, 469 (2d Cir. 1995) (11 month period not sufficient).

[25]    Even if the alleged wrongdoings had spanned more than two years, Plaintiff's attempt to plead closed-ended continuity would still fail.  "[A] plaintiff must provide some basis for a court to conclude that defendants' activities were 'neither isolated nor sporadic.'"  *Fresh Meadow Food Servs. LLC*, 282 Fed. App'x. at 99.  But all Plaintiff has alleged is that the Fund invested in two stocks Plaintiff (in hindsight) did not like.

[26]    Plaintiff argues that ignorance of what he claims the law is — critically, no court has ever agreed with him — is not a defense and, citing *Long v. State*, 65 A.2d 489 (Del. 1949), argues that in order to avoid liability Defendants must prove a reasonable effort to "ascertain and abide by the law."  (Opp. Br. at 15)  *Long* is inapposite because it applied Delaware's bigamy statute to conclude that an attorney's mistaken advice excused defendant's failure to properly divorce his wife before remarrying.  65 A.2d at 282-83.  But a plaintiff alleging bad faith conduct by officers or directors must plead facts demonstrating that defendants actually knew that "their conduct was legally improper."  (*See* IA. Def. Br. at 24)  Plaintiff has not tried to meet (or even acknowledged) this burden.

criminal conduct whereas *Citigroup* involved excessively risky investments.  (Opp. Br. at 11)

Specifically, Plaintiff argues that Defendants acted in bad faith because public documents

showed that 888 and NETeller were running illegal gambling operations and that either (i)

Defendants were aware of these documents and knowingly caused the Fund to violate the law by

purchasing the stocks or (ii) Defendants acted recklessly if they were unaware of such

documents.  (Opp. Br. at 16-17)  But that argument is substantively identical to the argument

made by the *Citigroup* plaintiffs, and Plaintiff's arguments fail for the same reasons the

arguments failed in *Citigroup*.[27]

       Plaintiff also tries to evade Delaware's statutory requirement that the propriety of

investments in a portfolio be judged in light of the performance of the entire portfolio.  (Opp. Br.

at 17)  On the one hand, Plaintiff entirely ignores the authority the Investment Advisor

Defendants cite, thus conceding those arguments.  *See* IA Def. Br. at 30.  The only authority

Plaintiff does cite (*Trans World Airlines, Inc. v. Summa Corp.*, No. 1607, 1986 WL 5671, at *13

(Del. Ch. May 15, 1986)) does not contradict the Investment Advisor Defendants' arguments

because that case addressed a transaction that was subject to intrinsic fairness review, which has

no application here (nor has Plaintiff claimed otherwise).

       Finally, Plaintiff's contention that an alleged violation of Section 1955 supports a

---

[27]    *See Citigroup*, 964 A.2d at 126-28.  Moreover, Plaintiff's contention that Delaware law allows "the assertion of breach of fiduciary claims with breach of contract claims" misstates Delaware law.  (Opp. Br. at 15)  "It is a well-settled principle [under Delaware law] that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim.  In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous."  *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010).  Here, the relationship between the Fund and the Investment Advisor Defendants arises from and is governed by the Management Agreement.  Indeed, but for the Management Agreement the Investment Advisor Defendants would not have any right or obligation to manage the Fund.  Moreover, the Management Agreement contractually limits the Investment Advisor Defendants' duties and obligations to the Fund.  Accordingly, Plaintiff's breach of fiduciary duty claim must be dismissed under *Nemec*.

negligence *per se* claim misses the mark.  *First*, although Plaintiff argues that recovery under negligence *per se* falls "squarely within the stated purpose" of Section 1955 because the OCCA "refers to 'harm to innocent investors' and the corruption of 'legitimate businesses'" (Opp. Br. at 12), he fails to note that Congress' express purpose in enacting Section 1955 was to halt the influence of organized crime (115 Cong. Rec. 10735 (1969); 116 Cong. Rec. 590 (1970); 116 Cong. Rec. 603 (1970)) — Plaintiff's claims do not relate to that purpose.  *Second*, Congress did create a way to bring private claims relating to alleged violations of Section 1955 — the RICO statute itself.  But that is the <u>only</u> such mechanism Congress created, it does not apply here, and Plaintiff cannot evade that problem by arguing negligence *per se*.  *Third*, Plaintiff's invocation of negligence *per se* is inconsistent with New York law.  Although it is true that violations of federal statutes and regulations can <u>sometimes</u> be given negligence *per se* effect in state tort proceedings, the New York legislature has decided that it does not wish there to be a private right of action relating to anti-gambling statutes by expressly repealing the private right of action that it had previously enacted.  (*See* IA Def. Br. at 19-20)  Allowing an alleged violation of federal law to serve as the basis for a state law negligence *per se* claim when (i) the sole federal enforcement mechanism created by Congress does not apply and (ii) the state legislature has expressly repealed an analogous enforcement mechanism would not be consistent with federal or New York law.[28]

B.     **Plaintiff Has Not Stated A Claim For Waste**

Plaintiff argues that he has adequately pleaded a claim for waste because "the question is whether the 'investments' are properly characterized as the use of corporate assets for an 'improper' or 'unnecessary' purpose" and he has adequately alleged that the investments were

---

[28]     *See Burns Jackson Miller Summit & Spitzer v. Linder*, 451 N.E.2d 459, 465-66 (N.Y. 1983); *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005).

improper and unnecessary.  (Opp. Br. at 16-17)  As an initial matter, the Amended Complaint does not even satisfy the test Plaintiff sets for himself because Plaintiff has not demonstrated that buying stock listed on the LSE was in any way "improper" or "unnecessary."  Indeed, Delaware law specifically permits funds to buy foreign stock (Del. Code Ann. tit. 12 § 3302 (2012)).  In any event, the test for waste is whether a plaintiff has pleaded that defendants "irrationally squander[ed] corporate assets."[29]  As set forth in the Investment Advisor Defendants' Opening Brief, Plaintiff cannot satisfy that test because (as Plaintiff concedes) the 888 and NETeller investments were undertaken in arms-length secondary market transactions with willing buyers and sellers.

C.    **Plaintiff Has Not Stated A Claim For Breach Of Contract**[30]

Plaintiff tries to avoid the fact that he did not make a demand relating to a breach of contract claim by arguing that the claim was encompassed within the demand he did make. (Opp. Br. at 17)  But Plaintiff did not demand that the Board pursue any claims that in the Board's view might have been warranted by a set of facts, he demanded that the Board pursue the specific claims pleaded in *Gamoran II*, which did not include a breach of contract claim.  The simple facts are that Plaintiff (i) did not make a demand relating to the breach of contract claim and (ii) cannot claim that demand was excused.[31]  That alone requires dismissal of the claim.

---

[29]   *See White v. Panic*, 783 A.2d 543, 554 (Del. 2001); *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000); *see also Taylor v. Kissner*, C.A. No. 11–635–RGA, 2012 WL 4461528, at *9 (D. Del. Sep. 27, 2012) ("A claim of waste requires the pleading of particularized facts demonstrating that 'the consideration received by the corporation was so inadequate that no person of ordinary sound business judgment would deem it worth that which the corporation paid.'") (citation omitted).

[30]   By not responding to the Investment Advisors' argument that defendants NB and Messrs. Segal, Sundman, and Rivkin cannot be liable for breach of the Management Agreement because they are not parties to the Agreement (IA Def. Br. at 28-29), Plaintiff concedes that argument.

[31]   *Grimes v. McDonald*, 673 A.2d 1207 (Del. 1996), is no help to Plaintiff.  *Grimes* held that a plaintiff cannot argue that demand was excused for a legal theory arising out of the set of facts described in a demand, even if that theory was not discussed in the demand.  *See* 673 A.2d at 1219.  *Grimes* thus limits a plaintiff's ability to argue that demand was excused for one claim

Plaintiff concedes that the Management Agreement exculpates the Investment Advisory Defendants from any liability arising from "any error of judgment or mistake of law," but argues that the Investment Advisor Defendants' conduct fits within the carve-out for claims for "willful misfeasance, bad faith, or gross negligence."  (Opp. Br. at 17)  This argument fails because Plaintiff has not alleged any facts even suggesting that the Investment Advisor Defendants acted with "willful misfeasance, bad faith, or gross negligence."  Specifically, Plaintiff has not alleged that the Investment Advisor Defendants knew or should have known that investing in publicly traded securities could or did violate federal or state anti-gambling laws. Therefore, to the extent the Investment Advisor Defendants were mistaken about the legality of investing in the stock of public companies listed on a foreign exchange — which Delaware law specifically permits (Del. Code Ann. tit. 12 § 3302 (2012)) — they would be protected from liability under the express terms of the Management Agreement.[32]

## IV.   PLAINTIFF'S CLAIMS ARE TIME BARRED

Plaintiff does not dispute that (i) the limitation periods for the Amended Complaint's state law and RICO claims are three and four years, respectively, (ii) those periods began to run no later than November 6, 2006, when the Fund disclosed its last purchase of 888 and NETeller stock, and (iii) those periods were not tolled, either by the stipulation in *Gamoran I* or the dismissal in *Gamoran II*.  Indeed, Plaintiff affirmatively pleaded that the relevant limitation periods would have expired on August 25, 2011 if Plaintiff had not filed *Gamoran III*

---

arising from a given set of facts when demand was made for another such claim, but it says nothing about how to interpret a demand when a plaintiff has deliberately drafted it narrowly.

[32]   Plaintiff cites no authority for his fallback argument that the supposedly "general" exculpation provision must give way to the supposedly "specific" provision of the Management Agreement obligating management of the Fund in accordance with applicable law.  (Opp. Br. at 16)  In any event, it is the exculpation provision that is more "specific" here, so Plaintiff's own distinction would do in his claims even if that distinction made a difference.

on August 24, 2011.  (*Gamoran III* Compl. ¶ 122)

But when the Court dismissed *Gamoran III* without setting a date certain for repleading, any statutes of limitation that would have expired on August 25, 2011 started running again, leaving Plaintiff one day to refile.[33]  Instead, he took 34 days, meaning that by Plaintiff's own argument the statutes of limitation expired 33 days before Plaintiff filed the Amended Complaint.  Plaintiff's argument that the Amended Complaint "relates back" (Opp. Br. at 49) is thus irrelevant.[34]

Finally, Plaintiff's arguments about tolling agreements (Opp. Br. at 49) are a red herring.  There was only one tolling agreement between Plaintiff and the defendants — the stipulation in *Gamoran I*  — and Plaintiff concedes that that agreement expired and does not apply here.[35]

Plaintiff's claims are untimely and must be dismissed.

## V.    PLAINTIFF SHOULD NOT BE GIVEN LEAVE TO AMEND

Plaintiff boldly requests leave to amend his Amended Complaint in the event the Court concludes that it "is in any way deficient."  (Opp. Br. at 50)  That boilerplate request should be denied:

---

[33]    *See In re Direxion Shares ETF Trust*, No. 09-cv-8011 (KBF), 2012 WL 717967, at *6 (S.D.N.Y. Mar. 6, 2012); *see also Brennan v. Kulick*, 407 F.3d 603, 606 (3d Cir. 2005) ("A statute of limitations is not tolled by the filing of a complaint subsequently dismissed without prejudice.").

[34]    If Plaintiff means to argue that his Amended Complaint "relates back" to complaints filed in *Gamoran I* or *II*, he is plainly mistaken — amended complaints do not relate back to complaints filed in previous actions.  *See Gannon v. Continuum Health Partners, Inc.*, 06 Civ. 5133 (CM), 2007 U.S. Dist. LEXIS 51396, at *10-11 (S.D.N.Y. July 11, 2012).

[35]    Plaintiff's contention that defendants "persuade[d]" Judge Sand to dismiss *Gamoran II* by representing that they would enter into tolling agreements (Opp. Br. at 48) is simply wrong. *Gamoran II* was dismissed because Judge Sand believed that Plaintiff's post-filing demand gave him no other choice, whereas the Investment Advisor Defendants strenuously objected to dismissal without reaching the merits and did not try to persuade Judge Sand to do anything other than dismiss the case on the merits.  *See* Henkin Decl. Exh. E at 13-18.

- Courts are not required to grant leave to amend when a plaintiff makes an informal request in an opposition to a motion to dismiss.[36]

- Courts properly decline to grant leave where, as here, a plaintiff does not explain how defects would be cured by amendment.[37]   As discussed above, it is abundantly clear that amendment would be futile here.

- This is Plaintiff's fourth complaint alleging claims based on the same underlying facts.  Plaintiff and his counsel have had more than enough chances to plead their claims against the defendants and to plead substantively identical claims in other cases before this Court and other courts.

Enough is enough — the defendants are entitled to be done with Plaintiff's accusations.

## CONCLUSION

For all the foregoing reasons, as well as the reasons set forth in the Investment

Advisors' Opening Brief, the Amended Complaint should be dismissed with prejudice.

Dated:  New York, New York
      November 5, 2012

Respectfully submitted,

MILBANK, TWEED, HADLEY & McCLOY LLP

By:   /s Douglas W. Henkin
    James N. Benedict
    jbenedict@milbank.com
    Alan J. Stone
    astone@milbank.com
    Douglas W. Henkin
    dhenkin@milbank.com
    Mia C. Korot
    mkorot@milbank.com
1 Chase Manhattan Plaza
New York, NY  10005-1413
(212) 530-5000
*Attorneys for Defendants Neuberger Berman Management LLC, Neuberger Berman, LLC, Benjamin Segal, Peter E. Sundman, and Jack L. Rivkin.*

---

[36]    *See In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 220 (2d Cir. 2006).

[37]    *See Porat v. Lincoln Towers Comty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006).